**SIRI & GLIMSTAD LLP**
Aaron Siri (*Pro Hac Vice* to be Filed)
Email: aaron@sirillp.com
Elizabeth A. Brehm (*Pro Hac Vice* to be Filed)
Email: ebrehm@sirillp.com
200 Park Avenue
Seventeenth Floor
New York, NY 10166
Telephone: 212-532-1091
Facsimile: 646-417-5967

Caroline Tucker (SBN 261377)
Email: ctucker@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: 213-376-3739
Facsimile: 646-417-5967

Attorneys for Plaintiff
ROCKMOND DUNBAR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ROCKMOND DUNBAR, | Case No.  2:22-cv-1075 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| THE WALT DISNEY COMPANY; TWENTIETH CENTURY FOX TELEVISION, A UNIT OF TWENTIETH CENTURY FOX FILM CORPORATION DOING BUSINESS AS 20TH TELEVISION, | |
| Defendants. | |

1

Rockmond Dunbar by and through counsel, and for his Complaint against Defendants, hereby states as follows:

## INTRODUCTION

1.     Over the past 30 years, Rockmond Dunbar ("**Mr. Dunbar**") has created a well-respected career as a black working actor, writer, and producer.  During that career, he has frequently been one of only a handful of black leading men appearing on network television.  He is well respected by his peers and employers and had built a sterling reputation in the entertainment industry by appearing in numerous successful television shows such as "Soul Food," "Prison Break," "The Mentalist," and "Sons of Anarchy."

2.     Since 2013, he and his family have been adherents to the teachings of the Church of Universal Wisdom ("**Universal Wisdom**"), which preaches that God and nature are one and that healing comes from God downward to His followers, which in turn emanates from within His followers.  Followers of Universal Wisdom, including Mr. Dunbar, believe they are obligated to avoid medical intervention that introduces disease into the body.  Mr. Dunbar has frequently adhered to this obligation by forgoing various medical interventions.   Mr. Dunbar is now compelled to bring this action because Defendants severely damaged his career by discriminating against him based on his race and religion.

3.     Mr. Dunbar has been the only black male lead actor on the hit television show "9-1-1" since it debuted.  Showing dedication to their work and employers, he and his castmates continued working throughout the entire pandemic, taking reasonable precautions to protect against COVID-19 infection.  In fact, all of the current season of the show was shot in either 2021 or 2022.  In September 2021, Defendants introduced a new policy mandating that all employees be vaccinated against COVID-19, but allowed actors like Mr. Dunbar to request an accommodation based on either medical or religious reasons.   Mr. Dunbar submitted paperwork seeking both a religious and a medical accommodation which included personal statements regarding his faith and a clergy letter

attesting to his membership in Universal Wisdom.  The producer of "9-1-1" assured Mr. Dunbar that he wanted him to remain with the show and that they could adjust his schedule to accommodate Mr. Dunbar's need to avoid obtaining the COVID-19 vaccine. In fact, Mr. Dunbar understands that other members of the "9-1-1" cast and crew who also could not be vaccinated have been accommodated, though none sought a religious exemption and none were black.

4.     Nevertheless, the administrators who work for Defendants never took Mr. Dunbar's requests for accommodations seriously.  They openly mocked his beliefs and proceeded to deny Mr. Dunbar his accommodations based on nothing more than rank hearsay and assumptions. Defendants refused to believe Mr. Dunbar's doctor's recommendation, and they refused to engage with Mr. Dunbar in any meaningful interactive communication regarding his religious beliefs, which is particularly unfortunate because, if they had, he could have explained that all of their assumptions were incorrect.  Because they refused to accommodate him, in October 2021, Defendants barred him from the "9-1-1" set.  However, the "9-1-1" producers ensured that his character's story showed him leaving temporarily, and made clear that he could return to the show at any time.

5.     Thereafter, Mr. Dunbar retained the undersigned counsel to assert his right to proper accommodations.   In retaliation, Defendants summarily terminated Mr. Dunbar's employment agreement, and refused to pay him the hundreds of thousands of dollars that are still owed to him.  Then, wanting to make an example out of Mr. Dunbar, he believes that Defendants wrongfully leaked negative information to the media about his departure from "9-1-1" including that he sought both religious and medical exemptions that were denied.   Defendants deliberately made it sound like Mr. Dunbar was a recalcitrant anti-vaxxer, rather than present the truth – that like millions of other Americans, he is a sincere adherent to a non-mainstream religious belief that prevents him from being vaccinated.

6.      After articles appeared in the media touting Defendants' story about Mr. Dunbar, he essentially became persona non grata in his industry.  Despite his decades of successful work, and continuing interest in him to play various roles, agents and casting directors have made clear that he is on a no-hire list due to his beliefs.  In addition, before Defendants' efforts to retaliate against him, Mr. Dunbar and his wife had obtained financing for a movie project that they had written and were set to produce.  Yet, numerous A and B list actors who were interested in working with him, refused to do so after the articles came out for fear of being blacklisted by merely being associated with Mr. Dunbar.

7.      Defendants' actions violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.* ) ("**Title VII**")*,* the California Fair Employment Housing Act (Cal. Gov. Code § 12900, *et seq.* ) ("**FEHA**"), and common law principles of contract law. Mr. Dunbar now brings this action to clear his name and recover for the damage that Defendants' discriminatory actions caused to him and his family.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e-2, 42 U.S.C.  § 1985(3) and 28 U.S.C. § 1331 because this action arises under federal law.

9.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, for state law claims under California Government Code § 12940, because such claims stem from part of the same case or controversy arising from a common nucleus of operative fact.

10.      Venue is proper in this district as Defendants operate corporate headquarters in this district, and one or more of Defendants' acts and those events complained of occurred herein, pursuant to 28 U.S.C. § 1391.

11.      The Plaintiff and Defendants consented to the exclusive jurisdiction and venue in this Court in the Plaintiff's employment contract pursuant to 28 U.S.C. § 1404(a).

12. This Court is authorized to grant Mr. Dunbar declaratory relief pursuant to 28 U.S.C. § 2202.

13. This Court is authorized to grant Mr. Dunbar prayer for relief regarding costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 2000e-5(k); and California Government Code § 12965(b).

## PARTIES

14. Mr. Dunbar is a resident of the State of Georgia.

15. Defendant The Walt Disney Company ("**Disney**") is a corporation qualified to do business in the state of California, with corporate offices at 500 S. Buena Vista Street, Burbank, CA 91521.

16. Defendant Twentieth Century Fox Television, a unit of Twentieth Century Fox Film Corporation doing business as 20th Television ("**Fox**") is a corporation qualified to do business in the state of California, with corporate offices at 10201 W. Pico Boulevard, Los Angeles, CA 90035. In 2019 Disney acquired Fox, making it a wholly owned subsidiary of Disney. On information and belief, Fox and Disney share many resources, including legal services and some resources involved in creating COVID-19 policy and/or providing exemptions to that policy.

17. Each of Defendants employs more than 15 employees.

18. Defendants are employers within the meaning of California and Federal statutory provisions cited herein.

19. All of the above paragraphs are incorporated into the following factual averments and claims as if fully set forth therein. Each of the following facts are incorporated into all of the others as if fully set forth therein.

## FACTUAL ALLEGATIONS

### Mr. Dunbar's Religious Beliefs

20. Mr. Dunbar has been an adherent to the teachings of the Church of Universal Wisdom ("**Universal Wisdom**") since 2013 following the birth of his first child. In that

COMPLAINT

time, Mr. Dunbar and his family have consistently followed the tenets of Universal Wisdom in their daily lives and in raising their children.

21.     Universal Wisdom was founded in 1974.  It includes the belief that the supreme attainment is the health and purity of body, mind, and spirit expressed through the concept of universal wisdom, and that harmony with all living things is the expression of God.  It is based on the concept that God and nature are one and that healing comes from above-downward, inward and out. This phrase explains that God provides healing from above, downward to His followers and the healing through God's grace begins from inside.

22.     Universal Wisdom deems it a sacrilege to depart from the precepts of the religion by the following (among other things):

     a.  The ingestion of medication or other chemical substances that defy natural law.

     b.  The injection into the body of medication or other matter of substances that defy natural law.

     c.  The application of medication, chemicals, or other foreign matter or substances unharmonious to the laws of nature.

     d.  The inhalation of medication, chemicals, or other foreign substances in disharmony with the laws of nature.

23.     With this in mind, the tenets of Universal Wisdom include, but are not limited to, the moral obligation to avoid medical intervention that intentionally introduces disease into the body, and to refuse to pierce the skin for medical treatment.

24.     Mr. Dunbar and his wife have rejected medical intervention in the past due to the tenants of their religion, and they continue to do so. Even though both Mr. Dunbar and his wife work in the entertainment industry, primarily in Los Angeles, their family relocated from California to Georgia in order to practice the tenets of their faith more

freely, and have found Georgia to be a more positive environment for their children's homeschool education in alignment with their faith.

### Mr. Dunbar's Employment with Defendants

25.     Mr. Dunbar has been employed as an actor, producer, director, and writer in various capacities for nearly thirty years.   His page on the website IMDb includes 61 credits as an actor and 20 credits as either a producer, director, or writer.[1]  Those credits included regular roles on such hit televisions shows as "Prison Break," "The Game," "The Mentalist," "Sons of Anarchy," and "Soul Food."  The majority of his roles as an actor were with Defendants.

26.     Mr. Dunbar built his long career through hard work.  He has been recognized as an outstanding actor, winning a Black Real Award in 2002, and he was nominated for that award again in 2013 and 2014.  He was also nominated twice for an NAACP Image Award.

27.     Most recently, Mr. Dunbar has been a series regular on the Fox television show "9-1-1."  He appeared on the show from the first episode of season 1 through episode 9 of season 5.  Specifically, Mr. Dunbar was employed on "9-1-1" from September 29, 2017 through November 10, 2021.  During this time, Mr. Dunbar was the only black male lead on the series, and one of only a handful of black male leads on primetime network television.

28.     Throughout his time working for Defendants, they had no complaints regarding his job performance.

29.     Mr. Dunbar received significant praise for his work on "9-1-1".   For example, Entertainment publication TV Fanatic published a story on October 5, 2021 regarding Mr. Dunbar's performance in Season 5, Episode 3 of the show, stating: "And major shout-out to Rockmond Dunbar, who was an absolute rockstar here."  Similarly, TV Fanatic said of Mr. Dunbar's performance in his penultimate episode in Season 5,

---

[1] https://www.imdb.com/name/nm0241870/.

Episode 8: "Whenever Rockmond Dunbar does get a chance to shine, he always knocks it out of the park."

30.    This praise also came from his superiors on the show.  For instance, "9-1-1" Showrunner Tim Minear spoke highly of Mr. Dunbar during an interview published online in entertainment publication "Decider" on January 3, 2022. When asked about Mr. Dunbar's refusal to be vaccinated: "I've known Rock for many years – we worked together on a show called Terriers, and then I cast him on this show because I knew how genius he was."

### The COVID-19 Pandemic

31.    By Spring of 2020, the coronavirus, SARS-CoV-2, had spread to many nations, including the United States.

32.    In that timeframe, Defendants began implementing certain mitigation procedures for its workforce, such as wearing masks, maintaining minimum distances from other workers, and receiving body temperature checks.

33.    Since then, three separate COVID-19 vaccines have been developed and authorized by the United States government for use.

34.    On August 23, 2021, the FDA issued full approval of one of those vaccines, the Pfizer-BioNTech vaccine called Comirnaty, for persons 16 years of age and older.

### Defendants' Vaccine Mandate

35.    For purposes of addressing issues concerning the ongoing COVID-19 pandemic, employees in the film and television industry are divided into Zones A, B, C and so forth.  Zone A includes actors, producers, and writers.

36.    From about December 2020 through August 2021, the studio hosted several zoom meetings with representatives from Disney Legal Department, Employee Relations, and COVID-19 compliance coordinators to discuss the incentives offered for voluntary COVID-19 vaccination and the possibility of mandatory COVID-19 vaccination.  During one meeting, Mr. Dunbar asked what would happen if an employee

did not receive the COVID-19 vaccination in exchange for incentives offered, to which a representative from Disney legal, Tanya Menton, replied, "there will be some form of punishment," or words to that effect.

37.     Then, in September 2021, Fox formally announced a policy that required "Zone A" employees to be fully vaccinated by October 18, 2021, defined as two weeks following the second dose of a two-shot regimen of Pfizer or Moderna, or two weeks after a single-dose regimen of the Johnson & Johnson vaccine.  Defendants offered the ability for employees to seek a religious and/or medical accommodation and directed employees to contact the Employee Relations department to make such a request.

38.     Prior to Defendants' vaccine requirement for Zone A, all cast and crew were required to be tested up to three times a week, wear masks, and social distance on set.

39.     Mr. Dunbar worked through the entire pandemic while filming on set for the "9-1-1" series.  He consistently complied with all of Defendants' testing, masking, and social distancing requirements on set.  Mr. Dunbar has never tested positive nor had COVID while working, nor while at work.

40.     Nevertheless, other actors on the "9-1-1" set became symptomatic and tested positive for SARS-CoV-2 multiple times, which required Mr. Dunbar and other exposed actors to quarantine.

**Mr. Dunbar Requests Exemption From Defendants' COVID-19 Vaccine Mandate**

41.     Between 2009 and 2015, Mr. Dunbar appeared on the television series "The Game" during its initial run.  When the producers recently decided to re-start that show, Defendant Disney granted Mr. Dunbar permission on September 17, 2021 to shoot new episodes for  "The Game" in Atlanta, Georgia from September 27, 2021 to October 1, 2021.  As a result, Mr. Dunbar was away from the "9-1-1" set during that time and had limited communication ability.

42.     On September 29, 2021, while Mr. Dunbar was on "The Game" set in Atlanta, an email was sent to Disney employees directing anyone seeking a medical or

religious accommodation for the COVID-19 vaccine mandate to contact Employee Relations.

43.     Based on his belief in Universal Wisdom, Mr. Dunbar has sincerely held religious beliefs and convictions that directly conflict with his receiving the COVID-19 vaccines.

44.     In addition, Mr. Dunbar has a disability, because of which his doctors have advised that he not receive a vaccination.

45.     Between about September 29 and 30, 2021, Mr. Dunbar's agents, Sheree Cohen and Ray Moheet, contacted Stephanie Herman at Fox via phone to notify her that Mr. Dunbar would be requesting both a religious exemption and a medical exemption to the COVID-19 vaccine mandate, and that a full explanation of Mr. Dunbar's faith in support of his request for a religious exemption would be submitted on October 3 or 4, 2021, as soon as Mr. Dunbar was done shooting "The Game."

46.     On September 30, 2021, Erin Nguyen, from Disney Employee Relations, acknowledged via email to Sheree Cohen that Mr. Dunbar would be requesting an accommodation.

47.     On October 4, 2021, Mr. Dunbar submitted the following to Defendants: (1) a Statement of Religious Beliefs, including a Purpose Statement, Moral Obligation and Sacrilege; (2) a personal letter explaining Mr. Dunbar's religious beliefs; and (3) a clergy letter from a Universal Wisdom minister.

48.     Around that same time, Mr. Dunbar's representatives submitted a letter from his physician stating that Mr. Dunbar's medical history is incompatible with all forms of the COVID-19 vaccine.

**Denial of Exemption Requests**

49.     On October 4, 2021, Ms. Nguyen notified Mr. Dunbar's agents, Sheree Cohen and Ray Moheet, via email that Mr. Dunbar's physician letter was not sufficient to support a medical exemption.   Ms. Nguyen added: "Am I understanding that

1   Rockmond is now requesting an accommodation based on his religious beliefs as well?"

2         50.    On October 4, 2021, Mr. Dunbar's agent Ray Moheet stated via email to Ms.

3   Nguyen that, "we don't agree with your assessment regarding Rockmond's medical and

4   are hereby requesting an appeal."  Mr. Moheet also forwarded a letter from Mr. Dunbar

5   in response to Ms. Nguyen's accusation that Mr. Dunbar was "pivoting" from a medical

6   to a religious exemption, stating: "My unwavering faith has and always will be the

7   cornerstone and foundation for which I seek any and all accommodation regarding my

8   employer's vaccination mandate."  Mr. Dunbar also requested that further inquiries

9   regarding his faith be conducted in writing, or if verbal communication is preferred that

10   he be accompanied by a representative of the U.S. Equal Employment Opportunity

11   Commission ("EEOC") or an attorney.

12         51.    The very next day, on October 5, 2021, Ms. Nguyen told Mr. Dunbar for the

13   first time that his last day working on the "9-1-1" set would be October 18, 2021 because,

14   according to her, Employee Relations supposedly did not have enough time to process

15   the request for an accommodation in the nearly two weeks between this email and the

16   October 18th deadline.

17         52.    In response to Ms. Nguyen's October 5th email, another one of Mr. Dunbar's

18   agents, Norm Aladjem, sent an email to Ms. Nguyen regarding Mr. Dunbar's religious

19   accommodation request, stating in part: "A sincerely held religious belief is exactly that,

20   whether anyone else shares that belief or not.  I understand that it's expedient for you to

21   pretend [Mr. Dunbar's] religious beliefs are not sincere to make your job easier, and to

22   make life easier for vaccinated people on set, but **I find your approach completely**

23   **retaliatory.  [Mr. Dunbar] has and is willing to get on the phone with you to discuss**

24   **his beliefs**, but is aware based on your approach that what you actually intend is to

25   pretend to listen to him and then pronounce his beliefs not to be sincere.  I suspect you

26   too would be hesitant to talk to someone about your beliefs in that context. " (Emphasis

27   added).

28

COMPLAINT

53.     After not hearing from Ms. Nguyen regarding his inquiries, Mr. Dunbar reached out yet again on October 12, 2021 to engage in the interactive process in good faith. Mr. Dunbar sent an email to Ms. Nguyen stating: "Erin: It's come to my attention that Disney believes that the documentation for medical and religious exceptions are insufficient and you might have some questions for me. I want to make it clear that I am available to have a discussion with you to answer any questions. If you have questions for me, please e-mail them to me ASAP."

54.     Nevertheless, Ms. Nguyen never emailed Mr. Dunbar any questions regarding his religious exemption. Instead, that same day, Mr. Dunbar received a response email from Ms. Nguyen: "Hello Rockmond, and thank you for your email. This is now in the hands of Disney Legal, who I understand has been in touch with your representative. Thanks very much."

55.     Despite claiming Mr. Dunbar's exemptions were being handled by the legal department and thus out of her hands, the following day, October 13, 2021, Ms. Nguyen sent Mr. Dunbar an email requesting additional information about his medical exemption request while ignoring his religious exemption request. Ultimately, Defendants refused Mr. Dunbar's medical exemption request because they would not accept his doctor's signed letters, even after the physician made Disney's requested changes to the letter.

56.     After a Disney-affiliated physician interviewed Mr. Dunbar's physician, Defendants insisted Mr. Dunbar provide more information regarding his medical condition, but given how he was being treated, he was concerned about either leaks to the public or retaliation against him if he provided Defendants with more personal information regarding his medical condition.

57.     October 18, 2021 was Mr. Dunbar's last day shooting on set for "9-1-1."

58.     Even though this was Mr. Dunbar's last day on set, Defendants did not terminate his employment at this time. To the contrary, during Mr. Dunbar's last episode, his character left Los Angeles, where the show is set, and went to Haiti on a humanitarian

mission, but it was clear from a story standpoint that he could return to the show at any time.

59.     The producers of "9-1-1" told Mr. Dunbar they were very pleased with his work.  In this regard, the producer, showrunner, and creator of "9-1-1," Mr. Minear, specifically offered to make reasonable accommodations for Mr. Dunbar on set so he could remain on the show during the pandemic despite his unvaccinated status.

60.     In addition, Mr. Minear stated in his interview published on the Decider website on January 3, 2022 that he "supported his [Mr. Dunbar's] autonomy to make decisions for himself. And I also explained that the company has a policy, and we work for a company, and there's only so much I can do. But what I did do was, I facilitated as grateful an exit as I could for him. I didn't kill him. I could have had his brain tumor come back. But we decided we would give him an elegant exit so that if this madness ever went away, it doesn't completely foreclose the possibility of him coming back."

61.     Entertainment publication Daily Soap Dish reported on November 18, 2021 that the social media response to Mr. Dunbar's "9-1-1" exit was "one of sympathy. Many people felt that this decision was not justifiable, given that he did have an exemption."

**Disparagement of Mr. Dunbar's Religious Beliefs**

62.     Defendants' communications regarding Mr. Dunbar's religious accommodation request conveyed Defendants' bias against Universal Wisdom.  This bias against Mr. Dunbar's beliefs is clear evidence of the intent to discriminate, regardless of Mr. Dunbar's sincerely held religious beliefs, and the evidence he submitted to Defendants to establish his sincerity.

63.     As an example, on or about October 13, 2021, Ms. Menton, Assistant General Counsel for Disney, remarked to Mr. Dunbar's prior attorney, Young Park, that his religion is "fake" and that Mr. Dunbar is merely an "anti-vaxxer," or words to that effect.   Ms. Menton's remarks were characteristic of the approach Defendants took to Mr. Dunbar's exemption requests.

13

64.     Similarly, the process that Defendants went through to evaluate Mr. Dunbar's exemption requests appeared to Mr. Dunbar haphazard at best and thoroughly opaque.  It was not clear which Defendant was ultimately making what decisions.  From what Mr. Dunbar could see, it appeared that Ms. Nguyen and/or Ms. Menton served as the judge of his exemption requests, even though they are Disney employees and Mr. Dunbar's contract was with Fox.

### Defendants Terminate Mr. Dunbar's Employment and Leak Negative Information

65.     On November 1, 2021, Mr. Dunbar's counsel, Siri & Glimstad LLP ("Siri & Glimstad"), sent a letter to Ms. Menton at Disney addressing Mr. Dunbar's religious and medical accommodation requests.  The letter described how Defendants' actions were discriminatory on the basis of Mr. Dunbar's religious beliefs and his race and how they had a disparate impact on Mr. Dunbar.

66.     Apparently in response to Siri & Glimstad's letter, on November 10, 2021, Mr. Dunbar received an email from an email address labeled "DGE Employee Accommodation Requests," and signed by the "Disney General Entertainment Employee Relations Team."   In that email, Disney (apparently on behalf of Fox) rejected Mr. Dunbar's requests for a religious and/or medical exemption to their COVID-19 vaccination mandate.  Specifically, with regard to the religious accommodation request, Disney stated that its Employee Relations Team had "researched the source of the letter you [i.e., Mr. Dunbar] provided and we cannot accept it as a basis for considering your request for an exception without discussing further with you."

67.     However, Defendants clearly never had any intention of "discussing further" Mr. Dunbar's religious exemption because on that same day, November 10, 2021, Mr. Dunbar received a letter from Fox terminating his entire employment contract.

68.     Nothing in the termination letter suggested that Fox was in any way displeased with his work.  Instead, the only reason provided by Defendants for Mr.

Dunbar's termination was his failure to comply with their COVID-19 policy by compromising his religious beliefs and obtaining the COVID-19 vaccination. This termination was not justified because Mr. Dunbar had requested a religious accommodation that Defendants had wrongfully denied. The letter went on to claim that Mr. Dunbar's actions had supposedly breached the employment agreement and as a result Defendants were "therefore released and discharged from all obligations to Lender [i.e., Mr. Dunbar's loan out company, Epiphany Entertainment] and Artist [i.e., Mr. Dunbar], including, without limitation, the obligation to pay Lender any further compensation under the Agreement." Fox then stated that it would "only pay Lender for Player's services up to and including episode 509 of the Series."

69. Thus, by summarily denying Mr. Dunbar's accommodation requests without even engaging in reasonable discussions as they suggested in the November 10th email, Defendants were denying Mr. Dunbar over $1.3 million in compensation owed to him under the contract.

70. Even assuming Fox could terminate Mr. Dunbar's contract for the reasons given, which it could not, Defendants sent Mr. Dunbar this letter after episode 510 commenced filming, which entitles him to his "pay or play" compensation for that episode. However, Disney refused to pay him this amount unless he agreed to forego this suit.

71. Mr. Dunbar's last episode of "9-1-1," episode 509, aired on November 15, 2021.

72. The next day, on November 16, 2021, the website Deadline published an article titled: "Rockmond Dunbar Exits '9-1-1' Over Covid Vaccine Mandate After Pursuing Medical & Religious Exemptions."

73. Deadline gave Mr. Dunbar's agents approximately 30 minutes to provide a comment prior to publishing the article. Even though Mr. Dunbar provided a quote for the article, that was only after finding out that it would contain leaked information

regarding his exemption requests.  The leaked information only could have originated from Defendants.  On information and belief, Defendants leaked this information intentionally to harm Mr. Dunbar's future career in retaliation for Mr. Dunbar's request for a religious accommodation and subsequent challenge of Defendants regarding their denial of his request.  The Deadline article implied that Mr. Dunbar's religious exemption was insincere.

74.    After Deadline published its story, similar stories about Mr. Dunbar were published in numerous other publications, including Variety and Entertainment Weekly, ensuring that his religious accommodation requests, and the negative light placed on them by the leaks from Defendants, became well known in the entertainment industry.

75.    On information and belief, Defendants intentionally leaked information to Deadline the day after Mr. Dunbar's last appearance on "9-1-1" as a proverbial "shot across the bow" to discourage Mr. Dunbar from further pursuing his claims, and to signal to the entertainment industry that Mr. Dunbar should not be hired.  Publicly calling him out also served to show other actors in the entertainment industry that they should not try to stand up for their religious beliefs because they too could be fired.

**Defendants Admit Their Wrongful Denial of Mr. Dunbar's Religious Accommodation Was Based on Blatantly Inaccurate Facts**

76.    On November 19, 2021, Paul Hastings, counsel for Fox sent a letter to Siri & Glimstad arguing that Mr. Dunbar's religious beliefs are insincere.  The letter claimed that Fox (though really Disney, acting on Fox's behalf) based this conclusion on the fact that Mr. Dunbar had previously received tattoos and ear piercings.

77.    However, the reality is that Mr. Dunbar received the body decorations Paul Hastings referred to many years before he became an adherent to Universal Wisdom.  Mr. Dunbar received his most recent tattoo approximately 20 years ago and had his ears pierced approximately 30 years ago.  Since becoming an adherent to Universal Wisdom,

Mr. Dunbar has not received any new tattoos or piercings.[2]

78.    Paul Hastings' November 19th letter also claimed that unnamed representatives of Mr. Dunbar had supposedly told Defendants that Mr. Dunbar's beliefs were insincere and that his wife threatened to divorce him if Mr. Dunbar received the COVID-19 vaccine.  This supposed statement was patently false and malicious.  Mr. Dunbar never made such a statement, and all of his representatives have denied ever making that statement.  Mr. Dunbar believes that Disney fabricated that statement as a means to discredit Mr. Dunbar's beliefs and to defame him.

79.    Paul Hastings' letter   further stated that Defendants had based their determination on the fact that Mr. Dunbar had supposedly requested a medical exemption prior to seeking a religious exemption.  However, again, Defendants were wrong.  Mr. Dunbar's representatives informed Defendants that he would seek both exemptions as part of the same communication.  The fact that his paperwork for the medical exemption may have been submitted a few days before the paperwork for the religious exemption is entirely immaterial.  And, furthermore, the fact that a person seeks both exemptions has no bearing on whether either exemption is legitimate and sincere because someone can both have a medical counterindication to vaccination and a sincere religious belief against the practice as well.

80.    Lastly, Paul Hastings claimed that Mr. Dunbar "joined the Congregation of Universal Wisdom after Twentieth Century announced its mandatory vaccination policy" simply because the letter from the minister attesting to Mr. Dunbar's membership was dated in September 2021.  Had Defendants engaged with Mr. Dunbar in an interactive

---

[2] Paul Hastings letter relied on an article on the Essence website that they claim was published in 2020, wherein Mr. Dunbar professed that he liked getting tattoos.  However, the actual article merely stated that it was  "UPDATED OCTOBER 29, 2020."  As explained in Siri & Glimstad's November 29th letter, that article was originally published in December 2009 based on an interview with Mr. Dunbar that year, a fact made plain by the content of the article as well as by the original article still being available (https://www.essence.com/news/rockmond-dunbar-changing-the-game/?amp=1).

process, rather than simply denying the request based on assumptions and then firing him, Mr. Dunbar could have explained that he has been an adherent to Universal Wisdom since 2013.

81.     Prior to Paul Hastings' letter, neither Defendants nor Paul Hastings had ever asked Mr. Dunbar about his tattoos, his piercings, his unnamed representative's statements, his wife's supposed statements, his reasons for seeking both accommodations, or the circumstances of his joining Universal Wisdom in the context of his religious beliefs or his exemption requests.  Thus, their assertion that these issues invalidated the sincerity of his beliefs was based entirely on Defendants' own ill-informed assumptions.

82.     On November 29, 2021, Siri & Glimstad sent a letter to Paul Hastings explaining how their assumptions and false statements about Mr. Dunbar were entirely incorrect.  However, Defendants did not change their decision in response to learning the true facts surrounding their supposed reasons for denying his accommodation request, which is further evidence that those reasons were merely a pre-text for discriminating against Mr. Dunbar based on his faith.

**Defendants Refusal of Mr. Dunbar's Continued Attempts to Explain His Religious Beliefs**

83.     On December 7, 2021, representatives from Siri & Glimstad and Paul Hastings met to discuss Mr. Dunbar's termination.  During that meeting, Paul Hastings indicated that if Mr. Dunbar had additional information to provide regarding his religious accommodation request, Defendants would consider it and use it to determine whether to alter their denial of that request.

84.     Mr. Dunbar wanted to allow Defendants every opportunity to correct their mistake, and therefore, on December 10, 2021, Siri & Glimstad sent a letter to Paul Hastings re-explaining the nature and sincerity of Mr. Dunbar's sincere religious beliefs, and offered to respond in writing to any further inquiries Defendants may have regarding

those beliefs.

85.     Prior to the 2021 Christmas holiday, representatives from Paul Hastings asked that Defendants be provided until after the New Year to respond regarding Mr. Dunbar's religious accommodation request.

86.     Thereafter, on January 7, 2022, representatives from Paul Hastings emailed Siri & Glimstad to state that Defendants required no additional information because they would not reconsider the denial of Mr. Dunbar's requests.

### Defendants' Refusal to Accommodate

87.     In both its November 19th letter and in its January 7th email, Paul Hastings stated that, even if Defendants had accepted his accommodation request "there would have been no reasonable accommodations available that would have allowed him to perform the essential functions of his role while adequately protecting the health and safety of Mr. Dunbar and his colleagues."  Nevertheless, this claim that Defendants could not accommodate Mr. Dunbar's request are disingenuous for several reasons.  First, they made this statement only after they sought and accepted religious accommodation requests from Zone A actors like Mr. Dunbar; if they were genuinely unable to accommodate any actor's religious accommodation requests then there would have been no reason to even seek such requests.

88.     Second, the producers of "9-1-1" had told Mr. Dunbar that they wanted to keep him on the show and would be able to accommodate his needs.   During filming of his scenes for the first 9 episodes of season five of the show, all of which were filmed during 2021, the producers implemented procedures intended to protect the cast and crew (including Mr. Dunbar) from exposure to COVID-19.   On information and belief, most if not all of those same procedures have continued even after the vaccine mandate.  Despite these safety protocols, according to news reports,[3] the "9-1-1" show has

---

[3] "Covid Surge Reportedly Forces 'NCIS: LA' And '9-1-1' To Postpone Production," https://www.forbes.com/sites/kimberleespeakman/2022/01/05/covid-surge-reportedly-

continued to experience production shutdowns due to breakthrough infections, even after Defendants implemented their COVID-19 mandate.  Therefore, there is no reason why those procedures could not continue in order to accommodate Mr. Dunbar and other members of the cast and crew.

89.    Furthermore, as noted, the showrunner for "9-1-1" told Mr. Dunbar in no uncertain terms that the show could accommodate Mr. Dunbar's religious beliefs and would have been able to safely continue production with Mr. Dunbar's involvement in the show.

90.    In addition, as a result of a prior SARS-CoV-2 infection (not contracted while working for Defendants), Mr. Dunbar's body has generated immunity to this virus ("**natural immunity**"). This immunity is more robust and durable than the immunity from vaccination ("**vaccine immunity**"). In fact, the data and science to date leave no doubt that Mr. Dunbar's vaccinated peers are more likely to become infected with and spread the virus than Mr. Dunbar.

91.    Third, on information and belief, Defendants accommodated exemption requests from other actors on the cast of "9-1-1," none of whom are black and none of whom sought a religious based accommodation.  Mr. Dunbar understands that others associated with the show were granted vaccine related accommodations, e.g., in the form of paid time-off, for non-religious reasons while Mr. Dunbar was denied an accommodation and terminated.

92.    On information and belief, Disney has a history of racial discrimination, and Mr. Dunbar was subjected to disparate treatment and disparate impact discrimination on the basis of his race.  On information and belief, non-minority employees similarly situated were not subject to termination when they refused the COVID-19 vaccine.

---

forces-ncis-la-and-9-1-1-to-postpone-production/?sh=65b8decb1f77.

COMPLAINT

**Defendants' Discriminatory and Retaliatory Actions Have Damaged Mr. Dunbar's Reputation and Caused him to Lose Hundreds of Thousands of Dollars**

93.     As noted, because Defendants wrongfully denied Mr. Dunbar's accommodation request, they have claimed that his refusal to compromise his sincerely held religious beliefs was a breach of his employment agreement.  Mr. Dunbar had a "pay-or-play" agreement whereby even if he did not appear in an episode of "9-1-1," he would still be compensated.  However, based on Defendants' claim that he breached his agreement, Defendants have refused to pay Mr. Dunbar the amounts guaranteed for the remaining episodes of the fifth season of "9-1-1," totaling approximately $723,800. Defendants also refused to pay Mr. Dunbar a bonus he earned, worth $352,296, and may refuse to pay between $200,000 and $300,000 in residual payments that are owed over time.

94.     Beyond their wrongful claims of breach, Defendants' discriminatory and retaliatory actions have severely damaged Mr. Dunbar's professional reputation.  For example, as a result of Defendants' representatives intentionally and maliciously leaking information to media outlets, Mr. Dunbar has been essentially "blacklisted" and publicly labeled a "non-complier" and "anti-vaxxer."

95.     Prior to Defendants' actions, Mr. Dunbar had a number of television and movie projects in active development.  Since Defendants leaked information about Mr. Dunbar's accommodation requests, he has lost numerous opportunities on those projects and has had multiple actors refuse to work with him for fear of also being "blacklisted" by association with him.

96.     To date, Mr. Dunbar's agents and managers are fielding "availability checks" regarding his services.  These inquiries routinely include accolades for Mr. Dunbar's career accomplishments, but also include that Mr. Dunbar has been placed on a "do not hire" list.

97.     Defendants intentionally retaliated against Mr. Dunbar by making the

circumstances of his accommodation request public, and therefore, are responsible for this damage to his reputation and future career.

**Defendants' Discriminatory and Retaliatory Actions Directly Lead to Damages on a Project Mr. Dunbar Had Long Been Working on**

98.      Before Defendants improperly leaked information regarding Mr. Dunbar to Deadline, Mr. Dunbar and his wife entered into a contract to secure funding prior to receiving deal memos for a film project titled, "The Rearing," (hereinafter "**the Project**") that they had been developing for years.

99.      Specifically, Mr. Dunbar and his wife secured $1,000,000 in investment funds on November 8, 2021 from a professional athlete/investor and an independent production company for the Project.  All supporting documentation was submitted to the Screen Actors Guild ("**SAG**") for union approval, which was obtained on December 7, 2021.

100.     The Project provided Mr. Dunbar and his wife financial benefits as compensation for writing, producing, and co-directing the Project.

101.     Defendants knew that the Project was in progress and that Mr. Dunbar was auditioning talent for the Project because it was listed on the industry "Breakdown Services" official site for the tv series/films currently casting.

102.     Casting for the Project began on December 8, 2021.  Three lead roles were advertised to A and B list talent for six-figure salaries.

103.     Mr. Dunbar and his wife received positive feedback from agents after reading the script for the Project and were engaged by multiple A and B list talent for the three lead roles for the Project.

104.     However, agents began to communicate to Mr. Dunbar's casting director for the Project their concerns.  Specifically, actors who were interested in the Project were unwilling to audition because of their fear of bad publicity about being associated with Mr. Dunbar due to his being blacklisted over the vaccine controversy publicized by

22

Defendants.

105.   One by one, A and B list talent backed away from the Project, because of the negative media generated by Defendants.

106.   Mr. Dunbar and his wife were forced to offer the Project's lead roles to B, C and D list actors.   Although these actors are promising undiscovered talent, the Project's investors retracted $500,000 in funding from the budget as a result of the casting.

107.   Thus, Defendants' wrongful conduct of leaking information to Deadline, and thereby damaging Mr. Dunbar's reputation, resulted in Mr. Dunbar losing talent and funding for the Project.

108.   Prior to the Deadline article, Mr. Dunbar had never before been the subject of major negative publicity in the entertainment industry, and was well thought of in the industry for the past 30 years.

109.   As a direct and proximate cause of Defendants' wrongful conduct alleged above, which was a substantial factor in the interference of Mr. Dunbar's ability to enjoy the benefits of his contract for the Project, Mr. Dunbar has suffered financial damages in an amount subject to proof, but in any case, exceeding $1,000,000, the exact damage amount to be determined according to proof at the time of trial.

**Exhaustion of Administrative Remedies**

110.   The U.S. Equal Employment Opportunity Commission, Los Angeles area office, issued Mr. Dunbar a notice of right to sue on January 26, 2022 in Charge No. 480-2022-02042 against the Walt Disney Company and Charge No. 480-2022-02043 against Twentieth Television.

### FIRST CAUSE OF ACTION

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C § 2000e, *et seq.*

### Religious Discrimination

111.   Mr. Dunbar hereby realleges and adopts each and every allegation in the preceding paragraphs above as if fully set forth herein.

112.   Title VII prohibits discrimination against employees on the basis of their religion.   42 U.S.C. § 2000e(j); 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin ….").

113.   Title VII defines the protected category of religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Moreover, as the EEOC has made clear, Title VII's protections also extend to nonreligious beliefs if related to morality, ultimate ideas about life, purpose, and death. *See* EEOC, Questions and Answers: Religious Discrimination in the Workplace (June 7, 2008), https://www.eeoc.gov/laws/guidance/questions-and-answersreligious-discrimination-workplace ("Title VII's protections also extend to those who are discriminated against or need accommodation because they profess no religious beliefs."); (*Id*. ("Religious beliefs include theistic beliefs (i.e. those that include a belief in God) as well as non-theistic 'moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.' ").)

114.   By, *inter alia*, refusing to engage in the interactive process to permit Mr. Dunbar to establish his sincere religious beliefs, by wrongfully denying him any religious accommodation or exemption to Defendants' COVID-19 vaccine mandate without any reason for doing so, and then by terminating Mr. Dunbar without justification, Defendants

discriminated against Mr. Dunbar based on his sincerely held religious beliefs with respect to the terms, conditions, and privileges of employment.

115.   Defendants have unlawfully discriminated against Mr. Dunbar by discharging him for the exercise of his religious beliefs.

116.   Mr. Dunbar has a bona fide and sincerely held religious belief that precludes him from obtaining any of the COVID-19 vaccines, as outlined above.

117.   Mr. Dunbar's sincerely held religious beliefs conflict with Defendants' policies that require him to obtain the COVID-19 vaccine.

118.   Mr. Dunbar raised his sincerely held religious beliefs with Defendants, brought his objections and request for a religious accommodation and exemption to Defendants' attention, and requested a religious exemption and accommodation from the COVID-19 vaccine mandate.

119.   Defendants' termination, denial of benefits, and other adverse employment actions against Mr. Dunbar were motivated by, and are the result of, his exercise of his sincerely held religious beliefs.

120.   Defendants lacked any justification for the adverse employment actions taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

121.   Defendants' discrimination against Mr. Dunbar was intentional and was performed with malice, willfulness, and reckless indifference to Mr. Dunbar's protected civil rights.

122.   Any justification offered by Defendants for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

123.   Defendants, therefore, violated Title VII, and Mr. Dunbar is entitled to the relief set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, past and future medical and counseling expenses to the extent

any exist, interest, and reasonable attorneys' fees and costs of the action pursuant to 42 U.S.C. § 2000e-5(k).

124.   As a result of Defendants' intentional violation of the Title VII rights of Mr. Dunbar, he suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, thereby entitling him to compensatory damages.

125.   The events described here justify an award of punitive damages under Title VII.

126.   Defendants' refusal to consider or grant Mr. Dunbar's request for accommodation and exemption from the COVID-19 vaccine mandate has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Mr. Dunbar's sincerely held religious beliefs.

127.   Mr. Dunbar has no adequate remedy at law for the continuing deprivation of his most cherished constitutional liberties and sincerely held religious beliefs.

128.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## SECOND CAUSE OF ACTION

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C § 2000e, *et seq.*

### Disparate Impact on the Basis of Religion

129.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

130.   Title VII makes it illegal for an employer to "limit, segregate, or classify his employees or applicants . . . in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's . . . religion ..." 42 U.S.C. § 2000e-2(a)(2).

131.   Furthermore, the statute provides that an unlawful employment practice

26

based on disparate impact is established when either an employee shows that an employment policy causes such a disparate impact and the employer fails to show "that the challenged practice is job related . . . and consistent with business necessity," or the employee shows there is an alternative way to serve the stated needs but the employer refuses it. 42 U.S.C. § 2000e-2(k)(1)(A).

132.   Even if facially neutral, Defendants' vaccination policy, by not recognizing and accommodating a sincere religious belief, had a disparate impact on Mr. Dunbar by forcing him to abandon his religious obligation or forgo employment with Defendants.

133.   Defendants' refusal to recognize and accommodate a sincere religious belief was neither required for Mr. Dunbar's job nor consistent with business necessity. Moreover, Defendants improperly refused Mr. Dunbar's less-restrictive but feasible options of continuing to be employed with appropriate COVID-19 mitigation precautions in place, as they had been during his work for Defendants in 2021 and/or as they did for other unvaccinated employees in similar positions to Mr. Dunbar.

134.   As a direct and proximate result of this additional unlawful action by Defendants under Title VII, Mr. Dunbar suffered lost income and other economic and non-economic damages.

WHEREFORE, Mr. Dunbar respectfully pray for relief against Defendants as hereinafter set forth in his prayer for relief.

### THIRD CAUSE OF ACTION

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C § 2000e, *et seq.*

### Race Discrimination

135.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

136.   According to 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any

27

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.")

137.   Defendants accommodated and/or did not terminate other actors on "9-1-1" who were similarly situated to Mr. Dunbar, but none of whom are black.

138.   On information and belief, Disney has a history of discrimination, and Mr. Dunbar was subjected to disparate treatment and disparate impact discrimination on the basis of his race, national origin, and/or color. Non-minority employees similarly situated were not subject to termination by avoiding the COVID-19 vaccine.

139.   Defendants' termination, denial of benefits, and other adverse employment actions against Mr. Dunbar were motivated by, and are the result of, his race, national origin and/or color.

140.   Defendants lacked any justification for the adverse employment actions taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

141.   Defendants' discrimination against Mr. Dunbar was intentional and was performed with malice, willfulness, and reckless indifference to Mr. Dunbar's protected civil rights.

142.   Any justification offered by Defendants for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

143.   The above described acts of Defendants constitute discrimination on the basis of his race, national origin and/or color in violation of public policy and Title VII.

144.   By the aforesaid acts and conduct of Defendants, and each of them, Mr. Dunbar has been directly and legally caused to suffer actual damages, as set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, past and future medical and counseling expenses to the extent any exist, interest,

and reasonable attorneys' fees and costs of the action  pursuant to 42 U.S.C. § 2000e-5(k).

145.   As a result of Defendants' intentional violation of the Title VII rights of Mr. Dunbar, he suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life, thereby entitling him to compensatory damages.

146.   The events described here justify an award of punitive damages under Title VII.

147.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully pray for relief against Defendants as hereinafter set forth in his prayer for relief.

**FOURTH CAUSE OF ACTION**

**Violation of Title VII of the Civil Rights Act of 1964**

**42 U.S.C § 2000e, *et seq.***

**Retaliation**

148.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

149.   42 U.S.C. 2000e-3(a) makes it unlawful for any person to retaliate against an employee who has opposed a discriminatory practice.  Specifically, under 42 U.S.C. § 2000e-3: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

150.   As described above, Defendants took adverse employment action against Mr. Dunbar because he engaged in the protected activity of complaining about the discrimination he suffered based on his religious beliefs, race, national origin and/or color, including wrongfully terminating his employment contract, depriving him of

29

financial compensation pursuant to the contract and intentionally harming Mr. Dunbar's reputation in the industry,  thereby intentionally interfering with Mr. Dunbar's prospective economic advantage.

151.   Defendants' actions constitute unlawful retaliation in violation of Title VII.

152.   Defendants lacked any justification for the adverse employment actions taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

153.   Defendants' discrimination against Mr. Dunbar was intentional and was performed with malice, willfulness, and reckless indifference to Mr. Dunbar's protected civil rights.

154.   Any justification offered by Defendants for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

155.   By the aforesaid acts and conduct of Defendants, and each of them, Mr. Dunbar has been directly and legally caused to suffer actual damages, as set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, past and future medical and counseling expenses to the extent any exist, interest, and reasonable attorneys' fees and costs of the action pursuant to 42 U.S.C. § 2000e-5(k).

156.   As a result of Defendants' intentional violation of the Title VII rights of Mr. Dunbar, he suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life, thereby entitling him to compensatory damages.

157.   The events described here justify an award of punitive damages under Title VII.

158.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully pray for relief against Defendants as hereinafter set forth in his prayer for relief.

### FIFTH CAUSE OF ACTION

### Violation of Mr. Dunbar's Civil Rights

### 42 U.S.C. § 1985

159.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

160.   Section 1985 provides a cause of action against public and private defendants who unlawfully conspire to deprive an individual of his constitutionally protected liberties. 42 U.S.C. § 1985(3) ("If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws").

161.   The elements of the claim of conspiracy to violate civil rights under 1985 include (1) a conspiracy, (2) a conspiratorial purpose to deprive Mr. Dunbar of the equal protection of the laws or of a constitutionally protected liberty, (3) an overt act in furtherance of the conspiracy, and (4) a deprivation of a constitutionally protected right. *See Fazaga v. FBI,* 916 F.3d 1202, 1245 (9th Cir. 2019)

162.   Defendants' COVID-19 vaccine mandate, combined with Defendants' agreements to enforce its provisions in a discriminatory manner and deny Mr. Dunbar's request for a religious exemption, constitutes a conspiracy to violate Mr. Dunbar's civil and constitutional rights based on his religious beliefs, race, national origin and/or color.

163.   Ms. Menton, Ms. Nguyen, and other representatives of Defendants have all reached an agreement with Defendants to deprive Mr. Dunbar of any exemption or accommodation for the exercise of his sincerely held religious beliefs.

164.   Defendants' agreement to deprive Mr. Dunbar of his constitutionally protected liberties is evidenced in its refusal to engage in the interactive process with Mr. Dunbar and denial of his request for a religious exemption and accommodation, especially given the false and inaccurate basis for reaching that conclusion.

31

165.   Ms. Menton and Ms. Nguyen made statements disparaging Mr. Dunbar's sincerely held religious beliefs.

166.   By agreeing to refuse to even consider Mr. Dunbar's requests for religious exemption and accommodation, Defendants have reached an express or tacit agreement to deprive Mr. Dunbar of his constitutionally protected rights to equal protection and religious exercise.

167.   Defendants' have engaged in an overt act in furtherance of the conspiracy to deprive Mr. Dunbar of his civil rights by failing to engage in the interactive process and terminating Mr. Dunbar's employment.

168.   Defendants have each engaged in an overt act in furtherance of the conspiracy to deprive Mr. Dunbar of his civil rights by refusing to consider, evaluate, or accept Mr. Dunbar's request for a religious exemption and accommodation from the COVID-19 vaccine mandate.

169.   By denying Mr. Dunbar his requested religious exemption and accommodation and terminating his employment because of the exercise of his sincerely held religious beliefs, Defendants' conspiracy has resulted in a deprivation of Mr. Dunbar's constitutionally protected rights based on his religious beliefs, race, national origin, and/or color.

170.   By the aforesaid acts and conduct of Defendants and their employees Mr. Dunbar has been directly and legally caused to suffer actual damages, as set out more fully below

171.   By the aforesaid acts and conduct of Defendants and their employees Defendants have caused, are causing, and will continue to cause irreparable harm and actual and undue hardship based on his religious beliefs, race, national origin, and/or color.

172.   Mr. Dunbar has no adequate remedy at law for the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

32

173.   This Court is authorized to grant Mr. Dunbar prayer for relief regarding costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988.

174.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

**SIXTH CAUSE OF ACTION**

**Violation of the California Fair Employment Housing Act**

**Cal. Gov. Code § 12900, *et seq.***

**Religious Discrimination**

175.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

176.   At all times herein mentioned, California Government Code § 12900 et seq., the Fair Employment and Housing Act ("**FEHA**"), was in full force and effect and was binding on Defendants, as Defendants regularly employed five (5) or more persons.

177.   Under the FEHA, Government Code section 12900 et. seq., it is an unlawful employment practice for an employer because of a person's religion, religious creed, religious beliefs, religious practices, or religious observances, to refuse to hire or employ the person, to refuse to select the person for a training program leading to employment, to bar or discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment. It is unlawful under FEHA for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under FEHA, or to attempt to do so.

178.   It is unlawful, under the California Government Code section 12900 et seq., for an employer to fail to take all reasonable steps necessary to prevent discrimination and harassment based on an employee's religion, or that religion's creed, beliefs, practices or observances.

179.   By, *inter alia*, refusing to engage in the interactive process to permit Mr. Dunbar to establish his sincere religious beliefs, by wrongfully denying him any religious accommodation or exemption to Defendants' COVID-19 vaccine mandate without any reason for doing so, and then by terminating Mr. Dunbar without justification, Defendants discriminated against Mr. Dunbar based on his sincerely held religious beliefs with respect to the terms, conditions, and privileges of employment.

180.   Defendants have unlawfully discriminated against Mr. Dunbar by discharging him for the exercise of his religious beliefs.

181.   Mr. Dunbar has a bona fide and sincerely held religious belief that precludes him from obtaining any of the COVID-19 vaccines, as outlined above.

182.   Mr. Dunbar's sincerely held religious beliefs conflict with Defendants' policies that require him to obtain the COVID-19 vaccine.

183.   Mr. Dunbar raised his sincerely held religious beliefs with Defendants, brought his objections and request for a religious accommodation and exemption to Defendants' attention, and requested a religious exemption and accommodation from the COVID-19 vaccine mandate.

184.   Defendants' termination, denial of benefits, and other adverse employment actions against Mr. Dunbar were motivated by, and are the result of, his exercise of his sincerely held religious beliefs.

185.   Defendants lacked any justification for the adverse employment actions taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

186.   As a proximate result of the aforesaid acts of Defendants, Mr. Dunbar has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial. Mr. Dunbar claims such amounts as damages pursuant

to Civil Code § 3287 and/or § 3288 and/or any other provision of law providing for prejudgment interest.

187.   As a proximate result of the wrongful acts of Defendants, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

188.   As a proximate result of the wrongful acts of Defendants, Mr. Dunbar has been forced to hire attorneys to prosecute his claims herein, and has incurred and is expected to continue to incur attorneys' fees and costs in connection therewith. Mr. Dunbar is entitled to recover attorneys' fees and costs under California Government Code § 12965(b).

189.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully pray for relief against Defendants as hereinafter set forth in his prayer for relief.

## SEVENTH CAUSE OF ACTION

### Violation of the California Fair Employment Housing Act

### Cal. Gov. Code § 12900, *et seq.*

### Race Discrimination

190.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

191.   At all times herein mentioned, California Government Code § 12900 et seq., FEHA, was in full force and effect and was binding on Defendants, as Defendants regularly employed five (5) or more persons.

192.   California Government Code § 12940(a) requires Defendant to refrain from discriminating against any employee on the basis of race.

35

193.   The above said acts of Defendants constituted racial discrimination in violation of public policy and in violation of California Government Code § 12940 et seq.

194.   As a proximate result of the aforesaid acts of Defendants, Mr. Dunbar has suffered actual, consequential, and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial. Mr. Dunbar claims such amounts as damages pursuant to Civil Code § 3287 and/or § 3288 and/or any other provision of law providing for prejudgment interest.

195.   As a proximate result of the wrongful acts of Defendants, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

196.   As a proximate result of the wrongful acts of Defendants, Mr. Dunbar has been forced to hire attorneys to prosecute his claims herein, and has incurred and is expected to continue to incur attorneys' fees and costs in connection therewith. Mr. Dunbar is entitled to recover attorneys' fees and costs under California Government Code § 12965(b).

197.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## EIGHTH CAUSE OF ACTION

### Violation of the California Fair Employment Housing Act

### Cal. Gov. Code § 12900, *et seq.*

### Retaliation

198.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

199.   At all times herein mentioned, California Government Code § 12900 et seq., FEHA, was in full force and effect and was binding on Defendants, as Defendants regularly employed five (5) or more persons.

200.   Code § 12940(h) makes it unlawful for any person to retaliate against an employee who has opposed a discriminatory practice.

201.   Defendants took adverse employment action against Mr. Dunbar because he engaged in the protected activity of complaining about the religious and race discrimination he suffered, including wrongfully terminating his employment contract, depriving him of financial compensation pursuant to the contract, and intentionally harming Mr. Dunbar's reputation in the industry, thereby intentionally interfering with Mr. Dunbar's prospective economic advantage.

202.   Defendants' actions constitute unlawful retaliation in violation of Code § 12940(h).

203.   As a result of Defendants' actions, Mr. Dunbar has suffered, and will continue to suffer, both economic and non-economic loss, including, but not limited to: loss of wages, benefits, pension, bonus entitlements, residual payments, deferred compensation, future pecuniary losses, emotional distress, and other compensatory damages.

204.   As outlined above, Defendants purposefully and intentionally retaliated against Mr. Dunbar based upon his opposition to Defendants' vaccine mandate and denial of his religious exemption request by taking adverse employment action against him. Mr.

Dunbar is entitled to recover damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary losses caused by Defendants' unlawful retaliation.

205.   Defendants' actions described above were done with malice or a reckless indifference to Mr. Dunbar's protected right to be free from retaliation for opposing unlawful employment practices. Due to the willful and malicious nature of the retaliation against Mr. Dunbar, he is entitled to an award of punitive damages in an amount sufficient to deter Defendants from engaging in retaliatory conduct in the future.

206.   As a proximate result of the wrongful acts of Defendants, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

207.   As a proximate result of the wrongful acts of Defendants, Mr. Dunbar has been forced to hire attorneys to prosecute his claims herein, and has incurred and is expected to continue to incur attorneys' fees and costs in connection therewith. Mr. Dunbar is entitled to recover attorneys' fees and costs under California Government Code § 12965(b).

208.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully pray for relief against Defendants as hereinafter set forth in his prayer for relief.

## NINTH CAUSE OF ACTION

### Breach of Written Contract

209.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

210.   Section II of Mr. Dunbar's Actor Agreement, dated September 20, 2017

with Defendants provides in relevant part that:

> Player shall be paid the Episodic Compensation set forth herein below. In ... each subsequent Contract Year, Player is guaranteed, pay or play, the following Ratio of original episodes produced but no less than the Minimum Number.
>
> ***
>
> the Episodic Compensation for the Third & subsequent Contract Years shall be as set forth.
>
> ***
>
> Except as otherwise specifically set forth herein, licensee cancellations … shall not relieve Fox of the obligation to pay episodic compensation for the Minimum Number of episodes indicated for any Contract Year for which Fox exercises its option.

211. The 2017 Memorandum of Agreement dated September 29, 2017 provides that:

> Advance payment for residuals: Other. For all other residual purposes… the salary at which advance payment is permitted shall be $9,000 per week or per episode.

212. The compensation letter dated July 29, 2021 provides that:

> In the event that Twentieth… to produce a sixth season of the Series and provided that neither Lender nor Player is in material

39

breach or default of the terms or conditions of the Agreement, Lender shall be entitled to a one-time bonus calculated to "gross up" Player's Fifth Season Fee to an amount equal to $100,000 for each episode for which Player was entitled to be paid.

\*\*\*

The S.6 Pick Up Bonus shall be paid promptly upon Twentieth's acceptance of the order but no later than commencement of production of a sixth season of the Series.

213. As alleged herein, Mr. Dunbar requested a religious exemption from Defendants' COVID-19 vaccine mandate so that he could continue to perform pursuant to the terms of his employment contract and intended to and was capable of finishing his commitment for season 5 and then continue on to season 6 of "9-1-1."

214. Defendants refused to engage in the interactive process with Mr. Dunbar and denied his request for a religious exemption, thereby preventing Mr. Dunbar from continuing to perform pursuant to the terms of the employment contract.

215. Defendants' action to deny Mr. Dunbar a religious exemption and his subsequent termination constitutes a breach of the employment agreements on the part of Defendants.

216. This breach of contract has caused, and is continuing to cause, Mr. Dunbar to incur damage, loss, and harm, in an amount to be determined according to proof at the time of trial.

217. Defendants' wrongful conduct for the breach of obligation arising from contract, entitles Mr. Dunbar to an award of damages pursuant to California Civil Code

COMPLAINT

§ 3300.

218.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

### TENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

219.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

220.   By agreeing to refuse to even consider Mr. Dunbar's requests for religious exemption and accommodation, Defendants have reached an express or tacit agreement to deprive Mr. Dunbar of his constitutionally protected rights to equal protection and religious exercise.

221.   Defendants' have engaged in an overt act in furtherance of the conspiracy to deprive Mr. Dunbar of his civil rights by failing to engage in the interactive process and terminating Mr. Dunbar's employment.

222.   Defendants' conduct alleged herein constituted a breach of the implied covenant of good faith and fair dealing as applied to Mr. Dunbar, as it frustrated Mr. Dunbar's ability to obtain the benefits expressly granted by his employment contract with Defendant Fox.

223.   The foregoing breach of the covenant of good faith and fair dealing has caused, and is continuing to cause, Mr. Dunbar to incur damage, loss, and harm, in an amount to be determined according to proof at the time of trial.

224.   But for Defendants' breach of the implied covenant of good faith and fair dealing which frustrated Mr. Dunbar's ability to perform the terms of his employment contract, Mr. Dunbar would continue to adhere to the terms of his employment contract with Defendants.

225.   Defendants' wrongful conduct for the breach of obligation arising from

41

contract, entitles Mr. Dunbar to an award of damages pursuant to   California Civil Code § 3300.

226.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## ELEVENTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

227.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-110 above as if fully set forth herein.

228.   Mr. Dunbar and his wife obtained union approval and funding for the Project and Defendants knew the Project was in progress. Despite positive feedback from agents, A and B list talent passed on the Project due to negative publicity regarding Mr. Dunbar and funding was retracted.

229.   As a direct and proximate cause of Defendants' wrongful conduct alleged above, which was a substantial factor in the interference of Mr. Dunbar's ability to enjoy the benefits of his contract for the Project, Mr. Dunbar has suffered financial damages in an amount subject to proof, but in any case, exceeding $1,000,000, the exact damage amount to be determined according to proof at the time of trial.

230.   Defendants' wrongful conduct was intended to cause injury to Mr. Dunbar and was carried out with malice, oppression, and/or fraud, with willful or callous disregard for the rights of Mr. Dunbar, thereby entitling Mr. Dunbar to an award of punitive damages pursuant to California Civil Code § 3294.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## TWELFTH CAUSE OF ACTION

### Negligent Interference with Potential Economic Advantage

231.   Mr. Dunbar hereby realleges and adopts each and every allegation in

paragraphs 1-110, and paragraphs 228-229, above as if fully set forth herein.

232.   Defendants' wrongful conduct was intended to cause injury to Mr. Dunbar and was carried out with malice, oppression, and/or fraud, with willful or callous disregard for the rights of Mr. Dunbar, thereby entitling Mr. Dunbar to an award of punitive damages pursuant to California Civil Code § 3294.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Mr. Dunbar respectfully requests that this Court enter judgment in favor of Mr. Dunbar and against Defendants and:

a.   Order Defendants to make Mr. Dunbar whole by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and front pay, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices.

b.   Order Defendants to make Mr. Dunbar whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to, expenses of entering into a replacement contract for the Project in an amount to be determined at trial.

c.   Order Defendants to make Mr. Dunbar whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation and loss of civil rights, in an amount to be determined at trial.

d.   Order Defendants to pay Mr. Dunbar punitive damages for the malicious and reckless conduct described above, in an amount to be determined at trial.

43

e.  Order Defendants to designate Mr. Dunbar as eligible for rehire by Defendants.

f.  Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, successors, and assigns, and all persons in active concert or participation with them, from discriminating against applicants and current or future employees based on their religious beliefs and/or their refusal to violate their religious beliefs, including but not limited to in their current and future employee vaccination policies.

g.  Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, successors and assigns and all persons in active concert or participation with them, from discriminating against applicants and current or future employees based on race, national origin and/or color, including but not limited to in their current and future employee vaccination policies and adverse employment actions.

h.  Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, successors and assigns and all persons in active concert or participation with them from retaliating against applicants and current or future employees based on their opposition to any conduct made unlawful by Title VII and/or Code § 12940(h), including but not limited to, intentionally and/or recklessly leaking confidential information of applicants and current or future employees to the press, and as part of their current and future employee vaccination policies.

i.  Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, including but not limited to effective policies prohibiting religious discrimination and allowing for appropriate religious accommodation as part of their current and future employee vaccination policies, all of which eradicate the effects

COMPLAINT

of Defendants' past and present unlawful employment practices.

j. Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, including but not limited to effective policies prohibiting race discrimination and allowing for appropriate accommodation as part of their current and future employee vaccination policies, all of which eradicate the effects of Defendants' past and present unlawful employment practices.

k. Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, including effective policies prohibiting retaliation, including but not limited to as part of their current and future employee vaccination policies, all of which eradicate the effects of Defendants' past and present unlawful practices.

l. Grant such further relief as the Court deems necessary and proper in the public interest.

m. Award attorneys' fees and costs of this action.

n. Any such other relief as the court may deem appropriate.

Plaintiff hereby demands trial by jury as to all triable claims.

Dated: February 16, 2022

**SIRI & GLIMSTAD LLP**

By:  _/s/ Caroline Tucker_
　　　Aaron Siri (*Pro Hac Vice* to be filed)
　　　Elizabeth Brehm (*Pro Hac Vice* to be filed)
　　　Caroline Tucker

　　　Attorneys for Plaintiff
　　　ROCKMOND DUNBAR