**SIRI & GLIMSTAD LLP**
Mason Barney (*Pro Hac Vice*)
Email: mbarney@sirillp.com
Elizabeth A. Brehm (*Pro Hac Vice*)
Email: ebrehm@sirillp.com
Ursula Smith (*Pro Hac Vice*)
Email: usmith@sirillp.com
200 Park Avenue
Seventeenth Floor
New York, NY 10166
Telephone: 212-532-1091
Facsimile: 646-417-5967

Caroline Tucker (SBN 261377)
Email: ctucker@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: 213-376-3739
Facsimile: 646-417-5967

Attorneys for Plaintiff
ROCKMOND DUNBAR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ROCKMOND DUNBAR,<br><br>                    Plaintiff,<br><br>v.<br><br>AMERICAN BROADCASTING COMPANIES, INC., TWENTIETH CENTURY FOX TELEVISION, A UNIT OF TWENTIETH CENTURY FOX | Case No. 2:22−cv−01075−DMG−JC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS**<br><br>[*Filed concurrently with (1) Declaration of Rockmond Dunbar, (2) Proposed Order and (3) Request for Judicial Notice (with Proposed Order)]* |

1

FILM CORPORATION DOING
BUSINESS AS 20TH TELEVISION,

                              Defendants.

| | |
|---|---|
| Hearing: | July 29, 2022 |
| Time: | 9:30am |
| Courtroom: | 8C, 8th Floor |
| Judge: | Hon. Dolly M. Gee |
| Action Filed: | February 16, 2022 |
| FAC Filed: | May 6, 2022 |

## <u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ............................................ 4

INTRODUCTION ........................................................ 7

STATEMENT OF FACTS .............................................. 9

   Mr. Dunbar's Sincerely Held Religious Beliefs and his Career with
Defendants ................................................................ 9

   Mr. Dunbar's Request for Religious and Medical Exemptions ................. 9

   Defendants' Abrupt Termination of Mr. Dunbar .......................... 11

   Defendants' Leak of Information to Damage Mr. Dunbar's Career .......... 13

PROCEDURAL HISTORY ............................................ 14

STANDARD OF REVIEW ............................................ 15

ARGUMENT ........................................................... 15

  I.   DEFENDANTS VIOLATED MR. DUNBAR'S RIGHTS UNDER
      TITLE VII BY ENGAGING IN AN UNLAWFUL EMPLOYMENT
      PRACTICE THAT CAUSED A DISPARATE IMPACT ON THE
      BASIS OF RELIGION ............................................ 15

2

A.  All that is necessary is a Short and Plain Statement of Disparate Impact in an Employment Discrimination Claim to Give Fair Notice to the Defendant ................................................................... 16

B.  Defendants Try to Evade Liability for Disparate Impact Religious Discrimination by Improperly Defining the Group to Only Mr. Dunbar ........................................................................... 17

II.  MR. DUNBAR HAS SUFFICIENTLY ALLEGED THAT DEFENDANTS INTERFERED WITH HIS PROSPECTIVE ECONOMIC ADVANTAGE ................................................................ 22

A.  Mr. Dunbar Has Alleged Claims for Interference with Prospective Economic Advantage ................................................................... 23

B.  Defendants' Attempts to Avoid Liability for Interfering with Mr. Dunbar's Projects are Unavailing ................................................. 24

1.  Defendants Knew that Mr. Dunbar had Other Prospective Economic Relationships, Which is All That is Required ......................... 25

2.  The FAC Clearly Pleads But For Causation ............................................. 29

C.  Mr. Dunbar Can Present Additional Evidence of Defendants' Knowledge of the Rearing Project ................................................ 30

CONCLUSION ........................................................................ 31

3

1

# **TABLE OF AUTHORITIES**

2

C<small>ASES</small>

3

4  Achal v. Gate Gourmet, Inc.,
    114 F. Supp. 3d 781 (N.D. Cal. 2015)……………………………………..13

5

6  Altera Corp. v. Clear Logic, Inc.,
    424 F.3d 1079 (9th Cir. 2005)……………………………………………..24

7

8  Arnold v. Sessions,
    No. 4:18-CV-00553-KAW, 2018 WL 6728008 (N.D. Cal. Dec. 21, 2018)…….16

9

10 Ashcroft v. Iqbal,
    556 U.S. 662 (2009)………………………………………………….13

11

12 Borja-Valdes v. City & Cty. of S.F.,
    No. 3:14-cv-04168-CRB, 2015 U.S. Dist. LEXIS 125252
13   (N.D. Cal. Sep. 18, 2015)…………………………………………..15

14 Doe v. Wynn Resorts Ltd.,
    No. 20-16551, 2021 U.S. App. LEXIS 34807 (9th Cir. Nov. 23, 2021)………..28
15

16 Eminence Cap., LLC v. Aspeon, Inc.,
    316 F.3d 1048 (9th Cir. 2003)………………………………………..28
17

18 Emrich v. Touche Ross & Co.,
    846 F.2d 1190 (9th Cir. 1988)………………………………………..18
19

20 Go Daddy Operating Co., LLC v. Ghaznavi,
    No. 17-cv-06545-PJH, 2018 U.S. Dist. LEXIS 33002
21   (N.D. Cal. Feb. 28, 2018)……………………………………………..25

22

23 GSI Tech. v. United Memories, Inc.,
    No. 5:13-cv-01081-PSG, 2014 U.S. Dist. LEXIS 54371
24   (N.D. Cal. Apr. 18, 2014)…………………………………………..26

25

26

4

27

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

28

*Karpe v. Chao*,
    416 F. Supp. 3d 1021(S.D. Cal. 2019)…………………………………..17

*Korea Supply Co. v. Lockheed Martin Corp.*,
    131 Cal. Rptr. 2d 29 (2003)…………………………………………..21, 23

*Leaser v. Prime Ascot, L.P.*,
    No. 2:20-CV-02502-TLN-AC, 2022 WL 2160386
    (E.D. Cal. June 15, 2022)……………………………………………..18

*Lee v. Hertz Corp.*,
    330 F.R.D. 557 (N.D. Cal. 2019)…………………………………..14

*Liu v. Uber Tech. Inc.*,
    551 F. Supp. 3d 988 (N.D. Cal. 2021)…………………………………..16

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008)…………………………………………..13

*Monex Deposit Co. v. Gilliam*,
    680 F. Supp. 2d 1148 (C.D. Cal. 2010)………………………….23, 24, 25

*Nance v. Miser*,
    No. CV130313PHXSMMDKD, 2014 WL 11332298
    (D. Ariz. Sept. 22, 2014), *affd*, 624 Fed. Appx. 610 (9th Cir. 2015)……………16

*Nelson v. Tucker Ellis LLP*,
    48 Cal. App. 5th 827 (2020)…………………………………………..21

*Rademacher v. American Broadcasting Companies, Inc.*,
    Case No. 21STCV45383 (Supr. Ct. L.A. Cnty)………………………….19

*Sebastian Intl., Inc. v. Russolillo*,
    162 F. Supp. 2d 1198 (C.D. Cal. 2001)………………………………..23, 26

*Smith v. VCA, Inc.*,

5

No. CV 21-9140-GW-AGRX, 2022 WL 2037116
(C.D. Cal. Apr. 6, 2022)……………………………………………18

Soil Retention Prod., Inc. v. Brentwood Indus., Inc.,
521 F. Supp. 3d 929 (S.D. Cal. 2021)………………………………...25

Starr v. Baca,
652 F.3d 1202 (9th Cir. 2011)...........................................................13

Tavernier v. Maes,
51 Cal. Rptr. 575 (1966)……………………………………………...28

Transcription Communs. Corp. v. John Muir Health,
No. C08-4418 TEH, 2009 U.S. Dist. LEXIS 25151
(N.D. Cal. Mar. 13, 2009)……………………………………………25

United States v. Maricopa County, Ariz.,
915 F. Supp. 2d 1073 (D. Ariz. 2012)………………………………...17

United States v. Ritchie,
342 F.3d 903 (9th Cir. 2003)................................................. 18

Wahl v. American Broadcasting Companies, Inc.,
Case No. 22STCV19481 (Supr. Ct. L.A. Cnty)…………………………18

STATUTES
42 U.S.C. § 12112 ..................................................................... 22
42 U.S.C. § 2000e-2 ............................................................. 14, 16
Cal. Civ. Code § 56 ................................................................. 22

OTHER AUTHORITIES
Rule 8(a) ............................................................................ 15
Rule 12(b)(6) ....................................................................... 13

6

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

## __INTRODUCTION__

For 30 years, Rockmond Dunbar ("**Mr. Dunbar**") has worked as an actor for Defendants or their parent company, The Walt Disney Company ("**Disney**"). Both Mr. Dunbar and Defendants have profited from this long relationship, with Mr. Dunbar attracting an excellent reputation in the industry. Most recently, Mr. Dunbar spent the last five seasons portraying a character in Defendant Twentieth Century Fox Television's ("**Fox**") hit show, 9-1-1. He was the only leading black male character, and one of the few on prime time television. He continued working throughout the pandemic, adhering closely to Fox's workplace safety protocols such that he did not contract COVID-19 while on set.

Despite this dedication, and the high quality of his work, Defendants refused to accommodate Mr. Dunbar's religious beliefs, a decision that was wrongfully influenced by the fact that Mr. Dunbar is black. Specifically, in the Fall of 2021, Defendants initiated a new requirement that mandated certain employees, like Mr. Dunbar, be vaccinated against the COVID-19 virus. Defendants told their employees that they could request both religious and medical exemptions to this mandate. For the last 8 years, Mr. Dunbar has sincerely adhered to the teachings of the Church of Universal Wisdom, which prohibit, among other things, the use of medication or other chemical substances that defy natural law. Mr. Dunbar and his family have long refused medical treatment due to this belief and have refused to be vaccinated against COVID-19. Therefore, Mr. Dunbar requested a religious exemption to Fox's vaccine mandate. Defendants never took this request seriously, mocking Mr. Dunbar's beliefs by calling his religion "fake" and accusing him of being merely an "anti-vaxxer." Given this attitude, it is no surprise that Defendants rejected Mr. Dunbar's requested accommodation out of hand, without even interviewing him to understand the sincerity of his beliefs.

7

When Mr. Dunbar then refused to compromise his beliefs by obtaining the vaccination, Defendants summarily fired him. By doing so, Defendants avoided paying Mr. Dunbar over $1 million on his pay or play contract. After Mr. Dunbar tried to protect himself by retaining counsel to challenge his unlawful termination, Defendants decided to make an example out of him to ensure other employees did not challenge Defendant's vaccination mandate. Defendants knew that Mr. Dunbar had a number of outside projects that he was working on, including a film he co-wrote and was close to getting produced. As such, Defendants wrongfully leak to the media that Mr. Dunbar had disingenuously sought exemptions to the vaccine requirements, and that he was in fact fired for being unvaccinated. When they leaked this information, Defendants' agents knew that in the politicly charged atmosphere in late 2021, being unvaccinated meant that many people would not want to work with Mr. Dunbar, and even those that might want to work with him would want to avoid being associated with him due to the negative press the leak generated. That is exactly what happened. Due to the leak, many name actors have refused to work with Mr. Dunbar on his film project, which resulted in nearly half of the funding for the film being withdrawn. Mr. Dunbar initiated this action to clear his name, reclaim respect for his sincerely held religious beliefs, and to recover the money that Defendants refused to pay him after wrongfully terminating him.

Mr. Dunbar asserted thirteen causes of action in his complaint. In their current motion, Defendants only seek to dismiss three of those causes of action, conceding that discovery must proceed on the other ten claims, including his claims for racial and religious discrimination. However, even just focusing on those three causes of action, Defendants' motion should still be denied because Defendants' arguments amount to nothing more than misinterpretations of Mr. Dunbar's causes of action and an attempt to raise the pleading standard to avoid liability.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

## STATEMENT OF FACTS

**Mr. Dunbar's Sincerely Held Religious Beliefs and his Career with Defendants**

Since early 2014, Mr. Dunbar has adhered to the teachings of the Church of Universal Wisdom, a religion founded in 1974 on the premise that God provides healing from above, downward to His followers and the healing through God's grace begins from inside. FAC ¶ 25. Universal Wisdom teaches that the supreme attainment is the health and purity of body, mind, and spirit expressed through the concept of universal wisdom. *Id.* With this in mind, the tenets of Universal Wisdom include, but are not limited to, the moral obligation to avoid medical intervention that intentionally introduces into the body any medication, chemicals, or other foreign matter or substances not in harmony with the laws of nature. *Id.* ¶ 27. In accordance with these sincerely held religious beliefs, Mr. Dunbar has rejected invasive and non-emergency/life-saving medical intervention in the past and continues to do so. *Id.* ¶ 28.

Mr. Dunbar has been an actor, producer, director, and writer for nearly thirty years, and was a regular on Defendant Fox's television show "9-1-1" from the pilot during season 1 through episode 9 of season 5. FAC ¶¶ 29-31. Mr. Dunbar was the only black male lead on the series and received significant praise for his work on the show, including from the showrunner and producers. *Id.* ¶¶ 31-34.

**Mr. Dunbar's Request for Religious and Medical Exemptions**

When the global pandemic hit, Defendants began implementing mitigation procedures for its workforce, such as wearing masks, social distancing and testing three times a week. FAC ¶¶ 36, 42. Mr. Dunbar worked through the entire pandemic while filming on set for the "9-1-1" series. *Id.* ¶ 43. He consistently complied with all the required mitigation procedures, and, even though other actors tested positive, Mr. Dunbar never tested positive for COVID-19 while working. *Id.*

9

In September 2021, Fox formally announced a policy that required "Zone A" employees (which included actors, producers, and writers) to be fully vaccinated for COVID-19 by October 18, 2021. FAC ¶ 41. On September 29, 2021, an email was sent to employees, directing anyone seeking a medical or religious accommodation for this COVID-19 vaccine mandate to contact Employee Relations. *Id.* ¶ 46.

At the time of this email, Mr. Dunbar was out of town filming a different TV show. FAC ¶ 45. Nevertheless, between about September 29 and 30, 2021, Mr. Dunbar's agents notified Fox that Mr. Dunbar would submit documentation for both a medical and religious exemption on October 3 or 4, 2021 when he finished filming the other show. *Id.* ¶ 49. On September 30, 2021, Ms. Erin Nguyen ("**Ms. Nguyen**") acknowledged via email to Mr. Dunbar's agent that Mr. Dunbar would be requesting an accommodation, which addressed both medical and religious exemptions. *Id.* ¶ 50.

On Thursday, September 30, 2021, Mr. Dunbar's agents forwarded to Defendants a physician's letter stating that Mr. Dunbar's medical history is incompatible with all forms of the COVID-19 vaccine. FAC ¶ 51. The following Monday, October 4, 2021, Mr. Dunbar submitted the completed COVID-19 Vaccination Accommodation Request Form, seeking both a medical and a religious exemption. *Id.* ¶¶ 53-54.

The same day, October 4th, Ms. Nguyen notified Mr. Dunbar's agents that his physician's letter was insufficient to support a medical exemption and asked if Mr. Dunbar was now changing to request a religious accommodation. FAC ¶ 55. In response, Mr. Dunbar's agents requested an appeal and forwarded a letter from Mr. Dunbar refuting the claim that he was changing from a medical to a religious exemption. *Id.* ¶ 56. The following day, October 5, 2021, Ms. Nguyen informed Mr. Dunbar that his last day working on set would be October 18, 2021, because two weeks was supposedly not enough time for Employee Relations to process Mr. Dunbar's accommodation requests.

10

1    *Id.* ¶ 57.  In this communication, Ms. Nguyen did not substantively respond to Mr.

2    Dunbar's religious exemption request, but appeared to dismiss that request by claiming

3    that Mr. Dunbar had "pivoted" from a medical exemption to a religious exemption.  *Id.*

4    Mr. Dunbar's agent responded by stating that Mr. Dunbar was still willing to speak with

5    Ms. Nguyen to explain his beliefs.  *Id.* ¶ 58.

6    When they heard nothing more from Ms. Nguyen, on October 12, 2021, Mr.

7    Dunbar again offered to have a discussion with Ms. Nguyen regarding any questions she

8    may have concerning his exemption requests. FAC ¶ 59.  Ms. Nguyen responded that she

9    could not speak to him because the matter was now in the hands of "Disney legal",

10   nevertheless, the following day Ms. Nguyen requested additional information from Mr.

11   Dunbar regarding his medical exemption, while ignoring his religious exemption.  *Id.*

12   ¶¶ 60-61. Ultimately, Defendants refused Mr. Dunbar's medical exemption request

13   because they would not accept his doctor's signed letters, even after the physician made

14   Disney's requested changes to the letter and met with a Disney-affiliated physician.  *Id.*

15   ¶¶ 61-62.

16   **Defendants' Abrupt Termination of Mr. Dunbar**

17   October 18, 2021 was Mr. Dunbar's last day shooting on set for 9-1-1.  FAC ¶ 63.

18   The show's producer/show runner Tim Minear's ("**Mr. Minear**") believed that Mr.

19   Dunbar could be accommodated on set, and pushed for a plan to bring Mr. Dunbar back

20   to the show at the end of the season.  *Id.* ¶¶ 65-66.  Despite these efforts, Mr. Minear told

21   Mr. Dunbar that after talking to "Disney legal" he was concerned that if he continued to

22   advocate for Mr. Dunbar, Mr. Minear's job would be in jeopardy.  *Id.* ¶¶ 65-66.

23   Nevertheless, Mr. Minear had Mr. Dunbar's character leave for a humanitarian mission

24   in Haiti, which left open the possibility that he would return.  *Id.* ¶¶ 63-64.

25

26

27

28

As of Mr. Dunbar's last day on set, Defendants had still not informed him of their conclusion regarding his religious accommodation request. Therefore, on November 1, 2021, Mr. Dunbar's undersigned counsel sent a letter to Defendants advocating for Mr. Dunbar's religious and medical accommodation requests. FAC ¶ 80. Thereafter, on November 10, 2021, Mr. Dunbar received an email from "Disney General Entertainment Employee Relations Team" rejecting his accommodation requests, however that letter also stated that the company could not accept the accommodation request "without discussing [it] further with" Mr. Dunbar. *Id.* ¶ 81. But, no such discussion occurred because, on the same day, Mr. Dunbar also received a letter from Fox terminating him. *Id.* ¶ 82. The only reason provided for his termination was his failure to compromise his religious beliefs by obtaining the COVID-19 vaccination. *Id.* ¶ 83. Conveniently for Defendants, they were able to claim that Mr. Dunbar's refusal was a breach of his employment agreement and therefore Fox was "released and discharged from all obligations to" Mr. Dunbar. *Id.* ¶¶ 81-85. By refusing to accommodate Mr. Dunbar's requests, and declaring a breach, Fox was able to avoid paying him more than $1 million on his pay or play contract. *Id.*

Neither Ms. Nguyen, nor any of Defendants' other agents, ever met directly with Mr. Dunbar regarding his religious exemption request, or even asked him any questions regarding his beliefs. FAC ¶¶ 4, 59, 79, 99. Instead, they concluded that his beliefs were insincere, based on little more than their biased beliefs regarding Mr. Dunbar's race and religion, falsely accusing him of "pivoting" from a medical to a religious exemption, referring to Mr. Dunbar's religion as "fake" and that Mr. Dunbar is merely an "anti-vaxxer," and acting based on their preconceived bias regarding vaccine hesitancy among the black community. FAC ¶¶ 69-72, 76-79. Defendants' pre-conceived notions regarding the religious and vaccination views of Mr. Dunbar, and black Americans

12

generally, wrongfully prejudiced their analysis of Mr. Dunbar's religious accommodation request, which lead directly to their pretextual determination that his beliefs were not sincerely held. FAC ¶ 74.

**Defendants' Leak of Information to Damage Mr. Dunbar's Career**

Mr. Dunbar's last episode of "9-1-1" aired on November 15, 2021. FAC ¶ 87. During his 30-year career, he had never been the subject of major negative publicity in the entertainment industry. *Id.* ¶ 128. However, on November 16, 2021, the website Deadline published an article containing confidential medical information and employee personnel record information that originated from Defendants' representatives. *Id.* ¶¶ 87-88. The article stated that sources told the author Mr. Dunbar "requested a medical exemption and **later sought** a religious exemption" in order to intentionally imply Mr. Dunbar's exemption requests were insincere. *Id.* ¶ 89 (emphasis added). Prior to this article, only Defendants' agents have pushed the narrative that Mr. Dunbar first sought a medical exemption and later "pivoted" to a religious exemption, whereas Mr. Dunbar has consistently explained that he all along had sought both. *Id.* ¶¶ 89-90. Mr. Dunbar believes Defendants agents leaked this information intentionally to harm his career in retaliation for his challenge of the denial of his religious exemption in order to set an example for other Disney/Fox/ABC employees to dissuade them from challenging the company's denial of their accommodations requests. *Id.* ¶ 169.

As a result of Defendants' discrimination and retaliation against Mr. Dunbar, including the intentional and malicious leak of confidential information to the media, Mr. Dunbar has been "blacklisted" and publicly labeled a "non-complier" and "anti-vaxxer" resulting in him being effectively placed on a "do not hire" list. FAC ¶¶ 113-115. This directly resulted in Mr. Dunbar losing investment funding for a film project titled "The Rearing." *Id.* ¶ 125. Defendants were aware that Mr. Dunbar had engaged in side

13

ventures, including developing the Rearing. *Id.* On November 8, 2021, they received $1 million in funding. *Id.* ¶ 118. However, as a result of Defendants' malicious leaks, A and B list talent backed away from the Project due to the negative media regarding Mr. Dunbar generated by the leak. FAC ¶¶ 118-124. The loss of this talent caused the investors to withdraw half the initially promised $1 million. *Id.* ¶ 125.

Despite the damage to his career caused by Defendants' leak, in the subsequent months, Mr. Dunbar again offered to work with Defendants and to answer any questions they had regarding his request for accommodations. FAC ¶ 101-102. Nonetheless, in two separate communications in November 2021 and January 2022, counsel for Defendant Fox stated that any such questions were irrelevant because "there would have been no reasonable accommodations available that would have allowed him to perform the essential functions of his role while adequately protecting the health and safety of Mr. Dunbar and his colleagues." *Id.* ¶ 105. This excuse is clearly pretextual because if there was no way to accommodate Zone A actors, then there was no reason for Defendants to explicitly seek requests for accommodations, and it is contradicted by the "9-1-1" producers' statement that Mr. Dunbar could be accommodated. *Id.* ¶¶ 105-107. Moreover, two other non-black actors on "9-1-1" were given paid time off for non-religious reasons while Mr. Dunbar was terminated. *Id.* ¶ 110.

## **PROCEDURAL HISTORY**

On February 16, 2022, Mr. Dunbar filed his Complaint in this action. (Dkt. No. 1.) The parties then engaged in a meet and confer process, which resulted in Mr. Dunbar dropping one of his counts, and filing his First Amended Complaint on May 6, 2022. (Dkt. No. 29.)

In the FAC, Mr. Dunbar asserted thirteen counts against one or both of the Defendants: (1) Religious Discrimination under Title VII; (2) Disparate Impact on the

14

Basis of Religion under Title VII; (3) Race Discrimination under Title VII; (4) Retaliation under Title VII; (5) Religious Discrimination under the California Fair Employment Housing Act ("CFEHA"); (6) Race Discrimination under CFEHA; (7) Retaliation under CFEHA; (8) Dissemination of Confidential Medical Information under the Americans with Disabilities Act; (9) Dissemination of Confidential Medical Information under the California Confidentiality of Medical Information Act; (10) Breach of Contract; (11) Breach of the Implied Covenant of Good Faith and Fair Dealing; (12) Intentional Interference with Prospective Economic Advantage; (13) Negligent Interference with Potential Economic Advantage.  Thereafter, on June 3, 2022, Defendants filed the instant motion in which they seek to dismiss only three out of the thirteen counts.  (Dkt. No. 38.)

## STANDARD OF REVIEW

Rule 12(b)(6) merely requires allegations that, taken as true and in the light most favorable to plaintiff, "plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A complaint need only "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  On a Title VII claim, "[a] plaintiff need not plead a prima facie case in order to survive a motion to dismiss[.]" *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 796 (N.D. Cal. 2015). Rather, dismissal is "appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008).

## ARGUMENT

**I.  DEFENDANTS VIOLATED MR. DUNBAR'S RIGHTS UNDER TITLE VII BY ENGAGING IN AN UNLAWFUL EMPLOYMENT PRACTICE**

15

**THAT CAUSED A DISPARATE IMPACT ON THE BASIS OF RELIGION**

Title VII provides that an unlawful employment practice is established when the plaintiff shows that an employment policy causes a disparate impact on a protected group and the employer cannot show the policy is necessary for their business or the employer refuses to accept an alternative employment practice. 42 U.S.C. § 2000e-2(k)(1)(A).  Mr. Dunbar pled that Defendants' policy of not providing accommodations disparately impacted employees, such as himself, who hold religious beliefs that prevent them from receiving the COIVD-19 vaccine, and that Defendants refused to even discuss any alternative business practices that could have accommodated those religious believers.

Defendants now misinterpret Mr. Dunbar's allegations as defining the protected group as exclusively the members of the Church of Universal Wisdom, in order to argue that only Mr. Dunbar was affected by the policy, and as such there was no disparate impact on a protected group.  However, when the effected group is understood to be all employees with a religious belief that prohibits them from receiving the COVID-19 vaccination, both the allegations in the FAC and events that have occurred recently show that Defendants' COVID-19 policy unquestionably had a disparate impact on a protected group of employees.

**A. All that is necessary is a Short and Plain Statement of Disparate Impact in an Employment Discrimination Claim to Give Fair Notice to the Defendant**

To properly plead a disparate impact claim under Title VII, the complaint must allege facts sufficient to: "'(1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact.'" *Lee v. Hertz Corp.*, 330 F.R.D. 557, 561 (N.D. Cal. 2019) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir, 2002)).  On a Title VII claim,

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

a plaintiff need provide only "a short and plain statement of the claim showing that the pleader is entitled to relief" under FRCP 8(a)(2). *Borja-Valdes v. City & Cty. of S.F.,* No. 3:14-cv-04168-CRB, 2015 U.S. Dist. LEXIS 125252, at *18 (N.D. Cal. Sep. 18, 2015). Mr. Dunbar has satisfied Fed. R. Civ. Pro. 8(a) and has provided fair notice to Defendants.

**B. Defendants Try to Evade Liability for Disparate Impact Religious Discrimination by Improperly Defining the Group to Only Mr. Dunbar**

Of the three pleading requirements for a disparate impact claim, Defendants do not challenge, and therefore concede, that the second (*i.e.*, identify the employment practice) and third (*i.e.*, show causation) requirements have been met.  Nor could they challenge these requirements because the FAC clearly identifies the specific employment practice, *i.e.*, Defendants' vaccination policy and its refusal to "recogniz[e] and accommodate[e] a sincere religious belief" that prevents vaccination.  FAC ¶ 151.  Likewise, the FAC also describes the causation, both by noting that the sole reason for Mr. Dunbar's termination was his refusal to compromise his religious belief (*Id.* ¶ 83), and that Defendants asserted as a pretextual reason for terminating Mr. Dunbar that "there would have been no reasonable accommodations available," which as discussed was directly refuted by the facts (*Id.* ¶ 105).

Defendants only claim that Mr. Dunbar did not identify "even one other member of the Church of Universal Wisdom and/or whether that person's employment was terminated in connection with the mandatory vaccination policy."  (Dkt. No. 38 p. 4.) There are at least two problems with this argument.  *First*, Defendants improperly define the effected group as "one person from the Church of Universal Wisdom[.]" *See* Dkt. No. 38 p. 4. In doing so, Defendants are artificially shrinking the size of the group in order to make it appear that only Mr. Dunbar was effected.  The Complaint does not limit the impacted group to just members of the Church of Universal Wisdom.  To the contrary,

17

the FAC asserts that Defendants' COVID-19 policy effected anyone with a sincere religious belief opposed to vaccination. 42 U.S.C. § 2000e-2(b) (listing "religion" as one of the protected classes); *Nance v. Miser*, No. CV130313PHXSMMDKD, 2014 WL 11332298, at *3 (D. Ariz. Sept. 22, 2014), *aff'd*, 624 Fed. Appx. 610 (9th Cir. 2015) ("The right to religious practice is not limited to beliefs which are shared by all of the members of a religious sect." (internal quotations omitted)).  Nothing about Defendants' decision to deny Mr. Dunbar a religious accommodation turned on "any specific facts concerning Mr. Dunbar's personal beliefs or practices" regarding the Church of Universal Wisdom. FAC ¶ 74. Instead, Defendants told Mr. Dunbar that there were no possible reasonable accommodations for their COVID-19 vaccine mandate. FAC ¶ 105. If Defendants believed that, then they could not have accepted any reasonable accommodations for anyone with a sincere religious belief that prevents vaccination. As such, Mr. Dunbar alleges that Defendant Fox's vaccination policy had a disparate impact "by not **recognizing and accommodating a sincere religious belief[.]**"[1] FAC ¶ 151 (emphasis added).

---

[1] Mr. Dunbar's claim is distinguishable from the two disparate impact cases cited by Defendants where the court dismissed disparate impact claims based on individual experiences.  In those cases it was not clear from the facts whether the policy at issue would or could have an effect on other members of the alleged group. *Liu v. Uber Tech. Inc.*, 551 F. Supp. 3d 988, 991 (N.D. Cal. 2021) (holding that the court could not determine whether any other Uber drivers were being terminated due to their race because the plaintiff only alleged information regarding himself, and "offered no allegations about what is actually happening (or appears to be happening) with driver terminations at Uber"); *Arnold v. Sessions*, No. 4:18-CV-00553-KAW, 2018 WL 6728008, at *9 (N.D. Cal. Dec. 21, 2018) (holding that it was speculative whether an FBI policy regarding reporting sexual harassment had an adverse effect on other women, and therefore the plaintiff needed to provide additional examples). Here, however, there can be no question that Defendants' COVID-19 vaccination mandate, and their belief that no accommodations were possible, would undeniably have an adverse effect on anyone who held religious beliefs that prevented vaccination.  An assertion that is borne out by the allegations in the *Wahl* and *Rademacher* complaints discussed below.

18

---

*Second*, Defendants appear to be under the misguided belief that, in order to satisfy the pleading standard for a disparate impact claim, Mr. Dunbar must allege a statistical analysis or must pierce any corporate vail of secrecy to uncover other individuals who are similarly situated.  At the pleading stage there is often a limited amount of information available to a plaintiff regarding the impact of a policy on other employees.  As such, courts regularly hold that "[a]t the motion to dismiss stage, a complaint need not allege statistical data" because at that stage "there is no reason [a plaintiff] would have this kind of statistical evidence yet."  *United States v. Maricopa County, Ariz.*, 915 F. Supp. 2d 1073, 1078 (D. Ariz. 2012) (gathering cases regarding same); *Karpe v. Chao*, 416 F. Supp. 3d 1021, 1029 (S.D. Cal. 2019) (holding that statistical analysis is not required in a pleading because the plaintiff  asserted that he could not "provide statistical evidence at this stage of the proceedings without the benefit of discovery").

This disparity of information is especially true here.  As described in the FAC, the accommodation process was not clearly conveyed to Mr. Dunbar, and information regarding an individual's exemption requests and employment files should be and are typically held in confidence.  FAC ¶¶ 78, 113, 213-217.  Thus, when he filed his Complaint, it would not have been reasonable to expect Mr. Dunbar to be aware of other instances outside the 9-1-1 cast and crew where a Fox or ABC employee sought and received a religious accommodation, or was terminated due to a refused accommodation. With regard to his immediate work colleagues (*i.e.,* the 9-1-1 cast and crew), Mr. Dunbar notes in the FAC that two other individuals were granted some form of accommodations to permit them to continue to work on the 9-1-1 set, but he is unaware of the specifics of those accommodations (other than that he did not think they were religious).  FAC ¶ 110.

Despite this supposed confidentiality, since Mr. Dunbar filed this action, more individuals have publicly asserted religious discrimination claims against Defendants.

19

Specifically, Mr. Dunbar has become aware of at least three individuals who have filed state actions alleging  religious discrimination claims against Defendant ABC because their religious accommodation requests regarding the COVID-19 vaccination requirement were denied and they were subsequently terminated.  For example, on June 14, 2021, a father and son, James Wahl and Timothy James Wahl filed a complaint against Defendant ABC.  *Wahl v. American Broadcasting Companies, Inc.*, Case No. 22STCV19481 (Supr. Ct. L.A. Cnty), Complaint ¶ 5.[2] Request for Judicial Notice ("RJN") ¶ 3, Ex. 3. They assert that they:

> requested a religious exemption to the Covid Vaccine Mandate.
> Although ABC said it would grant exemptions for sincerely held
> religious objections to the Covid-19 shots, it refused to accept
> Plaintiffs' request. It denied their requests without explanation,
> one week after they requested them.

*Id.* ¶ 6.  The Wahls were allegedly interviewed by an ABC attorney before their requests for religious exemptions were denied on November 9, 2021, and later their contract was terminated.  *Id.* ¶¶ 33, 50.

---

[2] The Court should take judicial notice of the *Wahl* and *Rademacher* complaints.  "A court may … consider certain materials—… matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  "The Ninth Circuit has held that proceedings and determinations of the courts are a matter of public record suitable for judicial notice."  *Leaser v. Prime Ascot, L.P.*, No. 2:20-CV-02502-TLN-AC, 2022 WL 2160386, at *3 (E.D. Cal. June 15, 2022) (citing *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988)).  As such, the *Wahl* and *Rademacher* complaints are proper subjects of judicial notice.  *Id.* (considering a complaint filed in another action on a motion to dismiss); *Smith v. VCA, Inc.*, No. CV 21-9140-GW-AGRX, 2022 WL 2037116, at *2 (C.D. Cal. Apr. 6, 2022) (granting plaintiffs' request for judicial notice of an amended complaint).  If, however, the Court does not grant judicial notice, then Mr. Dunbar requests leave to amend the FAC to include descriptions of the *Wahl* and *Rademacher* complaints.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

Likewise, Ingo Rademacher, who was a cast member on the ABC-produced soap opera General Hospital for 25 years also filed a religious discrimination claim against ABC. *Rademacher v. American Broadcasting Companies, Inc.*, Case No. 21STCV45383 (Supr. Ct. L.A. Cnty), First Amended Complaint ¶ 5.[3] RJN ¶ 2, Ex. 2. In a recently filed amended complaint, Mr. Rademacher asserts that:

> He requested a religious exemption to the [ABC/Walt Disney] Covid Vaccine Mandate. Although ABC said it would grant exemptions for sincerely held religious objections to the Covid-19 shots, it refused to accept Mr. Rademacher's request.

*Id.* ¶ 5. Mr. Rademacher requested a religious exemption in October 2021, like the Wahls he was interviewed by ABC, but he was terminated on November 5, 2021. *Id.* ¶¶ 30-32.

The Wahls and Mr. Rademacher's claims are public, and follow a similar pattern to Mr. Dunbar's claims. Since originally filing this action Mr. Dunbar also has privately learned about additional individuals who were similarly treated by Defendants. Dunbar Decl. ¶ 2. These allegations against Defendant ABC show a clear pattern in how ABC and the other Disney affiliates like Defendant Fox dealt with and ultimately denied, religious exemption requests. If anything, Mr. Dunbar's case is a more egregious example in that he was not even interviewed to permit him to explain his religious beliefs.

As shown, Mr. Dunbar's existing FAC more than adequately alleges the group of employees disparately impacted by Defendants' policy. The Wahls and Mr. Rademacher's examples further support Mr. Dunbar's claim that Defendants' policy had a disparate impact on many, if not all, employees who held religious beliefs that

---

[3] Mr. Rademacher filed his original complaint on December 13, 2021, but while referencing the religious exemption that complaint only asserted a claim under the California Constitution's right to privacy and bodily integrity. *Rademacher v. American Broadcasting Companies, Inc.*, Case No. 21STCV45383 (Supr. Ct. L.A. Cnty), Complaint ¶ 23. RJN ¶ 1, Ex. 1.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

prevented their vaccination.  Mr. Dunbar should not need to, but can easily amend his FAC to incorporate these additional examples, but either way, he has provided more than fair notice to Defendants to permit them to defend against his claims, and as such their motion to dismiss Mr. Dunbar's Second Count should be denied.

## II.    MR. DUNBAR HAS SUFFICIENTLY ALLEGED THAT DEFENDANTS INTERFERED WITH HIS PROSPECTIVE ECONOMIC ADVANTAGE

According to the FAC, when Mr. Dunbar had the temerity to retain counsel and challenge Defendants' decision to refuse his reasonable requests for accommodations, Defendants decided to make an example out of him.  FAC ¶ 5.  Mr. Dunbar had been a well-known and respected actor for 30 years, and if Defendants could harm his career, it would send a strong message to other employees that they should not challenge Defendants.  *Id.* ¶ 128.  Defendants knew Mr. Dunbar had other projects in the works. *Id.* ¶ 120.  Defendants retaliated against Mr. Dunbar by leaking to Deadline that his accommodation requests were denied, that he was fired for not being vaccinated, and implied that his accommodation requests were merely pretextual excuses to avoid vaccination, because they knew that such information would damage Mr. Dunbar's economic opportunities on those other projects.

Now, Defendants hope to avoid the consequences of their illegal leak of Mr. Dunbar's private confidential information by demanding that he meet unreasonable pleading requirements that they have fabricated from whole cloth in order to assert claims for either intentional or negligent interference with prospective economic relationships. The Court should reject Defendants' attempts to increase the pleading requirement and avoid paying for the damage their illegal leak caused.

22

## A. Mr. Dunbar Has Alleged Claims for Interference with Prospective Economic Advantage

The elements of intentional interference are "usually stated as follows: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.,* 131 Cal. Rptr. 2d 29, 45 (2003) (cited by Defendants) (internal quotations omitted). Similarly, the elements of negligent interference with prospective economic advantage are: (1) the existence of a valid economic relationship between the plaintiff and a third party containing the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge (actual or construed) of the relationship; (3) the defendant's knowledge (actual or construed) that the relationship would be disrupted if the defendant failed to act with reasonable care; (4) the defendant's failure to act with reasonable care; (5) actual disruption of the relationship; and (6) resulting economic harm. *Nelson v. Tucker Ellis LLP,* 48 Cal. App. 5th 827, 844 n.5 (2020).

Mr. Dunbar sufficiently alleged facts supporting all elements of both his counts for intentional and negligent interference with prospective economic advantage.  He plead that, like many actors, he regularly has multiple projects in the works at any one time in addition to his work for Fox on its 9-1-1 show.  FAC ¶¶ 45, 114.  As alleged in the FAC, there is no question that Defendants knew Mr. Dunbar had other projects, for example, they knew about his appearance on the show "The Game," which Mr. Dunbar had to obtain permission from Defendant Fox to appear on.  *Id.* ¶¶ 45, 120, 126, 251, 253.  One of these projects was a film that Mr. Dunbar and his wife had in development for some

23

time titled: The Rearing. *Id.* ¶¶ 117-118. The FAC repeatedly states that Defendants knew that Mr. Dunbar was working on this Project. *Id.* ¶¶ 120, 126, 251, 253. In early November 2021, Mr. Dunbar secured $1 million in funding for that Project, which was set to provide Mr. Dunbar and his wife economic benefits as compensation for writing, producing and co-directing the film. *Id.* ¶ 119.

The FAC then details how Defendants' agents disseminated to the media Mr. Dunbar's confidential medical information in violation of 42 U.S.C. § 12112(d) and Cal. Civ. Code § 56.20. *Id.* ¶¶ 88, 113, 126, 204, 219, 222, 252. Specifically, they leaked to Deadline that Mr. Dunbar was unvaccinated, and that he had sought exemptions to the COVID-19 vaccination mandate that were denied, falsely claiming that he pivoted from a medical to religious exemption to make it sound like his exemption requests were not legitimate. *Id.* Defendants did this intentionally, according to the FAC, in order to interfere with the economic advantages Mr. Dunbar would have received from the Project and his other ventures. *Id.* The FAC lays out how, as a result of the leaked information, "Mr. Dunbar has been essentially 'blacklisted' and publicly labeled a 'non-complier' and 'anti-vaxxer.'" *Id.* ¶ 113. It further describes how since the leaked information became public, he has lost numerous opportunities on his ongoing projects and has had multiple actors refuse to work with him on The Rearing for fear of also being "blacklisted" by association with him. *Id.* ¶ 114. Among other things, this caused Mr. Dunbar to lose funding for The Rearing because he was not able to secure prominent enough actors to fill the roles. *Id.* ¶¶ 123-127.

**B. Defendants' Attempts to Avoid Liability for Interfering with Mr. Dunbar's Projects are Unavailing**

Faced with these clear and precise factual allegations, Defendants attempt to change the standards that Mr. Dunbar must meet in order to plead an intentional or

24

negligent interference claim.   However, none of their attempts should be successful because the new requirements they add are not supported, even by the caselaw they cite.

### 1. Defendants Knew that Mr. Dunbar had Other Prospective Economic Relationships, Which is All That is Required

Defendants try to argue that in order to plead either intentional or negligent interference, "a plaintiff **must** plead facts explaining how somebody directly communicated information to the defendant" about the specific prospective relationship that was disrupted.  Dkt. No. 38-1 pp. 6-7 (emphasis added).  However, "a plaintiff need only show that the defendant acted with the knowledge that its wrongful acts were substantially certain to disrupt plaintiff's business expectancy."  *Korea Supply Co.,* 131 Cal. Rptr. 2d at 44-45 (the tort "does not require a plaintiff to plead that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage").  Even though a direct communication would satisfy this knowledge requirement, direct communication is not a required element of the claim. For example, in *Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148 (C.D. Cal. 2010), the Court held that the defendant's "**general knowledge** that [the plaintiff] had economic relationships with customers is sufficient to satisfy" the knowledge requirement.  *Id.* at 1162-1163 (emphasis added).

The *Monex* court ruled the way it did because the knowledge requirement just goes to the defendant's state of mind when it took actions that interfered with the potential economic advantage.  *Sebastian Intl., Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001) (cited by Defendants) ("the second element of this intentional tort relates to the state of mind of the defendant at the time that the alleged tort occurred").  Defendants argue that they could not act with the intent to interfere with an economic relationship if they had no idea the relationship exists, however what Defendants fail to note is that

25

"such intent can certainly be inferred if the defendant knows that contractual relations with a third party exist, but does not know the specific identity of the contractual party." *Id.* (holding that knowledge of a few contracts was sufficient to establish the state of mind required, even if the defendant did not know about every contract that it interfered with); *see also Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005) ("so long as [the defendant] knows he is interfering with a contractual relationship" he does not need to know which relationship he is interfering with); *Monex Deposit Co.*, 680 F. Supp. 2d at 1163 (permitting claim where the defendant had no "'knowledge of the injured party's specific identity or name'" but did know that at least some economic relationship existed with plaintiff's customers).

Here, just like the "general knowledge" of customer relationships approved in *Monex*, the FAC plausibly alleges that Defendants knew Mr. Dunbar had outside projects that he was working on, and alleged facts to support such knowledge. *Monex Deposit Co.*, 680 F. Supp. 2d at 1163. Again, the FAC explicitly says that Defendants knew about The Rearing project in particular. FAC ¶¶ 120, 126, 251, 253. Beyond that, the FAC further alleges that from time to time Mr. Dunbar had to ask for permission for such work, such as with "The Game", and that similar projects were publicly announced on websites like the "Breakdown Services," and (as addressed below in Section II.C.) Mr. Dunbar knows that he regularly discussed those projects, including The Rearing project specifically, with Defendants' employees and associates. FAC ¶¶ 45, 120; Dunbar Decl. ¶¶ 3-9.

The fact that Defendants knew these outside projects existed is sufficient to infer that when they leaked the information, they did so with the intent to interfere. FAC ¶ 126. Given the highly fraught politics regarding COVID-19 and vaccine mandates in the fall of 2021, when Defendants' agents leaked the information to Deadline, those agents knew

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

the leak was substantially certain to interfere with at least some of Mr. Dunbar's outside projects, even if they did not know exactly which project would be affected. *Id.* As such, it is irrelevant whether Mr. Dunbar had direct communications with Defendants regarding The Rearing, or if the Defendants found out about The Rearing specifically after the leak, because the FAC alleges that Defendants knew Mr. Dunbar had some outside economic relationships and intended to interfere with those relationships when they leaked the information. *Monex Deposit Co.*, 680 F. Supp. 2d at 1163; *see also Transcription Communs. Corp. v. John Muir Health*, No. C 08-4418 TEH, 2009 U.S. Dist. LEXIS 25151, at *31 (N.D. Cal. Mar. 13, 2009) (finding sufficient the allegation that the counterclaim-defendant "was aware that [the counterclaim-plaintiff] had a contractual relationship with a party other than" counterclaim-defendant, even if it did not know who that relationship was with).

The cases that Defendants rely on do not support their claim that direct communications about a specific contract are necessary to establish knowledge, or that Defendants had to have specific knowledge of the exact economic relationship they were interfering with. The first case, Defendants cite, *Soil Retention Prod., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929 (S.D. Cal. 2021) never claims that there must be direct communications. *Id.* at 962. It merely concludes that, among the many deficiencies with the intentional interference claim, a generic claim that the defendant "knew or should have known" of the relationship the plaintiff had with third parties was insufficient. *Id.* The court then used the hypothetical direct conversation quoted by Defendants as an example of what would satisfy the standard, but it did not state, nor did it cite any caselaw holding, that the plaintiff needed to specifically allege a direct communication. *Id.*

Likewise, in *Go Daddy Operating Co., LLC v. Ghaznavi*, No. 17-cv-06545-PJH, 2018 U.S. Dist. LEXIS 33002 (N.D. Cal. Feb. 28, 2018), another case Defendants rely

27

_____
PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

on, the plaintiff asked the court to assume that because a public database showed the defendants knew Go Daddy had registration services with those customers, that the defendants also must have known that Go Daddy had other contractual relationships, such as relationships for web design or search optimization. *Id.* at *26-27. The court refused to make this leap of logic because while the public database showed that the individuals were customers of Go Daddy for registration, it did not show that the customers also purchased the other services from Go Daddy, and it was only those other services that Go Daddy alleged the defendants interfered with. *Id.* The third case Defendants cite, *GSI Tech. v. United Memories, Inc.*, No. 5:13-cv-01081-PSG, 2014 U.S. Dist. LEXIS 54371 (N.D. Cal. Apr. 18, 2014), fairs no better, because it again never requires the direct communications that Defendants now want. Instead, in *GSI Tech.* the defendant allegedly knew a third party refused to work on a project once due to a non-compete clause, but the court held that this fact alone did not mean the defendant knew that the non-compete clause was still in effect three years later. *Id.* at *24.

Defendants also rely on *Sebastian Intl., Inc. v. Russolillo*, 162 F. Supp. 2d at 1203-04, to support their claim that the defendant must know about the specific contract being interfered with, but it actually reaches the opposite conclusion. In *Sebastian*, the defendants knew plaintiffs sold hair products to a large number of salons, but only had a representative list of some of the salons, and were not specifically aware of every one of the salons. *Id.* at 1204. Because the defendants knew their actions would interfere with at least the salons on the list, the court found defendants had the requisite state of mind to intentionally interfere with plaintiff's relationship with **all** the salons, even if the defendants did not know about every single economic relationship. *Id.*

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

## 2.  The FAC Clearly Pleads But For Causation

Defendants also argue that the FAC fails to allege that their leak was not the but for cause of the A and B list actors refusing to act in the Rearing.  There are several problems with this argument.  *First*, Defendants mis-identify the relevant economic relationship that was disrupted as Mr. Dunbar's relationship with the A and B list actors. The relevant relationship was the $1 million in funding for the Rearing.  The A and B list actors backing out resulted in $500,000 being withdrawn from that funding, which directly damaged Mr. Dunbar.  *Id.* ¶¶ 126-29.

*Second,* the FAC does allege a direct link between the leak and the damage to Mr. Dunbar.  Mr. Dunbar had not received any seriously negative publicity during his 30 year career.  FAC ¶ 128.  Nevertheless, after the leak occurred, the FAC asserts that:

> actors who were interested in the Project were unwilling to audition because of their fear of bad publicity about being associated with Mr. Dunbar due to his being blacklisted over the vaccine controversy publicized by Defendants.

FAC ¶ 123.  It was these actors refusal to work with Mr. Dunbar as a result of the leak, that caused the $500,000 to be withdrawn. FAC ¶ 125.

Defendants try to avoid this claim, by arguing that its not plausible because the actors would not have even read the script if it was truly the leak that caused them to avoid Mr. Dunbar.  However, this argument is pure speculation, not appropriate on a motion to dismiss where the plaintiff has the benefit of any doubt.  Moreover, it is entirely plausible to think that actors who are afraid of bad publicity would still privately accept a script from Mr. Dunbar, an actor they respect, and would provide positive feedback to Mr. Dunbar, again privately, but not want to publicly audition because that public act is what would link them to the negative publicity Defendants spread about Mr. Dunbar.

29

*Third*, Defendants are wrong to claim that the alleged economic relationship was too speculative.  Once the relationship is properly seen as the funding for the Rearing, which "Mr. Dunbar and his wife secured … from a professional athlete/investor and an independent production company" (FAC ¶ 118), there can be no question that, because this funding was already promised, it was not speculative in the least.  FAC ¶ 118.

## C. Mr. Dunbar Can Present Additional Evidence of Defendants' Knowledge of the Rearing Project

As shown, Mr. Dunbar alleged sufficient facts to state a claim that Defendants interfered with his prospective economic advantage. However, Mr. Dunbar can allege additional evidence that Defendants knew about The Rearing project prior to their leak to Deadline, which he can amend the complaint to include if the court find such information necessary.  *See Tavernier v. Maes,* 51 Cal. Rptr. 575, 579-80 (1966) (actual knowledge may be established by circumstantial evidence from which the knowledge of the fact in question can be reasonably inferred).  Leave to amend should be granted with "extreme liberality," *Eminence Cap., LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir. 2003), and dismissal of the pleadings with prejudice is only appropriate if the pleading cannot be cured by additional facts.  *See Doe v. Wynn Resorts Ltd.,* No. 20-16551, 2021 U.S. App. LEXIS 34807, at *5 (9th Cir. Nov. 23, 2021).  Even though the specific knowledge that Defendants argue for is not necessary in a complaint, with the below facts, Mr. Dunbar can strengthen his existing allegations regarding Defendants' knowledge of The Rearing project specifically, thereby addressing the specific issue of when Defendants knew about the project that Defendants harp on in their motion.

Mr. Dunbar can add to the complaint that:

PLAINTIFF'S OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

1. From January 2019 to November 2021, Mr. Dunbar, his wife and agents cast a wide net among Producers in the Entertainment Industry to obtain funding, a Production Company and talent for The Rearing.

2. An actor and Executive Producer of "9-1-1" was in possession of The Rearing's script in January 2019.

3. In March 2019, Mr. Dunbar's agents reached out to agents for an Actor and Producer regarding The Rearing and provided the script to her agents.  This Actor had produced a major television series for  ABC.

4. Two individuals, both creators, executive producers and writers of "9-1-1" were in possession of The Rearing script in in June 2020.

5. A "9-1-1" actor was given The Rearing script in July 2020 for the purpose of considering a lead role in the Project.

6. In July 2020, a producer received The Rearing script. This producer had a three-year creative development contract with Fox and had served as a consulting producer on a number of Fox  and Disney TV shows.

7. In October 2021, Mr. Dunbar and his wife secured $1 million in funding for The Rearing and arranged to send an offer to an actress for a lead role in the film.  The offer was sent to the actress on November 9, 2021 through Christi Holliday from Leah Daniels-Butler Casting.  Leah Daniels-Butler currently serves as Casting Director for television's #1 show "Empire" on Fox, and has worked on countless high-profile television and film projects.

Dunbar Decl. ¶¶ 3-9.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' motion to dismiss, or, in the alternative, allow Mr. Dunbar to amend his complaint.

31

Dated: July 1, 2022                    **SIRI & GLIMSTAD LLP**

By:  */s/ Caroline Tucker*
　　　Mason Barney (*Pro Hac Vice*)
　　　Elizabeth Brehm (*Pro Hac Vice*)
　　　Caroline Tucker
　　　Ursula Smith (*Pro Hac Vice)*

　　　Attorneys for Plaintiff
　　　ROCKMOND DUNBAR

32