**SIRI & GLIMSTAD LLP**
Mason Barney (*Pro Hac Vice*)
Email: mbarney@sirillp.com
Elizabeth A. Brehm (*Pro Hac Vice*)
Email: ebrehm@sirillp.com
Ursula Smith (*Pro Hac Vice*)
Email: usmith@sirillp.com
745 Fifth Ave, Suite 500
New York, NY 10151
Telephone: 212-532-1091
Facsimile: 646-417-5967

**PRECEPT GROUP, LLP**
Christopher Wren Czaplak (Cal. Bar No. 338818)
Email: chris@precept.co
8030 La Mesa Blvd., #268
La Mesa, CA 91942
Telephone: (619) 354-4434
Fax: (866) 265-7238

Attorneys for Plaintiff
ROCKMOND DUNBAR

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ROCKMOND DUNBAR, | Case No. 2:22−cv−01075−DMG−PD |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | |
| AMERICAN BROADCASTING COMPANIES, INC., TWENTIETH CENTURY FOX TELEVISION, A UNIT OF TWENTIETH CENTURY FOX FILM CORPORATION DOING BUSINESS AS 20TH TELEVISION, | |
| Defendants. | |

1

Rockmond Dunbar, by and through counsel, for his Second Amended Complaint against Defendants, hereby states as follows:

### INTRODUCTION

1.     Over the past nearly 30 years, Rockmond Dunbar ("**Mr. Dunbar**") has created a well-respected career as a black working actor, writer, and producer.  During his career, he has frequently been one of only a handful of black men with a lead actor role appearing on network television.  He is well respected by his peers and employers and had built a sterling reputation in the entertainment industry by appearing in numerous successful television shows such as "Soul Food," "Prison Break," "The Mentalist," and "Sons of Anarchy."

2.     Since early 2014, Mr. Dunbar and his family have been adherents to the teachings of the Church of Universal Wisdom ("**Universal Wisdom**"), which preaches that God and nature are one and that healing comes from God downward to His followers, which in turn emanates from within His followers, whom maintain a level of physical, spiritual, mental and emotional purity – which in turn, creates a balanced and 'clear' channel,  allowing for communication and healing through Universal Wisdom. For Mr. Dunbar and his family, their belief in Universal Wisdom is anchored in their ancestral heritage in Africa and helps them to link that heritage with their American experience. Mr. Dunbar believes he is obligated to avoid non-emergency and non-lifesaving medical intervention that intentionally introduces disease, medication, chemicals, or other foreign matter or substances unharmonious to the laws of nature into the body.  Mr. Dunbar has frequently adhered to this obligation by forgoing various medical interventions.  Mr. Dunbar is now compelled to bring this action because Defendants severely damaged his career by discriminating against him based on his race and religion.

3.     Mr. Dunbar has been the only black male lead actor on the hit television show "9-1-1" since it debuted.  Showing dedication to their work and employers, he and

2

his castmates continued working throughout the entire pandemic, taking reasonable precautions to protect against COVID-19 infection.  In fact, all of the fifth season of the show was shot in either 2021 or 2022.  In September 2021, Defendants introduced a new policy mandating that all employees be vaccinated against COVID-19, but allowed actors like Mr. Dunbar to request an accommodation based on either medical or religious reasons.  Mr. Dunbar submitted paperwork seeking both a religious and a medical accommodation which included personal statements regarding his faith and a clergy letter attesting to his membership in Universal Wisdom.  The producer of "9-1-1" assured Mr. Dunbar that he wanted him to remain with the show and that they could adjust his schedule to accommodate Mr. Dunbar's need to avoid obtaining the COVID-19 vaccine.  In fact, Mr. Dunbar understands that other members of the "9-1-1" cast and crew who also could not be vaccinated have been accommodated, though none sought a religious exemption and none were black.

4.     Nevertheless, the administrators who work for and/or are agents of Defendants never took Mr. Dunbar's requests for accommodations seriously.  They openly mocked his beliefs and proceeded to deny Mr. Dunbar his accommodations based on nothing more than rank hearsay and assumptions. Defendants, and agents thereof, refused to believe Mr. Dunbar's doctor's recommendation, and they refused to engage with Mr. Dunbar in any meaningful interactive communication regarding his religious beliefs, which is particularly unfortunate because, if they had, he could have explained that all of their assumptions were incorrect.  Because they refused to engage in the interactive process to accommodate him, in October 2021, Defendants, through their agents, barred him from the "9-1-1" set.  However, the "9-1-1" producers ensured him that his character's story showed him leaving only temporarily, and made clear that he could return to the show at any time.

5.     On information and belief, Defendants and other Disney subsidiaries, all implemented similar COVID-19 vaccination mandates, which were administered through

3

1  the same employee relations department, but the companies denied all or substantially all
2  religious exemption requests submitted by employees who adhere to a religious practice
3  that prohibits them from receiving the COVID-19 vaccines, regardless of the merits of
4  those exemption requests.

5      6.     Following his termination, Mr. Dunbar retained the undersigned counsel to
6  assert his right to proper accommodations.  In retaliation, Defendants, again through their
7  agents,  summarily terminated Mr. Dunbar's employment agreement, and refused to pay
8  him the hundreds of thousands of dollars that are still owed to him.  Then, wanting to
9  make an example out of Mr. Dunbar, he believes that Defendants' agents, acting within
10  that capacity, wrongfully leaked negative information to the media about his departure
11  from "9-1-1" including incorrectly stating that he sought first a medical exemption and
12  only later added the religious exemption request, both of which were denied.
13  Defendants' agents  deliberately made it appear that Mr. Dunbar was insincerely seeking
14  any means possible to avoid being vaccinated, rather than presenting the truth – that like
15  millions of other Americans, he is a sincere adherent to a non-mainstream religious belief
16  that prevents him from being vaccinated.

17      7.     After articles appeared in the media touting the story leaked by Defendants
18  about Mr. Dunbar, he essentially became persona non grata in his industry.  Despite his
19  decades of successful work and an impeccable reputation, and continuing interest in him
20  to play various roles, agents and casting directors have made clear that he was on a "no-
21  hire list" due to his beliefs.

22      8.     These actions by Defendants, through agents acting on their behalf, violated
23  Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*) ("**Title VII**")*,* the
24  California Fair Employment Housing Act (Cal. Gov. Code § 12900, *et seq.* ) ("**FEHA**"),
25  the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101, *et seq.*) ("**ADA**"), the
26  California Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq.*)
27  ("**CMIA**")  and common law principles of contract law.  Mr. Dunbar now brings this

28

4

action to clear his name and recover for the damage that Defendants' discriminatory actions caused to him and his family.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e-2, 42 U.S.C. § 12112 and 28 U.S.C. § 1331 because this action arises under federal law.

10.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, for state law claims because such claims stem from part of the same case or controversy arising from a common nucleus of operative fact.

11.     Venue is proper in this district as Defendants operate corporate headquarters in this district, and one or more of Defendants' acts and those events complained of occurred herein, pursuant to 28 U.S.C. § 1391.

12.     The Plaintiff and Defendants consented to the exclusive jurisdiction and venue in this Court in the Plaintiff's employment contract pursuant to 28 U.S.C. § 1404(a).

13.     This Court is authorized to grant Mr. Dunbar declaratory relief pursuant to 28 U.S.C. § 2202.

14.     This Court is authorized to grant Mr. Dunbar's prayed for relief regarding costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 2000e-5; 42 U.S.C. § 12117; 42 U.S.C. § 1981a, California Government Code § 12965(b), and/or California Civil Code § 56.35.

## PARTIES

15.     Mr. Dunbar is a resident of the State of Georgia.

16.     Defendant American Broadcasting Companies, Inc. ("**ABC**") is incorporated in Delaware, with its principal address at 77 W. 66th Street, New York, NY, 10023-6298, and has a mailing address at 500 S. Buena Vista Street, Burbank, CA 91521.

5

1   ABC is the cornerstone of Disney-ABC Television Group, the TV division of its ultimate

2   parent The Walt Disney Company ("**Disney**").

3        17.    Defendant Twentieth Century Fox Television, a unit of Twentieth Century

4   Fox Film Corporation doing business as 20th Television ("**Fox**") is a corporation

5   qualified to do business in the state of California, with corporate offices at 10201 W. Pico

6   Boulevard, Los Angeles, CA 90035.  In 2019 Disney acquired Fox, making it a wholly

7   owned subsidiary of Disney.

8        18.    On information and belief, ABC, Fox and Disney share many resources,

9   including legal services and some resources involved in creating COVID-19 policy

10   and/or providing exemptions to that policy.

11        19.    According to Defendants, Erin Truax Nguyen ("**Ms. Nguyen**") is an

12   employee of Defendant ABC, which is a direct or indirect subsidiary of Disney. On her

13   LinkedIn profile, Ms. Nguyen self-reports her title as "Director – Employee Relations"

14   at "Walt Disney Television" and "Disney General Entertainment Content".   Ms.

15   Nguyen's email signature block reflects that she works for "Employee Relations, Disney

16   General Entertainment."  At all relevant times, Ms. Nguyen acted as a representative or

17   agent of ABC, Fox and/or Disney regarding the processing and ultimate denial of Mr.

18   Dunbar's accommodation requests.

19        20.    According to Defendants, Tanya Menton ("**Ms. Menton**") is an employee

20   of TWDC Enterprise 18 Corp., which is a direct or indirect subsidiary of Disney. Ms.

21   Menton self-reports her current titles on her LinkedIn profile as "Vice President, The

22   Walt Disney Company," and "Vice President, Litigation and Employment Practices,

23   Disney ABC Media Networks."   At all relevant times, Ms. Menton acted as a

24   representative or agent of ABC, Fox and/or Disney regarding the processing and ultimate

25   denial of Mr. Dunbar's requests for medical and religious exemptions.

26        21.    Each of Defendants employs more than 15 employees.

27

28

SECOND AMENDED COMPLAINT

22.     Defendants are employers within the meaning of California and Federal statutory provisions cited herein.

23.     During the course of his nearly 30-year career, Mr. Dunbar has been an employee of Disney and/or Fox, including their predecessors and subsidiaries, in various capacities.

24.     All of the above paragraphs are incorporated into the following factual allegations and claims as if fully set forth therein.  Each of the following facts are incorporated into all of the others as if fully set forth therein.

## FACTUAL ALLEGATIONS

### Mr. Dunbar's Religious Beliefs

25.     Mr. Dunbar has sincerely held religious beliefs and convictions that directly conflict with his receiving the COVID-19 vaccines.

26.     Mr. Dunbar has been an adherent to the teachings of the Church of Universal Wisdom ("**Universal Wisdom**") since early 2014 following the birth of his first child in December 2013. In that time, Mr. Dunbar and his family have consistently followed the tenets of Universal Wisdom in their daily lives and in raising their children.

27.     Universal Wisdom was founded in 1974.  It includes the belief that the supreme attainment is the health and purity of body, mind, and spirit expressed through the concept of universal wisdom, and that harmony with all living things is the expression of God.  It is based on the concept that God and nature are one and that healing comes from above-downward, inward and out. This phrase explains that God provides healing from above, downward to His followers and the healing through God's grace begins from inside.

28.     Universal Wisdom deems it a sacrilege to depart from the precepts of the religion by the following (among other things):

a.  The ingestion of medication or other chemical substances that defy natural law.

7

b. The injection into the body of medication or other matter of substances that defy natural law.

c. The application of medication, chemicals, or other foreign matter or substances unharmonious to the laws of nature.

d. The inhalation of medication, chemicals, or other foreign substances in disharmony with the laws of nature.

29.     With this in mind, the tenets of Universal Wisdom include, but are not limited to, the moral obligation to avoid medical intervention that intentionally introduces into the body, through piercing of the skin or otherwise, any medication, chemicals, or other foreign matter or substances not in harmony with the laws of nature.

30.     Mr. Dunbar and his wife have rejected invasive and non-emergency/life-saving medical intervention in the past due to the tenants of their religion, and they continue to do so. Even though both Mr. Dunbar and his wife work in the entertainment industry, primarily in Los Angeles, their family relocated from California to Georgia in order to practice the tenets of their faith more freely and have found Georgia to be a more positive environment for their children's homeschool education in alignment with their faith.

**Mr. Dunbar's Employment with Defendants**

31.     Mr. Dunbar has been employed as an actor, producer, director, and writer in various capacities for nearly thirty years.   His page on the website IMDb includes 61 credits as an actor and 20 credits as either a producer, director, or writer.[1]  Those credits included regular roles on such hit televisions shows as "Prison Break," "The Game," "The Mentalist," "Sons of Anarchy," and "Soul Food."  The majority of his roles as an actor were with Defendants.

32.     Mr. Dunbar built his long career through hard work.  He has been recognized as an outstanding actor, winning a Black Real Award in 2002, and he was nominated for

---

[1] https://www.imdb.com/name/nm0241870/.

that award again in 2013 and 2014.  He was also nominated twice for an NAACP Image Award.

33.     Most recently, Mr. Dunbar has been a series regular on the Fox television show "9-1-1."  He appeared on the show from the first episode of season 1 through episode 9 of season 5.  Specifically, Mr. Dunbar was employed on "9-1-1" from September 29, 2017, through November 10, 2021.   During this time, Mr. Dunbar was the only black male lead on the series, and one of only a handful of black male leads on primetime network television.

34.     Throughout his time working for Defendants, they had no complaints regarding his job performance.

35.     Mr. Dunbar received significant praise for his work on "9-1-1".   For example, Entertainment publication TV Fanatic published a story on October 5, 2021 regarding Mr. Dunbar's performance in Season 5, Episode 3 of the show, stating: "And major shout-out to Rockmond Dunbar, who was an absolute rockstar here."  Similarly, TV Fanatic said of Mr. Dunbar's performance in his penultimate episode in Season 5, Episode 8: "Whenever Rockmond Dunbar does get a chance to shine, he always knocks it out of the park."

36.     This praise also came from his superiors on the show.  For instance, "9-1-1" Showrunner Tim Minear spoke highly of Mr. Dunbar during an interview published online in the entertainment publication "Decider" on January 3, 2022. When asked about Mr. Dunbar's refusal to be vaccinated: "I've known Rock for many years – we worked together on a show called Terriers, and then I cast him on this show because I knew how genius he was."

**The COVID-19 Pandemic**

37.     By Spring of 2020, the coronavirus, SARS-CoV-2, had spread to many nations, including the United States.

SECOND AMENDED COMPLAINT

38.     In that timeframe, Defendants began implementing certain mitigation procedures for its workforce, such as wearing masks, maintaining minimum distances from other workers, and receiving body temperature checks.

39.     Since then, three separate COVID-19 vaccines have been developed and authorized by the United States government for use.

40.     On August 23, 2021, the FDA issued full approval of one of those vaccines, the Pfizer-BioNTech vaccine called Comirnaty, for persons 16 years of age and older.

**Defendants' Vaccine Mandate**

41.     For purposes of addressing issues concerning the ongoing COVID-19 pandemic, employees in the film and television industry are divided into Zones A, B, C and so forth.  Zone A includes actors, producers, and writers.

42.     From about December 2020 through August 2021, the studio hosted several zoom meetings with representatives from Disney's Legal Department, Employee Relations, and COVID-19 compliance coordinators, acting as representatives or agents of Defendant Fox, to discuss the incentives offered for voluntary COVID-19 vaccination and the possibility of mandatory COVID-19 vaccination.  During one meeting, Mr. Dunbar asked what would happen if an employee did not receive the COVID-19 vaccination in exchange for incentives offered, to which Ms. Menton, replied, "there will be some form of punishment," or words to that effect.

43.     Then, in September 2021, Fox formally announced a policy that required "Zone A" employees to be fully vaccinated by October 18, 2021, defined as two weeks following the second dose of a two-shot regimen of Pfizer or Moderna, or two weeks after a single-dose regimen of the Johnson & Johnson vaccine.  In this notice, Defendant Fox directed employees to contact the Employee Relations department with any questions via the email "DGE.Employee.Accommodation.Requests@disney.com."  There was no information regarding how to request an accommodation in this notice.

10

---

SECOND AMENDED COMPLAINT

44.     Prior to Defendant Fox's vaccine requirement for Zone A, all cast and crew were required to be tested up to three times a week, wear masks, and social distance on set.

45.     Mr. Dunbar worked through the entire pandemic while filming on set for the "9-1-1" series.  He consistently complied with all of the required testing, masking, and social distancing requirements on set.  Mr. Dunbar has never tested positive nor had COVID-19 while working, nor while at work.

46.     Nevertheless, other actors on the "9-1-1" set became symptomatic and tested positive for SARS-CoV-2 multiple times, which required Mr. Dunbar and other exposed actors to quarantine.

**Mr. Dunbar Requests Exemption From Fox's COVID-19 Vaccine Mandate**

47.     Between 2009 and 2015, Mr. Dunbar appeared on the television series "The Game" during its initial run.  When the producers recently decided to re-start that show, "9-1-1" granted Mr. Dunbar permission on September 17, 2021, to shoot new episodes for "The Game" in Atlanta, Georgia from September 27, 2021, to October 1, 2021.  As a result, Mr. Dunbar was away from the "9-1-1" set during that time and had limited communication ability.

48.     On September 29, 2021, while Mr. Dunbar was on "The Game" set in Atlanta, an email was sent to employees, directing anyone seeking a medical or religious accommodation for the COVID-19 vaccine mandate to contact Employee Relations.

49.     In addition to his religious beliefs, Mr. Dunbar has a disability, because of which his doctors have advised that he not receive a vaccination.

50.     Between about September 29 and 30, 2021, Mr. Dunbar's agents, Sheree Cohen and Ray Moheet, contacted Stephanie Herman at Fox via phone to notify her that Mr. Dunbar would be requesting both a religious exemption and a medical exemption to the COVID-19 vaccine mandate, and that a full explanation of Mr. Dunbar's faith in

11

1  support of his request for a religious exemption would be submitted on October 3 or 4,

2  2021, as soon as Mr. Dunbar was done shooting "The Game."

3      51.   On September 30, 2021, Ms. Nguyen acknowledged via email to Sheree

4  Cohen that Mr. Dunbar would be requesting an accommodation.  Ms. Nguyen's email

5  addressed both medical and religious exemptions. Ms. Nguyen attached the "Vaccine

6  Accommodation Request Form" for Mr. Dunbar to fill out.

7      52.   After close of business on Thursday, September 30, 2021, Mr. Dunbar

8  received the form via email forwarded by Mr. Moheet.  Mr. Dunbar was on set shooting

9  "The Game" and did not have access to a printer to fill out the form but did have a

10  physician letter which he forwarded to his agents Mr. Moheet and Norm Aladjem.

11      53.   Mr. Dunbar's representatives then submitted the letter from his physician

12  stating in relevant part that Mr. Dunbar's medical history is incompatible with all forms

13  of the COVID-19 vaccine.

14      54.   On Friday, October 1, 2021, Mr. Dunbar continued shooting on set for "The

15  Game" and continued on set through the early morning hours of Saturday, October 2,

16  2021.

17      55.   The next business day, Monday, October 4, 2021, Mr. Dunbar, through his

18  agents submitted the following to Employee Relations: (1) a Statement of Religious

19  Beliefs, including a Purpose Statement, Moral Obligation and Sacrilege; (2) a personal

20  letter explaining Mr. Dunbar's religious beliefs; (3) a clergy letter from a Universal

21  Wisdom minister; (4) a letter from Dr. Charles Penick; and (5) the completed "COVID-

22  19 Vaccination Accommodation Request Form" (requesting both a medical and religious

23  accommodation and dated October 4, 2021).

24                     **Denial of Mr. Dunbar's Exemption Requests**

25      56.   On October 4, 2021, Ms. Nguyen notified Mr. Dunbar's agents, Sheree

26  Cohen and Ray Moheet, via email that Mr. Dunbar's physician letter was not sufficient

27  to support a medical exemption.  Ms. Nguyen added: "Am I understanding that

28

12

1   Rockmond is now requesting an accommodation based on his religious beliefs as well?"

2   57.   On October 4, 2021, Mr. Dunbar's agent Ray Moheet stated via email to Ms.

3   Nguyen that, "we don't agree with your assessment regarding Rockmond's medical and

4   are hereby requesting an appeal."  Mr. Moheet also forwarded a letter from Mr. Dunbar

5   in response to Ms. Nguyen's accusation that Mr. Dunbar was changing from a medical

6   to a religious exemption, stating: "My unwavering faith has and always will be the

7   cornerstone and foundation for which I seek any and all accommodation regarding my

8   employer's vaccination mandate."  Mr. Dunbar also requested that further inquiries

9   regarding his faith be conducted in writing, or if verbal communication is preferred that

10  he be accompanied by a representative of the U.S. Equal Employment Opportunity

11  Commission ("EEOC") or an attorney.

12  58.   The very next day, on October 5, 2021, Ms. Nguyen told Mr. Dunbar for the

13  first time via email that his last day working on the "9-1-1" set would be October 18,

14  2021 because, according to her, Employee Relations supposedly did not have enough

15  time to process the request for an accommodation in the nearly two weeks between this

16  email and the October 18th deadline.  In this communication, Ms. Nguyen claimed Mr.

17  Dunbar "pivoted" from a medical exemption to a religious exemption.

18  59.   In response to Ms. Nguyen's October 5th email, one of Mr. Dunbar's agents,

19  Mr. Aladjem, sent an email to Ms. Nguyen regarding Mr. Dunbar's religious

20  accommodation request, stating in part: "A sincerely held religious belief is exactly that,

21  whether anyone else shares that belief or not.  I understand that it's expedient for you to

22  pretend [Mr. Dunbar's] religious beliefs are not sincere to make your job easier, and to

23  make life easier for vaccinated people on set, but **I find your approach completely**

24  **retaliatory.  [Mr. Dunbar] has and is willing to get on the phone with you to discuss**

25  **his beliefs**, but is aware based on your approach that what you actually intend is to

26  pretend to listen to him and then pronounce his beliefs not to be sincere.  I suspect you

27  too would be hesitant to talk to someone about your beliefs in that context. " (Emphasis

28

13

added).

60.     After not hearing from Ms. Nguyen regarding his inquiries, Mr. Dunbar reached out yet again on October 12, 2021, to engage in the interactive process in good faith. Mr. Dunbar sent an email to Ms. Nguyen stating: "Erin: It's come to my attention that Disney believes that the documentation for medical and religious exceptions are insufficient and you might have some questions for me. I want to make it clear that I am available to have a discussion with you to answer any questions. If you have questions for me, please e-mail them to me ASAP."

61.     Nevertheless, Ms. Nguyen never emailed Mr. Dunbar any questions regarding his religious exemption.  Instead, that same day, Mr. Dunbar received a response email from Ms. Nguyen: "Hello Rockmond, and thank you for your email.  This is now in the hands of Disney Legal, who I understand has been in touch with your representative.  Thanks very much."  Mr. Dunbar was redirected to Ms. Menton in the Legal Department, who refused to speak to Mr. Dunbar directly and would only communicate with his prior attorney, Young Park.

62.     Despite claiming Mr. Dunbar's exemptions were being handled by the legal department and thus out of her hands, the following day, October 13, 2021, Ms. Nguyen sent Mr. Dunbar an email requesting additional information about his medical exemption request while ignoring his religious exemption request.   Ultimately, Defendants refused Mr. Dunbar's medical exemption request because they would not accept his doctor's signed letters, even after the physician made Disney's requested changes to the letter.

63.     After a Disney-affiliated physician interviewed Mr. Dunbar's physician, Defendants insisted Mr. Dunbar provide more information regarding his medical condition, but given how he was being treated, he was concerned about either leaks to the public or retaliation against him if he provided Defendants with more personal information regarding his medical condition.

64.     October 18, 2021, was Mr. Dunbar's last day shooting on set for "9-1-1."

14

65.    Even though this was Mr. Dunbar's last day on set, Defendants did not terminate his employment at this time.  To the contrary, during Mr. Dunbar's last episode, his character left Los Angeles, where the show is set, and went to Haiti on a humanitarian mission, but it was clear from a story standpoint that he could return to the show at any time.

66.    The producers of "9-1-1" told Mr. Dunbar they were very pleased with his work.  In this regard, the producer, showrunner, and creator of "9-1-1," Mr. Minear, specifically offered to make reasonable accommodations for Mr. Dunbar on set so he could remain on the show during the pandemic despite his unvaccinated status.

67.    On or about October 14, 2021, Mr. Minear informed Mr. Dunbar that Mr. Minear had spoken to "Disney legal" who pushed back on his plan to bring Mr. Dunbar's character back on "9-1-1" at the end of the season.  The representative from "Disney legal" stated that Mr. Dunbar would be terminated after episode 509 and instructed Mr. Minear not to talk to Mr. Dunbar anymore. Mr. Minear expressed concern to Mr. Dunbar that he believed if he continued to advocate for Mr. Dunbar that his job would be in jeopardy.

68.    Nevertheless, despite these threats to his employment, Mr. Minear stated in his interview published on the Decider website on January 3, 2022, that he "supported his [Mr. Dunbar's] autonomy to make decisions for himself. And I also explained that the company has a policy, and we work for a company, and there's only so much I can do. But what I did do was, I facilitated as grateful an exit as I could for him. I didn't kill him. I could have had his brain tumor come back. But we decided we would give him an elegant exit so that if this madness ever went away, it doesn't completely foreclose the possibility of him coming back."[2]

69.    Entertainment publication Daily Soap Dish reported on November 18, 2021,

_____

[2]  Ariano, Tara, '9-1-1 Lone Star' Showrunner Tim Minear Refuses To Let A Pandemic Prevent Him From Upping The Ante On Action-Packed Tragedy, Decider (January 3, 2022), *available at* https://decider.com/2022/01/03/tim-minear-911-lonestar-interview/.

15

1    that the social media response to Mr. Dunbar's "9-1-1" exit was "one of sympathy. Many

2    people felt that this decision was not justifiable, given that he did have an exemption."

3    **Racial Bias and Disparagement of Mr. Dunbar's Religious Beliefs**

4    70.    Communications by Defendants' agents regarding Mr. Dunbar's religious

5    accommodation request convey Defendants' bias against Mr. Dunbar's race and his

6    religion: Universal Wisdom.

7    71.    It has been well reported in the media that black Americans are the

8    demographic with the lowest COVID-19 vaccination rates.  In fact, the National Institutes

9    of Health has issued guidance on how to apply behavioral and social science when

10   addressing vaccine hesitancy, which states, "long-standing systemic racism and historical

11   scientific misconduct make many BIPOC [black, indigenous and people of color]

12   individuals more reluctant to trust the medical establishment and thereby accept

13   vaccines."[3]

14   72.    On information and belief, Defendants, through their agents, assumed that,

15   due to his race, Mr. Dunbar simply shared his racial community's well-known reluctance

16   to trust the medical establishment or to accept vaccines.  This racial bias caused them to

17   assume that Mr. Dunbar's accommodation requests were simply excuses to avoid

18   vaccination, rather than what they were – genuine medical reasons precluding vaccination

19   and sincerely held religious beliefs that prevented his vaccination.

20   73.    This bias is why, for example, Defendants' agents wrongly accused Mr.

21   Dunbar of "pivoting" from a medical exemption to a religious exemption, when in fact

22   he had all along made clear that he intended to seek both exemptions.  Had Defendants'

23   agents not entered with a pre-existing bias based on their general views concerning

24

[3]    https://www.obssr.od.nih.gov/sites/obssr/files/inline-files/OBSSR_VaccineWhite

25   Paper_FINAL_508.pdf;    *See also COVID Collaborative Survey: Coronavirus*

26   *Vaccination Hesitancy in the Black and Latinx Communities,* COVID Collaborative

27   (November 23, 2020), *available at*  https://www.covidcollaborative.us/content/vaccine-
     treatments/coronavirusvaccine-hesitancy-in-black-and-latinx-communities.

28

SECOND AMENDED COMPLAINT

vaccine hesitancy among the black community, they would have seen that Mr. Dunbar was not pivoting from one exemption to the other, and that, in fact, there is nothing inconsistent about Mr. Dunbar having both a sincere religious belief and a medical disability that prevented him from receiving a vaccine.

74.     Furthermore, according to the Pew Research Center, Black, non-Hispanic Americans are 69% Protestant, 19% unaffiliated, 5% Catholic, 3% other Christian and 3% non-Christian faiths.[4]   Congregation of Universal Wisdom is considered a non-Christian faith under this rubric.  Thus, as an adherent of Universal Wisdom, Mr. Dunbar belongs to a tiny minority of the overall black community.

75.     On information and belief, Defendants' agents' skepticism regarding Mr. Dunbar's religious sincerity was not due to any specific facts concerning Mr. Dunbar's personal beliefs or practices – especially because, as noted, Defendants had few if any facts reflecting a lack of sincerity when they chose to reject his accommodation request on those grounds.  Rather, Defendants' agents were skeptical of his sincerity because Mr. Dunbar's beliefs do not fit the typical mold for other black Americans.  Thus, Defendants' pre-conceived notions regarding the religious and vaccination views of black Americans wrongfully prejudiced their analysis of Mr. Dunbar's religious accommodation request, which lead directly to their pretextual determination that his beliefs were not sincerely held.

76.     These biases against Mr. Dunbar's beliefs show that Defendant Fox, through its agents, acted with the intent to discriminate, and ignored the truth regarding Mr. Dunbar's sincerely held religious beliefs, and the evidence he submitted to Defendants to establish his sincerity.

77.     The foregoing racial and religious biases are apparent in several specific incidences.  As an example, on or about October 13, 2021, Ms. Menton remarked to Mr.

---

[4] *Faith Among Black Americans,* Pew Research Center (February 16, 2021), *available at* https://www.pewresearch.org/religion/2021/02/16/religious-affiliation-and-congregations/.

SECOND AMENDED COMPLAINT

Dunbar's prior attorney, Mr. Park, that Mr. Dunbar's religion is "fake" and that Mr. Dunbar is merely an "anti-vaxxer," or words to that effect.   Ms. Menton's remarks were characteristic of the approach Defendants took in evaluating Mr. Dunbar's exemption requests.

78.   Ms. Menton made these remarks even though, at the time, she had never spoken with Mr. Dunbar regarding his religious beliefs, or to anyone else with firsthand knowledge of his beliefs, and thus she had no basis to conclude that his religion was supposedly "fake" or that he was a so called "anti-vaxxer."  Instead, Mr. Dunbar believes that her remarks were based on assumptions formed by the aforementioned racial issues along with a general bias against the Church of Universal Wisdom.  For instance, an internet search for Congregation of Universal Wisdom reveals generic accusations that the religion is a "sham religion."[5]  However, such generic accusations should have no bearing on the sincerity of Mr. Dunbar's personal religious beliefs.

79.   Overall, the process that Defendant Fox went through to evaluate Mr. Dunbar's exemption requests appeared to Mr. Dunbar to be haphazard and opaque at best. Even if Defendant Fox had a policy to conduct an interactive process to evaluate exemption requests, it was not at all evident in its treatment of or interactions with Mr. Dunbar.  It was not even clear which representative or agent of Defendant Fox was ultimately making what decisions.

80.   From what Mr. Dunbar could see, it appeared that Ms. Nguyen and/or Ms. Menton served as the judge of his exemption requests, while acting as agents of Fox. However, these agents, failed to engage in a real interactive process to acquire information regarding him and his beliefs, and acted with little, if any, input from sources directly knowledgeable about Mr. Dunbar personally.  In place of true interactive fact finding, their few interactions with Mr. Dunbar lead him to believe that they wrongfully

---

[5]   *Congregation of Universal Wisdom,* Rationalwiki, *available at* https://rationalwiki.org/wiki/Congregation_of_Universal_Wisdom#cite_note-4   (last visited April 29, 2022).

SECOND AMENDED COMPLAINT

1  based their determinations on assumptions and biases regarding his race and non-
2  traditional religious beliefs.

3  **Termination of Mr. Dunbar's Employment and Leak of Negative Information**

4      81.    On November 1, 2021, Mr. Dunbar's counsel, Siri & Glimstad LLP ("Siri
5  & Glimstad"), sent a letter to Ms. Menton addressing Mr. Dunbar's religious and medical
6  accommodation requests.  The letter described how the actions of Defendant Fox, and
7  agents thereof, were discriminatory on the basis of Mr. Dunbar's religious beliefs and his
8  race and how they had a disparate impact on Mr. Dunbar.

9      82.    Apparently in response to Siri & Glimstad's letter, on November 10, 2021,
10 Mr. Dunbar received an email from an email address labeled "DGE Employee
11 Accommodation Requests," and signed by the "Disney General Entertainment Employee
12 Relations Team."  In that email, Disney Employee Relations (apparently on behalf of Fox
13 acting as its agents) rejected Mr. Dunbar's requests for a religious and/or medical
14 exemption to their COVID-19 vaccination mandate.  Specifically, with regard to the
15 religious accommodation request, Disney stated that its Employee Relations Team had
16 "researched the source of the letter you [i.e., Mr. Dunbar] provided and we cannot accept
17 it as a basis for considering your request for an exception without discussing further with
18 you."

19     83.    However, Defendant Fox, and agents thereof, clearly never had any
20 intention of "discussing further" Mr. Dunbar's religious exemption because on that same
21 day, November 10, 2021, Mr. Dunbar received a letter from Fox terminating his entire
22 employment contract.

23     84.    Nothing in the termination letter suggested that Fox was in any way
24 displeased with his work.  Instead, the only reason provided by Defendant Fox for Mr.
25 Dunbar's termination was his failure to comply with its COVID-19 policy by
26 compromising his religious beliefs and obtaining the COVID-19 vaccination.  This
27 termination was not justified because Mr. Dunbar had requested a religious

28

19

accommodation that Defendants had wrongfully denied.  The letter went on to claim that Mr. Dunbar's actions had supposedly breached the employment agreement and as a result Defendants were "therefore released and discharged from all obligations to Lender [i.e., Mr. Dunbar's loan out company, Epiphany Entertainment] and Artist [i.e., Mr. Dunbar], including, without limitation, the obligation to pay Lender any further compensation under the Agreement."  Fox then stated that it would "only pay Lender for Player's services up to and including episode 509 of the Series."

85.    Thus, by summarily denying Mr. Dunbar's accommodation requests without even engaging in reasonable discussions as they suggested in the November 10th email, Defendant Fox, through its agents, was denying Mr. Dunbar over $1.3 million in compensation owed to him under the contract.

86.    Even assuming Fox could terminate Mr. Dunbar's contract for the reasons given, which it could not, Defendant Fox sent Mr. Dunbar this letter after episode 510 commenced filming, which entitles him to his "pay or play" compensation for that episode.  However, Ms. Menton, acting as an agent of Disney and Fox, refused to pay him this amount unless he agreed to forego this suit.

87.    Mr. Dunbar's last episode of "9-1-1," episode 509, aired on November 15, 2021.

88.    The next day, on November 16, 2021, the website Deadline published an article titled: "Rockmond Dunbar Exits '9-1-1' Over Covid Vaccine Mandate After Pursuing Medical & Religious Exemptions."

89.    Deadline gave Mr. Dunbar's agents approximately 30 minutes to provide a comment prior to publishing the article, stating that it would be published regardless of whether Mr. Dunbar provided a comment.  Even though Mr. Dunbar provided a quote for the article, that was only after finding out that it would contain leaked information regarding his exemption requests.  On information and belief, the leaked information, consisting of confidential medical information and employee personnel record

SECOND AMENDED COMPLAINT

1  information, only could have originated from representatives of Disney, ABC and/or Fox,

2  acting as agents of Defendant Fox, such as Ms. Nguyen and/or Ms. Menton.

3      90.    On information and belief, Defendants, or agents thereof, leaked this

4  information intentionally to harm Mr. Dunbar's future career in retaliation for Mr.

5  Dunbar's request for a religious accommodation and subsequent challenge of

6  Defendants' denial of same. Among other things, the Deadline article stated that sources

7  had told the author Mr. Dunbar "requested a medical exemption and later sought a

8  religious exemption." This formulation was used intentionally to imply that Mr.

9  Dunbar's exemption requests were insincere.

10     91.    Mr. Dunbar has all along maintain that he and/or his agents notified Ms.

11  Nguyen that he was seeking both medical and religious exemptions. To his knowledge,

12  it was only representatives of Defendants, such as Ms. Nguyen and Ms. Menton, that used

13  the narrative that Mr. Dunbar had first sought a medical exemption and later "pivoted" to

14  a religious exemption. Therefore, the source that Deadline relied on had to have

15  originated from within Defendants, and there are likely very few individuals within

16  Defendants who would have provided this false "pivot" narrative to Deadline.

17     92.    After Deadline published its story, similar stories about Mr. Dunbar were

18  published in numerous other publications, including Variety and Entertainment Weekly,

19  ensuring that his religious accommodation requests, and the negative light placed on them

20  by the leaks from Defendants, became well known in the entertainment industry.

21     93.    There was no reason why representatives of Disney and Fox, acting as

22  agents for Fox, needed to leak the fact that Mr. Dunbar was leaving because he was denied

23  a medical and religious accommodation or that he supposedly sought a medical

24  accommodation and only later sought a religious accommodation. If the company wanted

25  to make a statement regarding Mr. Dunbar's departure, it could have simply stated that

26  Mr. Dunbar was leaving the show and left it at that. The creator of the show left Mr.

27  Dunbar's character's exit "open" so he could return. Prior to the announcement on

28

Deadline, the online reaction by Mr. Dunbar's fans/audience to his character's departure was neutral and that it was simply a storyline. However, following the article, Mr. Dunbar began to receive death threats and harassment online.

94.    On information and belief, Defendants, and agents thereof, intentionally leaked information to Deadline the day after Mr. Dunbar's last appearance on "9-1-1" as a proverbial "shot across the bow" to discourage Mr. Dunbar from further pursuing his claims, and to signal to the entertainment industry that Mr. Dunbar should not be hired. Publicly calling him out also served to show other actors in the entertainment industry that they should not try to stand up for their religious beliefs because they too could be fired.

**Defendant Fox Admits The Wrongful Denial of Mr. Dunbar's Religious Accommodation Was Based on Blatantly Inaccurate Facts**

95.    On November 19, 2021, Paul Hastings, counsel for Fox sent a letter to Siri & Glimstad arguing that Mr. Dunbar's religious beliefs are insincere.  The letter claimed that Fox (though really other Disney subsidiaries, acting as agents for and on behalf of Fox) based its insincerity conclusion on the fact that Mr. Dunbar had previously received tattoos and ear piercings.

96.    However, the reality is that Mr. Dunbar received the body decorations Paul Hastings referred to many years before he became an adherent to Universal Wisdom.  Mr. Dunbar received his most recent tattoo approximately 20 years ago and had his ears pierced approximately 30 years ago.  Since becoming an adherent to Universal Wisdom, Mr. Dunbar has not received any new tattoos or piercings.[6]

---

[6] Paul Hastings letter relied on an article on the Essence website that they claim was published in 2020, wherein Mr. Dunbar professed that he liked getting tattoos.  However, the actual article merely stated that it was "UPDATED OCTOBER 29, 2020."  As explained in Siri & Glimstad's November 29th letter, that article was originally published in December 2009 based on an interview with Mr. Dunbar that year, a fact made plain by the content of the article as well as by the original article still being available (https://www.essence.com/news/rockmond-dunbar-changing-the-game/?amp=1).

**SECOND AMENDED COMPLAINT**

97.     Paul Hastings' November 19th letter also claimed that unnamed representatives of Mr. Dunbar had supposedly told Defendants that Mr. Dunbar's beliefs were insincere and that his wife threatened to divorce him if Mr. Dunbar received the COVID-19 vaccine.  This supposed statement was patently false and malicious.  Mr. Dunbar never made such a statement, and all of his representatives have denied ever making that statement.  Mr. Dunbar believes that Disney fabricated that statement as a means to discredit Mr. Dunbar's beliefs and to defame him.

98.     Paul Hastings' letter further stated that agents of Defendants Fox had based their determination on the fact that Mr. Dunbar had supposedly requested a medical exemption prior to seeking a religious exemption.  However, again, Defendants were wrong.  Mr. Dunbar's representatives informed Defendants that he would seek both exemptions as part of the same communication.  The fact that his paperwork for the medical exemption may have been submitted a few days before the paperwork for the religious exemption is entirely immaterial.  And, furthermore, the fact that a person seeks both exemptions has no bearing on whether either exemption is legitimate and sincere because someone can both have a medical counterindication to vaccination and a sincere religious belief against the practice as well.

99.     Lastly, Paul Hastings claimed that Mr. Dunbar "joined the Congregation of Universal Wisdom after Fox announced its mandatory vaccination policy" simply because the letter from the minister attesting to Mr. Dunbar's membership was dated in September 2021.  Had Defendants engaged with Mr. Dunbar in an interactive process, rather than simply denying the request based on assumptions and then firing him, Mr. Dunbar could have explained that he has been an adherent to Universal Wisdom since 2014.

100.   Prior to Paul Hastings' letter, none of Defendants' agents, including Paul Hastings, had ever asked Mr. Dunbar about his tattoos, his piercings, his unnamed representative's statements, his wife's supposed statements, his reasons for seeking both

1    accommodations, or the circumstances of his joining Universal Wisdom in the context of

2    his religious beliefs or his exemption requests.  Thus, their assertion that these issues

3    invalidated the sincerity of his beliefs was based entirely on the ill-informed assumptions

4    of Defendants' agents and their preformed biases.

5         101.  On November 29, 2021, Siri & Glimstad sent a letter to Paul Hastings

6    explaining how their assumptions and false statements about Mr. Dunbar were entirely

7    incorrect.  However, Defendant Fox did not change its decision in response to learning

8    the true facts surrounding the supposed reasons for denying his accommodation request,

9    which is further evidence that those reasons were merely a pre-text for discriminating

10   against Mr. Dunbar based on his race and faith.

11   **Refusal of Mr. Dunbar's Continued Attempts to Explain His Religious Beliefs**

12        102.  On December 7, 2021, representatives from Siri & Glimstad and Paul

13   Hastings met to discuss Mr. Dunbar's termination.  During that meeting, Paul Hastings

14   indicated that if Mr. Dunbar had additional information to provide regarding his religious

15   accommodation request, Defendant Fox would consider it and use it to determine whether

16   to alter their denial of that request.

17        103.  Mr. Dunbar wanted to allow Defendant Fox every opportunity to correct its

18   mistake, and therefore, on December 10, 2021, Siri & Glimstad sent a letter to Paul

19   Hastings re-explaining the nature and sincerity of Mr. Dunbar's religious beliefs, and

20   offered to respond in writing to any further inquiries Defendants, and agents thereof, may

21   have regarding those beliefs.

22        104.  Prior to the 2021 Christmas holiday, representatives from Paul Hastings

23   asked that Defendants be provided until after the New Year to respond regarding Mr.

24   Dunbar's religious accommodation request.

25        105.  Thereafter, on January 7, 2022, representatives from Paul Hastings emailed

26   Siri & Glimstad to state that Defendant Fox required no additional information because

27   they would not reconsider the denial of Mr. Dunbar's requests.

28

**Defendant Fox's Refusal to Accommodate**

106.   In both its November 19th letter and in its January 7th email, Paul Hastings stated that, even if Defendant Fox had accepted his accommodation request "there would have been no reasonable accommodations available that would have allowed him to perform the essential functions of his role while adequately protecting the health and safety of Mr. Dunbar and his colleagues."

107.   Paul Hastings' claim that Defendant Fox could not accommodate Mr. Dunbar's request are disingenuous for several reasons.  First, they made this statement only after they sought and accepted religious accommodation requests from Zone A actors like Mr. Dunbar; if they were genuinely unable to accommodate any actor's religious accommodation requests then there would have been no reason to even seek such requests.

108.   Second, the producers of "9-1-1" had told Mr. Dunbar that they wanted to keep him on the show and would be able to accommodate his needs.   During filming of his scenes for the first 9 episodes of season five of the show, all of which were filmed during 2021, the producers implemented procedures intended to protect the cast and crew (including Mr. Dunbar) from exposure to COVID-19.   On information and belief, most if not all of those same procedures have continued even after the vaccine mandate.  Despite these safety protocols, according to news reports,[7] the "9-1-1" show has continued to experience production shutdowns due to breakthrough infections, even after Defendant Fox implemented their COVID-19 mandate.   Therefore, there is no reason why those procedures could not continue in order to accommodate Mr. Dunbar and other members of the cast and crew.

109.   Furthermore, as noted, the showrunner for "9-1-1" told Mr. Dunbar in no

---

[7] "Covid Surge Reportedly Forces 'NCIS: LA' And '9-1-1' To Postpone Production," https://www.forbes.com/sites/kimberleespeakman/2022/01/05/covid-surge-reportedly-forces-ncis-la-and-9-1-1-to-postpone-production/?sh=65b8decb1f77.

25

uncertain terms that the show could accommodate Mr. Dunbar's religious beliefs and would have been able to safely continue production with Mr. Dunbar's involvement in the show.

110.   In addition, as a result of a prior SARS-CoV-2 infection (not contracted while working for "9-1-1"), Mr. Dunbar's body has generated immunity to this virus ("**natural immunity**"). This immunity is more robust and durable than the immunity from vaccination ("**vaccine immunity**"). In fact, the data and science to date leave no doubt that Mr. Dunbar's vaccinated peers are more likely to become infected with and spread the virus than Mr. Dunbar.

111.   Third, on information and belief, Defendant Fox provided accommodations to other actors on the cast of "9-1-1," none of whom are black and none of whom sought a religious based accommodation.  Mr. Dunbar understands that others associated with the show were granted vaccine related accommodations, e.g., in the form of paid time-off, for non-religious reasons while Mr. Dunbar was denied an accommodation and terminated.

**Defendants And Other Disney Subsidiaries Denied All Or Substantially All Religious Accommodation Requests**

112.   Mr. Dunbar was far from the only person for whom Disney and its subsidiaries denied a religious accommodation to its COVID-19 vaccination mandate.  In fact, on information and belief, Disney and its subsidiaries (including Defendants), all established the same or similar COVID-19 vaccination mandates, but denied all or substantially all religious exemption requests sought by employees whose religious beliefs prohibit them from receiving the COVID-19 vaccines.   Disney and its subsidiaries, like Defendants, denied these religious accommodation requests regardless of the basis for the religious belief, or the specific religious group the employee belonged to, and instead presumed the employees' beliefs are insincere.  Defendants, and the other Disney subsidiaries were therefore discriminating against a particular religious practice

26

(the religious practice of refraining from the COVID-19 vaccine for religious beliefs), by refusing to accommodate anyone who adhered to that religious practice.

113.   Mr. Dunbar was not the first person to sue Defendants regarding a denial of a religious accommodation to their COVID-19 mandate.  That distinction goes to former General Hospital soap opera actor Ingo Rademacher, who filed suit against ABC, Inc. in December 2021.[8]  Mr. Rademacher alleges that on October 11, 2021, he submitted a written request for a religious exemption to ABC's COVID-19 vaccination mandate. This was more than a week after Mr. Dunbar submitted his written request, yet Mr. Rademacher, a Caucasian, never claims that he was told there was too little time to process his request (as was the case for Mr. Dunbar).  Instead, Mr. Rademacher asserts that he was required to participate in an interview where he was subjected to a "cross-examination" by "a lawyer who works for Disney/ABC human relations" about his religious beliefs prior to a decision being made regarding his religious exemption.  On information and belief, the lawyer who interrogated Mr. Rademacher was either Ms. Nguyen or Ms. Menton.  After this interrogation, "[o]n November 5, ABC officially denied Mr. Rademacher's request for a religious exemption and terminated his contract[.]"

114.   In June 2022, James and Timothy Wahl, former behind-the-scenes employees of the General Hospital soap opera also filed suit against ABC, Inc.  They too alleged religious discrimination, retaliation and wrongful termination.[9]  Like Mr. Rademacher, but unlike Mr. Dunbar, the Wahls, who are both Caucasian, state that their religious exemption requests were denied after they too were subjected to a cross-examination "by a lawyer who works for Disney."  Again, on information and belief, the

---

[8] *See* Rad*emacher v. American Broadcasting Companies, Inc.*, Case No. 21STCV45383 (Supr. Ct. L.A. Cnty).

[9] *Wahl v. American Broadcasting Companies, Inc.*, Case No. 22STCV19481 (Supr. Ct. L.A. Cnty).

SECOND AMENDED COMPLAINT

1    lawyer referenced here was either Ms. Nguyen or Ms. Menton.

2        115.   In addition to these court actions, Mr. Dunbar has learned about numerous

3    other individuals who (like Mr. Dunbar) were denied a religious accommodation to their

4    COVID-19 vaccination mandate by Disney and its subsidiaries.  For example:

5            a.  A Caucasian production coordinator and actor on various popular

6                television shows was denied a religious exemption to the COVID-19

7                vaccine by the Employee Relations Team, Disney General Entertainment

8                and accused of having insincere religious beliefs following an interview.

9                Said individual was informed he was not eligible for work until he

10               received the COVID-19 vaccine.

11           b.  A Caucasian stunt performer requested a religious exemption, fully

12               cooperated with a two-hour interview regarding her religious beliefs,

13               provided clergy letters in support of the request, and was terminated from

14               a television show after being denied an accommodation by the Disney

15               General Entertainment Employee Relations Team.

16           c.  A black actress was terminated from a role on a television show produced

17               by Fox after requesting a religious exemption. Like Mr. Dunbar, this

18               actress was not interviewed, but was ultimately denied an

19               accommodation by Disney General Entertainment Employee Relations.

20       116.   On information and belief, Disney subsidiaries and agents, including its

21   ABC subsidiaries like the one Ms. Nguyen worked for, have previously been accused of

22   racial discrimination when working with their on-air talent.[10]  Mr. Dunbar was not only

23   subjected to direct racial animus, but also experienced disparate treatment and disparate

---

[10] *E.g.,* "To say that she's an abusive figure is an understatement': ABC News executive is put on administrative leave for 'making racist comments at black staffers' and quipping that GMA host Robin Roberts wasn't forced to 'pick cotton' when discussing a pay raise" Daily Mail.com (June 15, 2020) *available at* https://www.dailymail.co.uk/news/article-8423647/The-View-host-Sunny-Hostin-hurt-ABC-News-executives-comments-low-rent.html

SECOND AMENDED COMPLAINT

impact discrimination on the basis of his race. On information and belief, employees that are not African American, and who were similarly situated had their exemption requests treated differently than Mr. Dunbar did and/or were not subject to termination when they refused the COVID-19 vaccine. Defendants' agents relied on racial bias when informing Mr. Dunbar that his religious accommodation request was too late, refusing to meet with Mr. Dunbar to assess the sincerity of his beliefs, and as discussed above, by baselessly concluding that Mr. Dunbar's religious beliefs are not sincere.

**Discriminatory and Retaliatory Actions By Defendants and Their Agents Have Damaged Mr. Dunbar's Reputation and Caused him to Lose Millions of Dollars**

117.   As noted, because Defendants through their agents wrongfully denied Mr. Dunbar's accommodation request, they have claimed that his refusal to compromise his sincerely held religious beliefs was a breach of his employment agreement. Mr. Dunbar had a "pay-or-play" agreement whereby even if he did not appear in an episode of "9-1-1," he would still be compensated. However, based on the claim by Ms. Menton, acting as an agent for Defendant Fox, that he breached his agreement, Defendant Fox has refused to pay Mr. Dunbar the amounts guaranteed for the remaining episodes of the fifth season of "9-1-1," totaling approximately $723,800. Defendants also refused to pay Mr. Dunbar a bonus he earned, worth $352,296, and thus far have refused to make residual payments that are owed over time and could amount to between $200,000 and $300,000 or more.

118.   Beyond their wrongful claims of breach, discriminatory and retaliatory actions by Defendants, and agents thereof, have severely damaged Mr. Dunbar's professional reputation. For example, as a result of the intentional and malicious leak of confidential medical information and employee personnel record information to media outlets by representatives of Disney, ABC and/or Fox, acting as agents of Defendant Fox, Mr. Dunbar has been essentially "blacklisted" and publicly labeled a "non-complier" and "anti-vaxxer."

SECOND AMENDED COMPLAINT

119.   Prior to the actions of Defendants, despite not receiving the COVID-19 vaccine, Mr. Dunbar had a number of television and movie projects in active development during the COVID-19 pandemic.   Since the leaked information about Mr. Dunbar's accommodation requests, he has lost numerous opportunities on those projects and has had multiple actors refuse to work with him for fear of also being "blacklisted" by association with him.

120.   To date, Mr. Dunbar's agents and managers are fielding "availability checks" regarding his services.   These inquiries routinely include accolades for Mr. Dunbar's career accomplishments, but also include that Mr. Dunbar has been placed on a "do not hire" list.

121.   Representatives of Disney, ABC and Fox, acting as agents of Defendant Fox, intentionally retaliated against Mr. Dunbar by making the circumstances of his accommodation request public, and therefore, are responsible for this damage to his reputation and future career.

### Exhaustion of Administrative Remedies

122.   The U.S. Equal Employment Opportunity Commission, Los Angeles area office, issued Mr. Dunbar a notice of right to sue on January 26, 2022, in Charge No. 480-2022-02042 against the Walt Disney Company and Charge No. 480-2022-02043 against Twentieth Television. On April 25, 2022, Mr. Dunbar filed an amended Charge of Discrimination to include a violation under the Americans with Disabilities Act of 1990, to correct the name of Defendant Fox, and to add Defendant ABC as a Respondent.

### COUNT 1

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C § 2000e, *et seq.*

### Religious Discrimination Against All Defendants

123.   Mr. Dunbar hereby realleges and adopts each and every allegation in the preceding paragraphs above as if fully set forth herein.

30

124.   Title VII prohibits discrimination against employees on the basis of their religion.   42 U.S.C. § 2000e(j); 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin ....").

125.   Title VII defines the protected category of religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Moreover, as the EEOC has made clear, Title VII's protections also extend to nonreligious beliefs if related to morality, ultimate ideas about life, purpose, and death. *See* EEOC, Questions and Answers: Religious Discrimination in the Workplace (June 7, 2008), https://www.eeoc.gov/laws/guidance/questions-and-answersreligious-discrimination-workplace ("Title VII's protections also extend to those who are discriminated against or need accommodation because they profess no religious beliefs."); *Id.* ("Religious beliefs include theistic beliefs (*i.e.* those that include a belief in God) as well as non-theistic 'moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.' ").

126.   By, *inter alia*, refusing to engage in the interactive process to permit Mr. Dunbar to establish his sincere religious beliefs, by wrongfully denying him any religious accommodation or exemption to Defendant Fox's COVID-19 vaccine mandate without any justifiable reason for doing so, and then by terminating Mr. Dunbar without justification, Defendants discriminated against Mr. Dunbar based on his sincerely held religious beliefs and practices with respect to the terms, conditions, and privileges of employment.

127.   Defendants have unlawfully discriminated against Mr. Dunbar by discharging him for the exercise of his religious beliefs and practices.

128.   Mr. Dunbar has a bona fide and sincerely held religious belief and practice

31

that precludes him from obtaining any of the COVID-19 vaccines, as outlined above.

129.   Mr. Dunbar's sincerely held religious beliefs and practices conflict with Defendants' policies that require him to obtain the COVID-19 vaccine.

130.   Mr. Dunbar raised his sincerely held religious beliefs and practices with Defendants, brought his objections and request for a religious accommodation and exemption to Defendants' attention, and requested a religious exemption and accommodation from the COVID-19 vaccine mandate.

131.   Defendants' termination, denial of benefits, and other adverse employment actions against Mr. Dunbar were motivated by, and are the result of, his exercise of his sincerely held religious beliefs and practices.

132.   Defendants lacked any justification for the adverse employment actions taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

133.   The discrimination by Defendants against Mr. Dunbar was intentional and was performed with malice, willfulness, and reckless indifference to Mr. Dunbar's protected civil rights.

134.   Any justification offered by Defendants for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

135.   Representatives of ABC and Fox, acting as agents of Defendant Fox, therefore, violated Title VII, and Mr. Dunbar is entitled to the relief set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, past and future medical and counseling expenses to the extent any exist, interest, and reasonable attorneys' fees and costs of the action pursuant to 42 U.S.C. § 2000e-5(k).

136.   As a result of the intentional violation of the Title VII rights of Mr. Dunbar by Defendants, through their agents, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish, and embarrassment, as well as the

SECOND AMENDED COMPLAINT

manifestation of physical symptoms as a result of the stress, thereby entitling him to compensatory damages. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial. The events described here justify an award of punitive damages under Title VII. Mr. Dunbar is entitled to damages pursuant to 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981a.

137.   The refusal to consider or grant Mr. Dunbar's request for accommodation and exemption from the COVID-19 vaccine mandate by Defendants has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Mr. Dunbar's sincerely held religious beliefs.

138.   Mr. Dunbar has no adequate remedy at law for the continuing deprivation of his most cherished constitutional liberties and sincerely held religious beliefs.

139.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## COUNT 2

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C § 2000e, *et seq.*

### Disparate Impact on the Basis of Religion Against All Defendants

140.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-122  above as if fully set forth herein.

141.   Title VII makes it illegal for an employer to "limit, segregate, or classify his employees or applicants . . . in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's . . . religion ..." 42 U.S.C. § 2000e-2(a)(2).

142.   Furthermore, the statute provides that an unlawful employment practice based on disparate impact is established when either an employee shows that an

33

employment policy causes such a disparate impact and the employer fails to show "that the challenged practice is job related . . . and consistent with business necessity," or the employee shows there is an alternative way to serve the stated needs but the employer refuses it. 42 U.S.C. § 2000e-2(k)(1)(A).

143.   Title VII defines "religion" to include "all aspects of religious observance and **practice**, as well as belief[.]" 42 U.S.C. § 2000e(j) (emphasis added).

144.   An individual's religious practice, just like his religious belief, "is one of the protected characteristics" under Title VII and therefore "must be accommodated." *See Abercrombie & Fitch Stores, Inc.,* 135 S. Ct. 2028, 2034 (2015).

145.   EEOC guidance states that Title VII's "protections apply whether the religious beliefs or practices in question are common  or non-traditional, and regardless of whether they are recognized by any organized religion."[11] Additionally,  "[r]eligious observances or practices include, for example, attending worship services, praying, wearing religious garb or symbols, displaying religious objects, adhering to certain dietary rules, proselytizing or other forms of religious expression, and **refraining from certain activities**."[12]

146.   A neutral policy can have a disparate impact on individuals of different religions who share the same religious practice.   For example, many religions adhere to a religious practice of wearing a head covering, including Muslim women, Sikh men, Orthodox Jews and others.   Where a public transit agency had a practice to transfer anyone who wore a head covering for religious reasons, courts in New York found that this could have a disparate impact even where not all plaintiffs were members of the same religious organization.   *See, e.g., Lewis v. NYC Transit Authority*, 12 F. Supp. 3d 418, 447 (E.D.N.Y. 2014) (a reasonable juror could conclude that the defendant's neutral

---

[11]   *See* EEOC Compliance Manual, § 12-IA, *available at* https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref23.
[12]   *Id.* (Emphasis added.)

policy of transferring persons with religious objections due to its uniform policy had a disproportionately adverse effect on Muslim women and Sikh men); *Muhammad v. NYC Transit Auth.,* 52 F. Supp. 3d 468, 485-87 (E.D.N.Y. 2014) (the court found a genuine issue of material fact existed whether the defendant's headwear policy had a disparate impact on "khimar-wearing bus operators").

147.   A legal manual published by the Department of Justice[13] states that an adverse disparate impact may harm several specific groups collectively and a disparity analysis may include multiple protected groups that are aggregated, citing cases that used statistics that aggregate "Blacks" and "Hispanics". *See e.g., NYC Transit Auth. v. Beazer*, 440 U.S. 568, 584–85 (1979); *Biondo v. City of Chicago*, 382 F.3d 680, 682–83 (7th Cir. 2004); *Cox v. City of Chicago,* 868 F.2d 217, 220 (7th Cir. 1989); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 929 (2d Cir. 1988), aff'd in part, 488 U.S. 15 (1988).

148.   Similar to the religious practice of wearing a head covering, which is not confined to one particular religion or sect, members of multiple religious groups hold similar religious beliefs that conflict with the COVID-19 vaccine and observe the same religious practice of abstaining from being vaccinated.

149.   Even if facially neutral, Defendant Fox's vaccination policy as it was enforced by its agents had a disparate impact on Mr. Dunbar, and other individuals employed by Disney and its subsidiaries whose religious beliefs prohibit them from receiving the COVID-19 vaccine.  Defendants' policies and practices improperly forced them to either abandon their religious obligation or forgo employment.

150.   Mr. Dunbar is a member of a protected class (individuals who engage in the religious practice of refraining from receiving the COVID-19 vaccine based on a sincere religious belief) that was disproportionately impacted as a result of the implementation

---

[13]   *See Title VI Legal Manual,* U.S. Department of Justice (Updated February 3, 2021), *available at* https://www.justice.gov/crt/fcs/T6Manual7#D.

of the COVID-19 vaccine mandate, by and through Disney affiliates and agents (including Defendants) who took tangible employment action against Mr. Dunbar and other members of this protected class.

151.   The refusal by Defendants, to recognize and accommodate a sincere religious belief was neither required for Mr. Dunbar's job (or for the jobs of others with the same religious practice) nor consistent with business necessity.   Moreover, Defendants improperly refused Mr. Dunbar's less-restrictive but feasible options of continuing to be employed with appropriate COVID-19 mitigation precautions in place, as they had been during his work for Defendant Fox in 2021 and/or as they did for other unvaccinated employees in similar positions to Mr. Dunbar.   Likewise, on information and belief, Defendants and other Disney subsidiaries with the same COVID-19 vaccination mandate also refused less restrictive options presented by other individuals who's religious practices prohibited them from receiving the COVID-19 vaccine.

152.   As a direct and proximate result of this unlawful action under Title VII by Defendants, through their agents, Mr. Dunbar, and other similarly situated individuals who were terminated by Defendants and other Disney subsidiaries, have suffered and continue to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress, thereby entitling Mr. Dunbar to compensatory damages. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial. Mr. Dunbar has also suffered lost income and other economic and non-economic damages. Mr. Dunbar is entitled to damages, costs and attorney fees pursuant to 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981a.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

//

36

**COUNT 3**

**Violation of Title VII of the Civil Rights Act of 1964**

**42 U.S.C § 2000e,** *et seq.*

**Race Discrimination Against All Defendants**

153.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-122 122above as if fully set forth herein.

154.   According to 42 U.S.C. § 2000e-2(a)(1), "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."

155.   Defendants accommodated and/or did not terminate other actors on "9-1-1" who were similarly situated to Mr. Dunbar, but none of whom are black.

156.   On information and belief, Disney, by and through its affiliates and subsidiaries including some of Defendants, has a history of discrimination, and Mr. Dunbar was subjected to disparate treatment and disparate impact discrimination on the basis of his race, national origin, and/or color. Non-minority employees similarly situated were not subject to termination by avoiding the COVID-19 vaccine.

157.   Defendants' agents intentionally discriminated against Mr. Dunbar by, on information and belief, assuming that Mr. Dunbar shared the black community's skepticism of vaccines, applying racial bias to the review of Mr. Dunbar's religious accommodation request which led to their pretextual determination that his religious beliefs were not sincere, treating his accommodation request differently from that of other non-black employees, and falsely accusing him of transitioning from a medical exemption to a religious exemption only after Ms. Nguyen initially denied his medical exemption request.

158.   Defendants' termination, denial of benefits, and other adverse employment

37

actions against Mr. Dunbar were motivated by, and are the result of, his race, national origin and/or color.

159.   Defendants lacked any justification for the adverse employment actions taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

160.   Defendants' discrimination against Mr. Dunbar was intentional and was performed with malice, willfulness, and reckless indifference to Mr. Dunbar's protected civil rights.

161.   Any justification offered by Defendants, through their agents, for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

162.   The above-described acts of Defendants, through their agents, constitute discrimination on the basis of his race, national origin and/or color in violation of public policy and Title VII.

163.   By the aforesaid acts and conduct of Defendants, through their agents, Mr. Dunbar has been directly and legally caused to suffer actual damages, as set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, past and future medical and counseling expenses to the extent any exist, interest, and reasonable attorneys' fees and costs of the action pursuant to 42 U.S.C. § 2000e-5(k).

164.   As a result of the intentional violation of the Title VII rights of Mr. Dunbar by Defendants, through their agents, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress, thereby entitling him to compensatory damages. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial. The events described here justify an award of punitive damages under Title VII. Mr.

1   Dunbar is entitled to damages pursuant to 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981a.

2       165.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

3       WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as

4   hereinafter set forth in his prayer for relief.

### COUNT 4

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C § 2000e, *et seq.*

### Retaliation Against All Defendants

9       166.   Mr. Dunbar hereby realleges and adopts each and every allegation in

10  paragraphs 1-122 above as if fully set forth herein.

11      167.   42 U.S.C. 2000e-3(a) makes it unlawful for any person to retaliate against

12  an employee who has opposed a discriminatory practice.  Specifically, under 42 U.S.C.

13  § 2000e-3: "It shall be an unlawful employment practice for an employer to discriminate

14  against any of his employees or applicants for employment, for an employment agency...

15  because he has opposed any practice made an unlawful employment practice by this

16  subchapter, or because he has made a charge, testified, assisted, or participated in any

17  manner in an investigation, proceeding, or hearing under this subchapter."

18      168.   As described above, Defendants took adverse employment action against

19  Mr. Dunbar because he engaged in the protected activity of complaining about the

20  discrimination he suffered based on his religious beliefs, religious practices, race,

21  national origin and/or color, including wrongfully terminating his employment contract,

22  depriving him of financial compensation pursuant to the contract, and intentionally

23  harming Mr. Dunbar's reputation in the industry,  thereby intentionally interfering with

24  Mr. Dunbar's prospective economic advantage.

25      169.   The actions of Defendants, through their agents, constitute unlawful

26  retaliation in violation of Title VII.

27      170.   Defendants lacked any justification for the adverse employment actions

28

SECOND AMENDED COMPLAINT

taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

171.   The discrimination against Mr. Dunbar by Defendants was intentional and was performed with malice, willfulness, and reckless indifference to Mr. Dunbar's protected civil rights.

172.   Any justification offered by Defendants for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

173.   By the aforesaid acts and conduct of Defendants, through their agents, Mr. Dunbar has been directly and legally caused to suffer actual damages, as set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, past and future medical and counseling expenses to the extent any exist, interest, and reasonable attorneys' fees and costs of the action pursuant to 42 U.S.C. § 2000e-5(k).

174.   As a result of the intentional violation of the Title VII rights of Mr. Dunbar by Defendants, through their agents, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress, thereby entitling him to compensatory damages. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial. The events described here justify an award of punitive damages under Title VII.  Mr. Dunbar is entitled to damages pursuant to 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981a.

175.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

//

//

40

**COUNT 5**

**Violation of the California Fair Employment Housing Act**

**Cal. Gov. Code § 12900, *et seq.***

**Religious Discrimination Against All Defendants**

176.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-122 above as if fully set forth herein.

177.   At all times herein mentioned, California Government Code § 12900 *et seq.,* the Fair Employment and Housing Act ("FEHA"), was in full force and effect and was binding on Defendants, as Defendants regularly employed five (5) or more persons.

178.   Under the FEHA, Government Code section 12900 *et. seq.,* it is an unlawful employment practice for an employer because of a person's religion, religious creed, religious beliefs, religious practices, or religious observances, to refuse to hire or employ the person, to refuse to select the person for a training program leading to employment, to bar or discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment. It is unlawful under FEHA for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under FEHA, or to attempt to do so.

179.   It is unlawful, under the California Government Code section 12900 *et seq.,* for an employer to fail to take all reasonable steps necessary to prevent discrimination and harassment based on an employee's religion, or that religion's creed, beliefs, practices or observances.

180.   By, *inter alia*, refusing to engage in the interactive process to permit Mr. Dunbar to establish his sincere religious beliefs and practices, by wrongfully denying him any religious accommodation or exemption to Defendant Fox's COVID-19 vaccine mandate without any reason for doing so, and then by terminating Mr. Dunbar without justification, Defendants discriminated against Mr. Dunbar based on his sincerely held

41

religious beliefs and practices with respect to the terms, conditions, and privileges of employment.

181.   Defendant unlawfully discriminated against Mr. Dunbar by discharging him for the exercise of his religious beliefs.

182.   Mr. Dunbar has bona fide and sincerely held religious beliefs and practices that preclude him from obtaining any of the COVID-19 vaccines, as outlined above.

183.   Mr. Dunbar's sincerely held religious beliefs and practices conflict with Defendant Fox's policies that require him to obtain the COVID-19 vaccine.

184.   Mr. Dunbar raised his sincerely held religious beliefs and practices with Defendants, brought his objections and request for a religious accommodation and exemption to the attention of Defendants, and requested a religious exemption and accommodation from the COVID-19 vaccine mandate.

185.   The termination, denial of benefits, and other adverse employment actions by Defendants, through their agents, against Mr. Dunbar were motivated by, and are the result of, his exercise of his sincerely held religious beliefs and practices.

186.   Defendants lacked any justification for the adverse employment actions taken against Mr. Dunbar, and said actions were neither based on job-related rational nor consistent with business necessity.

187.   As a proximate result of the aforesaid acts of Defendants, through their agents, Mr. Dunbar has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial. Mr. Dunbar claims such amounts as damages pursuant to Civil Code § 3287 and/or § 3288 and/or any other provision of law providing for prejudgment interest.

188.   As a proximate result of the wrongful acts of Defendants, through their agents, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation,

42

1   mental anguish and embarrassment, as well as the manifestation of physical symptoms

2   as a result of the stress. Mr. Dunbar is informed and believes and thereupon alleges that

3   he will continue to experience said physical and emotional suffering for a period in the

4   future not presently ascertainable, all in an amount subject to proof at the time of trial.

5        189.   As a proximate result of the wrongful acts of Defendants, through their

6   agents, Mr. Dunbar has been forced to hire attorneys to prosecute his claims herein, and

7   has incurred and is expected to continue to incur attorneys' fees and costs in connection

8   therewith. Mr. Dunbar is entitled to recover attorneys' fees and costs under California

9   Government Code § 12965(b).

10       190.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

11       WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as

12  hereinafter set forth in his prayer for relief.

13  **COUNT 6**

14  **Violation of the California Fair Employment Housing Act**

15  **Cal. Gov. Code § 12900, *et seq.***

16  **Race Discrimination Against All Defendants**

17       191.   Mr. Dunbar hereby realleges and adopts each and every allegation in

18  paragraphs 1-122 above as if fully set forth herein.

19       192.   At all times herein mentioned, California Government Code § 12900 *et seq.,*

20  FEHA, was in full force and effect and was binding on Defendants, as Defendants

21  regularly employed five (5) or more persons.

22       193.   California Government Code § 12940(a) requires Defendants to refrain from

23  discriminating against any employee on the basis of race.

24       194.   The above said acts of Defendants, through their agents, constituted racial

25  discrimination in violation of public policy and in violation of California Government

26  Code § 12940, *et seq.*

27       195.   Among other things, Defendants' agents intentionally discriminated against

28

43

Mr. Dunbar, on information and belief, by assuming that Mr. Dunbar shared the black community's skepticism of vaccines, applying racial bias to the review of Mr. Dunbar's religious accommodation request which led to their pretextual determination that his religious beliefs were not sincere, and falsely accusing him of transitioning from a medical exemption to a religious exemption only after Ms. Nguyen initially denied his medical exemption request.

196.   As a proximate result of the aforesaid acts of Defendants, through their agents, Mr. Dunbar has suffered actual, consequential, and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial. Mr. Dunbar claims such amounts as damages pursuant to Civil Code § 3287 and/or § 3288 and/or any other provision of law providing for prejudgment interest.

197.   As a proximate result of the wrongful acts of Defendants, through their agents, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

198.   As a proximate result of the wrongful acts of Defendants, through their agents, Mr. Dunbar has been forced to hire attorneys to prosecute his claims herein, and has incurred and is expected to continue to incur attorneys' fees and costs in connection therewith. Mr. Dunbar is entitled to recover attorneys' fees and costs under California Government Code § 12965(b).

199.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

44

# COUNT 7

## Violation of the California Fair Employment Housing Act

## Cal. Gov. Code § 12900, *et seq.*

## Retaliation Against All Defendants

200.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-1222 above as if fully set forth herein.

201.   At all times herein mentioned, California Government Code § 12900 *et seq.,* FEHA, was in full force and effect and was binding on Defendants, as Defendants regularly employed five (5) or more persons.

202.   Code § 12940(h) makes it unlawful for any person to retaliate against an employee who has opposed a discriminatory practice.

203.   Defendants took adverse employment action against Mr. Dunbar because he engaged in the protected activity of complaining about the religious and race discrimination he suffered, including wrongfully terminating his employment contract, depriving him of financial compensation pursuant to the contract, and intentionally harming Mr. Dunbar's reputation in the industry, thereby intentionally interfering with Mr. Dunbar's prospective economic advantage.

204.   The actions of Defendants, through their agents, constitute unlawful retaliation in violation of Code § 12940(h).

205.   As a result of the actions of Defendants, through their agents, Mr. Dunbar has suffered, and will continue to suffer, both economic and non-economic loss, including, but not limited to: loss of wages, benefits, pension, bonus entitlements, residual payments, deferred compensation, future pecuniary losses, emotional distress, and other compensatory damages.

206.   As outlined above, Defendants purposefully and intentionally retaliated against Mr. Dunbar based upon his opposition to Defendant Fox's vaccine mandate and denial of his religious exemption request by taking adverse employment action against

him. Mr. Dunbar is entitled to recover damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary losses caused by the unlawful retaliation by Defendants.

207.   The actions by Defendants, through their agents, described above were done with malice or a reckless indifference to Mr. Dunbar's protected right to be free from retaliation for opposing unlawful employment practices. Due to the willful and malicious nature of the retaliation against Mr. Dunbar, he is entitled to an award of punitive damages in an amount sufficient to deter Defendants from engaging in retaliatory conduct in the future.

208.   As a proximate result of the wrongful acts of Defendants, through their agents, Mr. Dunbar has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress. Mr. Dunbar is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

209.   As a proximate result of the wrongful acts of Defendants, through their agents, Mr. Dunbar has been forced to hire attorneys to prosecute his claims herein, and has incurred and is expected to continue to incur attorneys' fees and costs in connection therewith. Mr. Dunbar is entitled to recover attorneys' fees and costs under California Government Code § 12965(b).

210.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

//

//

//

//

SECOND AMENDED COMPLAINT

**COUNT 8**

**Violation of Title III of the Americans with Disabilities Act of 1990**

**42 U.S.C § 12101,** *et seq.*

**Dissemination of Confidential Medical Information Against Defendant Fox**

211.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-1222 above as if fully set forth herein.

212.   42 U.S.C. § 12112(d) makes it unlawful to disseminate confidential medical information to persons with no legitimate need for the information when the information was obtained by the employer as a condition of employment.

213.   With limited exceptions, the ADA requires employers to keep confidential any medical information they learn about an employee.  Medical information includes the fact that an individual has requested or is receiving a reasonable accommodation.[14]

214.   42 U.S.C. § 12112(d)(4) applies to all employees, whether or not they are disabled under the ADA.

215.   A "disability-related inquiry" is a question that is likely to elicit information about a disability.

216.   42 U.S.C. § 12112(d) permits employers to make inquiries necessary to the reasonable accommodation process, and the confidentiality requirement ensures that the information disclosed spreads no farther than necessary to satisfy the legitimate needs of both employer and employee.

217.   Defendant Fox obtained Mr. Dunbar's medical information in the context of an employment-related inquiry.

218.   Mr. Dunbar, through his agents, requested a medical exemption by submitting a physician letter to Disney Employee Relations on or about October 4, 2021. Because Mr. Dunbar requested an accommodation to the COVID-19 vaccine mandate,

---

[14]       https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

47

Defendant Fox, and agents thereof, possessed confidential medical information, including Mr. Dunbar's request for a medical exemption, which also revealed Mr. Dunbar's vaccine status.

219.  Defendant Fox, and agents thereof, were required by the ADA to keep the fact that Mr. Dunbar requested a medical exemption, the documents submitted in support of that medical exemption, and the information contained in those documents (including but not limited to his vaccination status) confidential and store the documents separately from the regular personnel files.

220.  Defendant Fox violated the ADA by failing to keep Mr. Dunbar's medical information confidential and within the limitations necessary to fulfill the purpose of a proper employer medical inquiry.

221.  On information and belief, Defendants, through their agents, disseminated Mr. Dunbar's confidential medical information to persons with no legitimate need for the information, which resulted in the publication of Mr. Dunbar's vaccination status, and the fact that he had requested a medical exemption, in Deadline on November 16, 2021, and then in numerous other publications thereafter.

222.  By the aforesaid acts and conduct of Defendant Fox, through its agents, Mr. Dunbar has been directly and legally caused to suffer actual damages including compensatory damages, back pay, front pay, compensation for benefits, past and future medical and counseling expenses to the extent any exist, interest, and reasonable attorneys' fees and costs. As a result of the intentional violation of the ADA rights of Mr. Dunbar by Defendant Fox, and agents thereof, he suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life, thereby entitling him to compensatory damages.  Defendant Fox, and agents thereof, acted with malice or reckless indifference to Mr. Dunbar's federally protected rights, thereby entitling him to punitive damages.

223.  Mr. Dunbar is entitled to damages pursuant to 42 U.S.C. § 12117, 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981a.

48

224.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## COUNT 9

**Violation of the California Confidentiality of Medical Information Act**

**Cal. Civ. Code § 56, *et seq.***

**Dissemination of Confidential Medical Information Against Defendant Fox**

225.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-122, and paragraphs 217-222 above as if fully set forth herein.

226.   Code § 56.20 makes it unlawful for an employer to use, disclose, or knowingly permit its employees or agents to use or disclose medical information which the employer possesses pertaining to its employees without the employee having first signed an authorization permitting such use or disclosure.

227.   As established above, Defendant Fox, through its agents, unlawfully permitted disclosure of medical information (including but not limited to Mr. Dunbar's vaccination status), without obtaining Mr. Dunbar's prior specific authorization.

228.   Mr. Dunbar is entitled to damages pursuant to Cal. Civ. Code § 56.35.

229.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendant Fox as hereinafter set forth in his prayer for relief.

## COUNT 10

**Breach of Written Contract**

**Against Defendant Fox**

230.   Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-122 above as if fully set forth herein.

231.   Section II of Mr. Dunbar's Actor Agreement with Defendants, dated September 20, 2017, provides in relevant part that:

49

Player shall be paid the Episodic Compensation set forth herein below. In
... each subsequent Contract Year, Player is guaranteed, pay or play, the
following Ratio of original episodes produced but no less than the
Minimum Number.

***

the Episodic Compensation for the Third & subsequent Contract Years
shall be as set forth.

***

Except as otherwise specifically set forth herein, licensee cancellations …
shall not relieve Fox of the obligation to pay episodic compensation for the
Minimum Number of episodes indicated for any Contract Year for which
Fox exercises its option.

232.   The 2017 Memorandum of Agreement dated September 29, 2017, provides
that:

Advance payment for residuals: Other. For all other residual
purposes… the salary at which advance payment is permitted
shall be $9,000 per week or per episode.

233.   The compensation letter dated July 29, 2021, provides that:
In the event that Twentieth… to produce a sixth season of the
Series and provided that neither Lender nor Player is in material
breach or default of the terms or conditions of the Agreement,
Lender shall be entitled to a one-time bonus calculated to
"gross up" Player's Fifth Season Fee to an amount equal to

50

$100,000 for each episode for which Player was entitled to be paid.

\*\*\*

The S.6 Pick Up Bonus shall be paid promptly upon Twentieth's acceptance of the order but no later than commencement of production of a sixth season of the Series.

234.   As alleged herein, Mr. Dunbar requested a religious exemption from Defendant Fox's COVID-19 vaccine mandate so that he could continue to perform pursuant to the terms of his employment contract and intended to and was capable of finishing his commitment for season 5 and then continue on to season 6 of "9-1-1."

235.   Mr. Dunbar was prepared to, and was able to, complete the terms of his employment contract, but Defendant Fox, through its agents, refused to engage in the interactive process with Mr. Dunbar and wrongfully denied his request for a medical or religious exemption, thereby preventing Mr. Dunbar from continuing to perform pursuant to the terms of the employment contract.

236.   The actions of Defendant Fox, through its agents, to deny Mr. Dunbar a religious exemption and his subsequent termination constitute a breach of the employment agreements on the part of Defendant Fox.

237.   This breach of contract has caused, and is continuing to cause, Mr. Dunbar to incur damage, loss, and harm, in an amount to be determined according to proof at the time of trial.

238.   The wrongful conduct for the breach of obligation arising from contract by Defendant Fox, entitles Mr. Dunbar to an award of damages pursuant to, *inter alia,* Cal. Civ. Code § 3300.

239.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

51

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendant Fox as hereinafter set forth in his prayer for relief.

## COUNT 11

### Breach of Implied Covenant of Good Faith and Fair Dealing

### Against Defendant Fox

240. Mr. Dunbar hereby realleges and adopts each and every allegation in paragraphs 1-122 above as if fully set forth herein.

241. Defendant Fox, through its agents, subjected Mr. Dunbar to racial and religious discrimination through, *inter alia*, treating him differently from other non-black cast members, the process of wrongfully denying him a religious accommodation based on assumptions and pre-established biases, such as groundlessly accusing him of fabricating his religious beliefs, unnecessarily and wrongfully terminating his employment contract, and retaliating against him for asserting his civil rights by wrongfully terminating his employment contract and leaking confidential medical information and the contents of his employee personnel file to Deadline.

242. The conduct alleged herein constituted a breach of the implied covenant of good faith and fair dealing as applied to Mr. Dunbar by Defendant Fox, through its agents, as it frustrated Mr. Dunbar's ability to obtain the benefits expressly granted by his employment contract with Defendant Fox.

243. The foregoing breach of the covenant of good faith and fair dealing has caused, and is continuing to cause, Mr. Dunbar to incur damage, loss, and harm, in an amount to be determined according to proof at the time of trial.

244. But for Defendant Fox's breach of the implied covenant of good faith and fair dealing, through its agents, which frustrated Mr. Dunbar's ability to perform the terms of his employment contract, Mr. Dunbar would continue to adhere to the terms of his employment contract with Defendants.

245. Defendant Fox's wrongful conduct for the breach of obligation arising from

52

contract, entitles Mr. Dunbar to an award of damages pursuant to, *inter alia*, Cal. Civ. Code § 3300.

246.   Mr. Dunbar is entitled to other such relief as this court deems appropriate.

WHEREFORE, Mr. Dunbar respectfully prays for relief against Defendant Fox as hereinafter set forth in his prayer for relief.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Mr. Dunbar respectfully requests that this Court enter judgment in favor of Mr. Dunbar and against Defendants and:

a. Order Defendants to make Mr. Dunbar whole by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and front pay, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices.

b. Order Defendants to make Mr. Dunbar whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above in an amount to be determined at trial.

c. Order Defendants to make Mr. Dunbar whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation and loss of civil rights, in an amount to be determined at trial.

d. Order Defendants to pay Mr. Dunbar punitive damages for the malicious and reckless conduct described above, in an amount to be determined at trial.

e. Order Defendants to designate Mr. Dunbar as eligible for rehire by Defendants.

f. Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, successors, and assigns, and all persons in active

53

concert or participation with them, from discriminating against applicants and current or future employees based on their religious beliefs and practices and/or their refusal to violate their religious beliefs and practices, including but not limited to in their current and future employee vaccination policies.

g. Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, successors and assigns and all persons in active concert or participation with them, from discriminating against applicants and current or future employees based on race, national origin and/or color, including but not limited to in their current and future employee vaccination policies and adverse employment actions.

h. Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, successors and assigns and all persons in active concert or participation with them from retaliating against applicants and current or future employees based on their opposition to any conduct made unlawful by Title VII and/or Code § 12940(h), including but not limited to, intentionally and/or recklessly leaking confidential information of applicants and current or future employees to the press, and as part of their current and future employee vaccination policies.

i. Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, including but not limited to effective policies prohibiting religious discrimination and allowing for appropriate religious accommodation as part of their current and future employee vaccination policies, all of which eradicate the effects of Defendants' past and present unlawful employment practices.

j. Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, including but not limited to effective policies prohibiting race discrimination and

54

allowing for appropriate accommodation as part of their current and future employee vaccination policies, all of which eradicate the effects of Defendants' past and present unlawful employment practices.

k.  Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, including effective policies prohibiting retaliation, including but not limited to as part of their current and future employee vaccination policies, all of which eradicate the effects of Defendants' past and present unlawful practices.

l.  Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, including but not limited to effective policies prohibiting disability discrimination and ensuring the proper recordkeeping and confidentiality requirements of employee medical information obtained pursuant to a job-related function, all of which eradicate the effects of Defendants' past and present unlawful employment practices.

m. Grant such further relief as the Court deems necessary and proper in the public interest.

n.  Award attorneys' fees and costs of this action.

o.  Any such other relief as the court may deem appropriate.

Plaintiff hereby demands trial by jury as to all triable claims.

Dated: August 15, 2022        **SIRI & GLIMSTAD LLP**

By:  _/s/ Mason Barney_____

Mason Barney (*Pro Hac Vice*)
Elizabeth Brehm (*Pro Hac Vice*)
Ursula Smith (*Pro Hac Vice)*

**PRECEPT GROUP, LLP**
Christopher Wren Czaplak

Attorneys for Plaintiff
ROCKMOND DUNBAR

56