**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROCKMOND DUNBAR,<br>Plaintiff,<br>v.<br>TWENTIETH CENTURY FOX TELEVISION,<br>Defendant. | Case No. CV 22-1075-DMG (JCx)<br><br>**ORDER RE PLAINTIFF'S RULE 59 MOTION [304]** |

Plaintiff Rockmond Dunbar, formerly an actor on the television show "9-1-1," brought a claim for failure to accommodate under Title VII of the Civil Rights Act of 1964 against Defendant Twentieth Century Fox Television ("20th"). His claim arises out of 20th's decision to write his character off the show during the COVID-19 pandemic. Following a four-day trial, a jury returned a defense verdict on the claim. Dunbar now brings a motion pursuant to Federal Rule of Civil Procedure 59, seeking both a new trial and to amend the summary judgment order in this action. Mtn. [Doc. # 304]. For the reasons set forth in this Order, his motion is **DENIED**.

# I.
# TRIAL

## A. Evidence about the Vaccine Requirement

Dunbar played a regular character on "9-1-1." Day 1 Tr. at 73.[1] His work for 20th required him to comply with its reasonable directions, practices, and policies. Day 2 Tr. at 80.

During the COVID-19 pandemic, 20th entered into a July 2021 Return to Work Agreement, negotiated with its labor unions, which required vaccinations for all Zone A actors (generally as those who were on set). Day 2 Tr. at 80; Day 3 Tr. at 87; Agreement [Doc. # 314-7]. 20th circulated a memorandum regarding the Vaccine Requirement, which stated that in order to comply with the Requirement and return to work in person, Zone A personnel had to receive an accommodation or be fully vaccinated by October 18, 2021. This meant receiving the second dose of either the Pfizer or Moderna vaccine or a single dose of the Johnson & Johnson vaccine by October 4, 2021. [Doc. ## 314-8, 314-9.] 20th sent emails on September 7 and 14, 2021 regarding the Memorandum to Dunbar and others.[2] *See* Day 3 Tr. at 161; Doc. # 314-8 at 2; Doc. # 314-9 at 2.

## B. Dunbar's Exemption Request

Dunbar, who stated he had been a member of the "Congregation of Universal Wisdom"[3] since 2014, testified that he believed taking the COVID-19 vaccine was "sacrilege," requiring him to put "aborted fetal cells" and "disease" into his body, in

---

[1] Citations to the Trial Transcript refer to the following: Day 1 Tr., Doc. # 314-3; Day 2 Tr., Doc. # 314-5; Day 3 Tr., Doc. # 314-6; Day 4 Tr., Doc. # 314-16. Citations to the record are to the CM/ECF pagination.

[2] Dunbar claimed not to have received the September 7, 2021 email, as it was sent to an email address he no longer used. Day 2 Tr. at 85.

[3] The Congregation is a religion founded by a chiropractor, whose adherents believe "you keep the spine aligned so you can get your signal from God" and "the spine is the antennae to God." Day 2 Tr. at 27, 36, 38.

violation of his religious beliefs. Day 2 Tr. at 23, 27, 36, 38. According to Dunbar's Congregation enrollment certificate, the tenets of the religion included that—

> [n]o member of the Congregation shall have applied, injected, ingested, or infused into the body any foreign materials of unhealthy or unnatural composition. . . . No member of the Congregation shall have surgical Instruments cutting or piercing the tissues of the body.

[Doc. # 314-10 at 3.]

Dunbar admitted that he interpreted the tenets differently from the Congregation. At the time of trial, the tenets as he interpreted them were the following: "not to put disease or . . . anything of death that derives from aborted fetal cells into our body"; to not have "surgery unless it's life threatening"; to "keep[] the spine aligned"; and to "respect[] all God's creation." Day 2 Tr. at 32–33. Thus, while Dunbar acknowledged a laundry list of medications and injections he took and surgeries that he underwent, he testified that he did not view these actions as inconsistent with the tenets as he understood them. For instance, he took "Albuterol," "inhalers," "steroid shots," "Prednisone," and "testosterone," but he stated those medications "do not have disease in them" and had to be taken "to actually keep my lungs open." *Id.* at 33, 41.

Regarding the timeline of events, Dunbar testified that he learned the vaccine mandate was going to happen in mid-September 2021. *Id.* at 45. Dunbar formally applied to become a member of the Congregation on September 10. *Id.* at 22.

Dunbar requested a medical accommodation on September 30, 2021. *Id.* at 92. 20th's director of employee relations, Erin Nguyen, reviewed the request and informed Dunbar it was inadequate. Day 3 Tr. at 68, 90.

Dunbar's request for accommodation then morphed into a request for a religious accommodation when his agent submitted such a request on October 4, 2021. Day 2 Tr. at 47; Doc. # 314-10 at 4–5. According to one of his representatives, although they were aware of the vaccination requirement, by this point they did not believe there was any urgency in turning in the paperwork. Day 3 Tr. at 29. Dunbar's request for accommodation included his certification of enrollment in the Congregation. [Doc. # 314-10 at 3.]

On October 5, 2021, Nguyen responded to Dunbar's team's emails, stating the request for medical accommodation was inadequate and that, with respect to the religious accommodation, Dunbar had indicated an unwillingness to speak with her about his beliefs[4] as part of the interactive process. Doc. # 314-11 at 4. She therefore denied his medical and religious requests. Day 3 Tr. at 96–98. Nguyen's October 5 email stated that Dunbar would be unable to continue on "9-1-1" after October 13, 2021. *Id.* at 4. His contract was terminated on November 10, 2021. *Id.* at 10.

## II.

## LEGAL STANDARD

Rule 59(a) permits a district court to grant a new trial but "does not specify the grounds on which a motion for a new trial may be granted." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)) (quotation marks omitted). Therefore, the court is bound by historically recognized grounds, including "claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Id.* (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)) (internal quotation marks omitted). A new trial may be granted "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Id.* (quoting *Passantino v. Johnson &*

[4] This was a reference to a statement from Dunbar sent to her the day before via email, in which he stated, *inter alia*, "I have submitted all necessary and requested information in writing pertaining to my faith to my employer . . . therefore I am uncertain of what line of discussions can be had without putting my religion under judgment/debate by parties/entities who[] do not have the authority legally or morally to do so." [Doc. # 314-11 at 6.] Enclosing the certification of enrollment referred to above, which he referred to as a "signed document from" his minister, Dunbar also asserted that he "would think that any further questions that may have arisen are now answered." *Id.* Although Dunbar contested Nguyen's interpretation of his written statements as a lack of willingness to meaningfully engage in the interactive process, the jury could reasonably have construed it in that way. *See* Day 3 Tr. at 101, 131

*Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)) (quotation marks omitted).

The standard for a Rule 59 motion for a new trial gives a district court greater leeway to grant the motion than under Rule 50. The Court "is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).

## III.

## DISCUSSION

### A. The Verdict Is Not Against the Weight of the Evidence

The Court begins by addressing Dunbar's argument that there was "no basis for the jury to conclude [he] was lying about his religious objection to vaccination." Mtn. at 13. Dunbar fails to show that the jury's verdict went against the clear weight of the evidence.

At trial, the jury was instructed as to the following elements, each of which Dunbar had to prove to prevail on his failure-to-accommodate claim:

> 1. That Plaintiff has a sincerely held religious belief,
> 2. That Plaintiff informed his employer of his religious belief and that it was in conflict with his responsibilities as an employee;
> 3. That Plaintiff was terminated for failing to comply with the conflicting employment requirement.

[Doc. # 290 at 28.] 20th presented ample evidence for the jury to question the sincerity of Dunbar's religious belief, which is enough to support a defense verdict.

Principally, there was evidence of a multitude of ways in which Dunbar's interpretation and practice of the tenets of his religion were inconsistent with the Congregation's tenets. Dunbar testified as to a long list of medications and medical procedures that he had taken or undergone, including a vasectomy, twice weekly synthetic testosterone injections as well as steroidal epidural injections and injections for spinal stenosis, fluoroscopic imaging, and taking the medications albuterol, alprazolam, amlodipine, anastrozole, fentanyl, and Viagra. Day 2 Tr. at 162–73. But the certification

of enrollment that he relied on with his religious accommodation request indicated that the tenets prevented injection and ingestion of "any foreign materials of unhealthy or unnatural composition" as well as "surgical [i]nstruments cutting or piercing the tissues of the body." [Doc. # 314-10 at 3.] Dunbar provided the certification with his own statement that it represented the tenets of his faith, which was the "cornerstone and foundation" of the request for accommodation. [*See* Doc. # 314-11 at 5.]

Dunbar attempted to reconcile these discrepancies, testifying that he acknowledged that his practice was not perfect. Day 2 Tr. at 41. He further testified, "I have been trying to exclude the middleman for quite some time. And I do believe that everyone has the right to pray and hear God speak to them directly. It should not have to come through man."[5] Day 2 Tr. at 38. Yet, the leader of the Congregation, Walter Schilling, whose video deposition testimony was played at trial, confirmed that Dunbar's medications and injections would be violations of the Congregation's tenets. [*See* Doc. # 205-1 at 27, 30.][6] Schilling also conceded that Congregation members are not excused from its tenets just because they claim that direct communications from God gave them permission to do so. *Id.* at 30. He stated that it was a requirement of membership that members follow all tenets to the best of their ability, although he acknowledged that "[n]o religion has perfect attendance to the tenets." Day 4 Tr. at 63.

While an adherent's practice need not be perfect, this evidence supports the jury's reasonable inference that Dunbar's religious belief was not sincere. Indeed, as set forth in his second amended complaint, which was admitted as evidence at trial, Dunbar represented that pursuant to his religion, he believed "he is obligated to avoid non-

---

[5] The jury also heard evidence from Defendant's medical expert that contrary to Dunbar's claim, the COVID-19 vaccines do not carry any "live disease" or contain aborted fetal cells. Day 4 Tr. at 47. The expert characterized the claim—which Dunbar endorsed—that doctors found disease in the Pfizer vaccine as "[h]ogwash"—a "ridiculous concept." Day 4 Tr. at 47–48.

[6] This is a citation to Schilling's deposition transcript, not the trial transcript, because the trial transcript does not reflect the video deposition excerpts played at trial.

emergency and non-lifesaving medical intervention that intentionally introduces disease, medication, chemicals or other foreign matter or substance unharmonious to the laws of nature into the body." [*See* Doc. # 49 at 2.] At trial, however, challenged by defense counsel with the extensive list of medications and injections he took, Dunbar gave a different account of the tenets to which he subscribed. The jury was entitled to conclude that Dunbar's shifting description of his religious tenets undermined his credibility. *See* Jury Instruction 27 ("The employee's sincerity in holding a religious belief is largely a matter of individual credibility. Factors that—either alone or in combination—might undermine an employee's credibility include: whether the employee has acted in a manner inconsistent with the professed belief (although employees need not be scrupulous in their observance); . . . whether the timing of the request renders it suspect (for example, it follows an earlier request by the employee for the same benefit for secular reasons); and whether the employer otherwise has reason to believe the accommodation is not sought for religious reasons.") [Doc. # 290 at 32].

In addition to evidence of the fluid nature of his beliefs, there was also evidence about statements made by Dunbar himself in which he endorsed motivations other than his religious belief for asking for an accommodation. Dunbar's friend and colleague, Timothy Minear, among others, testified that Dunbar had told him that Dunbar's wife would leave him if he took the vaccine. Day 1 Tr. at 96. Similarly, there was evidence presented at trial from other Dunbar affiliates (his agent and his prior attorney) that the vaccine issue appeared to be a "marital dispute" that put Dunbar in the difficult position of choosing between his livelihood and his wife's antipathy towards the vaccine. Day 3 Tr. at 141, 192. The jury also saw an email Dunbar sent to another actor about "looking for a safe way around" getting vaccinated on September 14, 2021, the same day one of the memos about the vaccine requirement was sent. Day 2 Tr. at 71. Finally, Dunbar himself requested a religious accommodation only after Nguyen informed him the documentation for his medical accommodation request was inadequate, supporting 20th's contention that his motivation was secular, not religious. *See id.* at 108.

20th also highlighted other discrepancies that called Dunbar's credibility into question. In addition to his shifting description of his beliefs, Dunbar testified that he first heard about the vaccine mandate in mid-September, but his doctor's note was dated September 2 and Dunbar physically saw his doctor to obtain this note. Day 2 Tr. at 71, 83.

The evidence well supports the jury's verdict, given the spectrum of credibility findings that had to accompany its ultimate conclusion that Dunbar had not met his burden of proving that he had a sincerely held religious belief with respect to avoiding vaccination and that his aversion to the COVID-19 vaccine was grounded in religious, not secular, reasons. The record does not support a conclusion that the verdict was based on improper reasons, such as "health and safety concerns."[7] Mtn. at 15.

Dunbar submitted as supplemental authority the following cases: *Weiss v. Permanente Med. Grp.*, 182 F.4th 1139 (9th Cir. 2026); *Kincannon v. United Airlines, Inc.*, 168 F.4th 713 (5th Cir. 2026) (affirming ruling on class certification motion); *Nadler v. Trihealth, Inc.*, 826 F. Supp. 3d 943 (S.D. Ohio 2026) (no dispute of fact on summary judgment that plaintiff had a sincerely held religious belief); Doc. ## 318–20.

None of these decisions support granting the Motion. The only binding, relevant case is *Weiss*, which concerns whether an employee provided adequate notice to her employer of her religious belief. This case does not present the issue addressed in *Weiss*, which was a case about the adequacy of pleading a *prima facie* case of failure to accommodate religious beliefs. *See* 182 F.4th at 1145–46. Having gone to trial, this case advanced far beyond the pleading stage.

[7] The Court has reviewed the closing argument and does not find that 20th's counsel improperly vouched for any witness's credibility or otherwise made improper arguments appealing to passion and prejudice, contrary to Dunbar's argument. To the extent 20th implied in passing that Sheree Cohen, Dunbar's agent, would have testified adversely to Dunbar, had she been called as a witness, the Court does not find any error that would justify the granting of a Rule 59(a) motion. Counsel did not object to this statement, and the jury was properly instructed that the arguments of counsel are not evidence and that they were to decide the case solely based on the evidence at trial. *See Kaiser Steel Corp. v. Frank Coluccio Const. Co.*, 785 F.2d 656, 658 (9th Cir. 1986); Doc. # 290 at 8.

**B. Summary Judgment Ruling**

Dunbar alternatively requests the Court "correct a clear error" in its summary judgment ruling with respect to his breach of contract claim. Mtn. at 7. He argues the trial evidence "revealed" that the showrunner, Tim Minear, had excused him from his duty to appear in "9-1-1" by writing him out of the second half of season 5. *Id.* at 16. Therefore, he asserts, a jury could find he was excused from performance for the remainder of season 5 and did not breach his obligations under his contract, so that his breach of contract claim should have survived summary judgment. *Id.*

Under Rule 59(e), a court may alter, amend, or reconsider its previous judgment, including a grant of summary judgment. Fed. R. Civ. P. 59(e). Relief under Rule 59(e) is appropriate when the Court: "(1) is presented with newly discovered evidence; (2) committed clear error or the initial decision was manifestly unjust; or (3) if there is an intervening change in the controlling law." *In re Syncor ERISA Litigation*, 516 F.3d 1095, 1100 (9th Cir. 2008) (citation omitted). Dunbar argues that the exception for error and injustice applies. Mtn. at 15.

Dunbar fails to show that the Court made any error or issued an unjust order when it granted summary judgment in 20th's favor on the breach of contract claim. Rule 59(e) is not intended to provide litigants with a "second bite at the apple." *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001). Instead, reconsideration of a final judgment under Rule 59(e) is an "extraordinary remedy, to be used sparingly in the interest of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003).

First, because Dunbar relies on what the evidence "revealed" after the summary judgment motion, his motion appears to be a disguised motion under Rule 59(e) on the basis of newly discovered evidence. Such a motion cannot be brought on the basis of newly discovered evidence that could reasonably have been raised earlier in the litigation. *See McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999). But evidence that Minear wrote Dunbar off season 5 and it was not necessary that his character appear in subsequent

episodes was hardly new at trial or unavailable at the time of summary judgment. Minear was deposed as part of the proceedings in this action and, indeed, his text messages *to Dunbar* in October 2021 were part of the evidence in this trial. *See* Day 1 Tr. at 86. These messages included Minear's statement to Dunbar that Minear did not intend to write Dunbar off the show and intended to ensure that Dunbar's character could return to the show. *Id.* at 86–89.

Setting this procedural issue aside, however, the Court is not persuaded Dunbar has shown any error or injustice, let alone a "clear" error or "manifest" injustice. In his Opposition to the MSJ, Dunbar argued (1) he was a third-party beneficiary of the contract for his performance and (2) the Vaccine Mandate was not a reasonable policy, so he was not obliged to comply. Opp. to MSJ at 28–29 [Doc. # 100]. The argument he was "excused from performance" does not appear in that Opposition. The Court did not err by omitting consideration of an argument Dunbar did not clearly raise and therefore waived.

Dunbar's argument fails on the merits as well. Minear testified that Dunbar was paid for, but did not necessarily appear, in every episode of the show and, as noted above, that Dunbar's character had been written off in a way that allowed for the character's return. Day 1 Tr. at 73, 83, 88. Dunbar's focus on this testimony ignores that Menton, Disney's Deputy Chief Counsel, testified that there was a different reason Dunbar could not simply be paid out for Season Five without complying with the Vaccine Requirement. Day 3 Tr. at 162, 172. Regardless of whether the Player Agreement allowed him to be written out and still paid, Menton testified that collective bargaining agreements with respect to contracted, unionized actors did not allow for actors to be *paid* if they were not eligible to work. [*See also* Doc. # 314-4 at 8 (the Player Agreement, stating it is governed by the SAG-AFTRA collective bargaining agreement).] Indeed, even in the context of the summary judgment motion, Minear testified that the decision whether to grant Dunbar's request for accommodation was not up to him. [Doc. # 99-11 at 8.]

## IV.
## CONCLUSION

In light of the foregoing, Dunbar's Rule 59(a)(1) Motion for a new trial and to amend the summary judgment order is respectfully **DENIED**.

**IT IS SO ORDERED.**

DATED: September 25, 2026

DOLLY M. GEE
CHIEF U.S. DISTRICT JUDGE